**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLEY CAT ALLIES INCORPORATED<br>7920 Norfolk Avenue<br>Suite 600<br>Bethesda, MD 20814-2525,<br><br>SAVE-A-GATO, INC.<br>21 Caleta de las Monjas<br>San Juan, PR 00901-1575<br><br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES NATIONAL PARK<br>SERVICE, an agency of the U.S.<br>Department of the Interior,<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>JESSICA BOWRON, in her capacity as<br>Comptroller and Acting Director of the U.S.<br>National Park Service,<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>DARRELL ECHOLS, in his capacity as the<br>Acting Regional Director of the South<br>Atlantic-Gulf region of the U.S. National<br>Park Service,<br>100 Alabama Street, S.W.<br>1924 Building<br>Atlanta, GA 30303,<br><br>DOUG BURGUM, in his capacity as U.S.<br>Secretary of the Interior,<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>MYRNA PALFREY, in her capacity as<br>Superintendent of the San Juan National<br>Historic Site | No.<br><br>**COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF** |

501 Norzagaray Street
San Juan, PR 00901,

UNITED STATES ARMY CORPS OF
ENGINEERS,
701 San Marco Blvd,
Jacksonville, FL 32207,

COLONEL BRANDON L.
BOWMAN, District Commander, Army
Corps of Engineers, Jacksonville Office,
in his official capacity,
701 San Marco Blvd,
Jacksonville, FL 32207

                              Defendants.

## INTRODUCTION

1.      This lawsuit is brought by Alley Cat Allies Incorporated ("ACA")—a global non-profit organization whose mission is to protect and improve cats' lives through advocacy, education, and action, and whose mission also includes advocating for the adoption and support of Trap-Neuter-Return ("TNR"), of which ACA is a pioneer, as the only humane and effective approach to community cats i.e. unowned cats who live outdoors—and Save-A-Gato, Inc. ("SAG")—a San Juan, Puerto Rico, non-profit organization whose mission is to provide for the health and well-being of San Juan's cats through the administration of a TNR program—in order to prevent the unlawful, misguided, and cruel starvation and death of countless cats in Puerto Rico due to the actions of the National Park Service ("NPS") and United States Army Corps of Engineers ("Corps").

2.      Cats have lived in Puerto Rico for centuries and are a recognized and treasured part of its historic culture and contemporary community. These community cats[1] live throughout Old

---

[1] NPS' administrative materials refer to the community cats in the Paseo as "free-ranging" cats. The two terms are used interchangeably in this Complaint.

San Juan, including in and around the Paseo Del Morro National Recreational Trail (the "Paseo") at the San Juan National Historic Site (the "Park").

3.    Community cats have lived in the area that is now the Paseo long before the Paseo was constructed, and the cats are beloved by residents and tourists alike.

4.    For almost two decades, from 2005 to 2023, NPS partnered with one of ACA's Feral Friend Network organizations, Plaintiff SAG, via Memorandum of Understandings ("MOUs") to manage and protect the health, welfare, and population of the community cats in the Paseo through a TNR program, whereby cats are trapped, spayed or neutered, eartipped, vaccinated, given veterinary care, and returned to the Park. This program has improved the cats' lives and allowed them to thrive in their natural outdoor home in a community that cares about them, while also stabilizing the population of community cats via sterilization.

5.    An important and necessary component of the MOUs and the TNR program is that SAG is provided unlimited access to the Paseo by NPS so that SAG can maintain feeding stations along the Paseo that are critical to the health and safety of the community cats. SAG must access the Paseo on a daily basis to maintain these necessary feeding stations, ensure there is clean water and food, assess the need for medical care for the community cats, and carry out TNR successfully.

6.    In 2023, NPS reversed course on the TNR program and partnership with SAG, announcing a 2023 Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") (collectively, the "2023 Plan") that would end the TNR program at the Paseo and result in the removal of all community cats from the Paseo.

7.    The 2023 Plan was selected by NPS despite almost unanimous opposition from the public.

8.      ACA and SAG challenged NPS' 2023 Plan in separate, but related, actions. *See Alley Cat Allies, Inc. v. United States Natl Park Serv.*, 1-24-cv-876 (Lead Case, Consolidated with *Save-a-Gato v. United States Natl Park Serv.*, 25-cv-1873) (D.D.C.) (the "Related Litigation").[2] In the Related Litigation, ACA and SAG argue that the 2023 Plan violated the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and that NPS lacks jurisdiction over the Paseo.

9.      In the Related Litigation, ACA and SAG agreed to withdraw their motions for a preliminary injunction and temporary restraining order in exchange for NPS' commitment to provide a 30-day notice prior to authorizing removal of any of the community cats on the Paseo under the 2023 Plan.  *Id.* at ECF No. 23.  Summary Judgment briefing has not yet concluded at this time, due to an error in NPS' originally certified administrative record and the recent government shutdown.

10.      As of the filing of this action, NPS has not provided notice to Plaintiffs ACA and SAG of the intent to authorize removal of any of the community cats on the Paseo under the 2023 Plan.  In fact, NPS has indicated in the Related Litigation that it will not authorize the removal of community cats at the Paseo prior to May 15, 2026.  *Alley Cat Allies, Inc.*, 1-24-cv-876, at ECF No. 64, ¶¶ 5-6.

11.      The 2023 Plan specifically states that the *gradual* removal of community cats is the first step in implementing NPS' preferred alternative.  Only *after* cats have *gradually* been removed from a specific stretch of the Paseo would an animal welfare organization then be

---

[2] While this complaint terms the separate litigation as "Related Litigation", Plaintiffs do not believe that the identified Related Litigation meets this District's definition of a "related case" under LCvR. 40.5.

4

permitted to remove the feeding stations used by ACA and SAG to provide care to the community cats.

12.     Despite the clear requirements of the 2023 Plan and NPS' selected preferred alternative, and NPS' indication it would not authorize removal of the community cats prior to May 15, 2026, NPS recently informed ACA and SAG that it intends to close, as early as December 15, 2025, a significant portion of the Paseo from all access to ACA and SAG for a restoration and construction project that would stabilize the slope at the San Fernando Bastion (the "Cliff Project"). NPS has informed ACA and SAG that this closure could last as long as 18 months.

13.     The Cliff Project and planned closure of the Paseo would cut off ACA and SAG's access to three existing feeding stations along the Paseo, of which there are only currently six.

14.     As a preliminary matter, NPS and the Corps lack jurisdiction over the Paseo because the Paseo (and the associated designated National Recreation Trail that overlaps the Paseo) is outside of the Park boundaries, and NPS and the Corps lacks authority to administer lands outside of the Park boundaries. As such, the closure of the Paseo by NPS and the Corps is *ultra vires*, and should be deemed unlawful by this Court.

15.     NPS claims that the plan is unrelated to the 2023 Plan, relying on a single NEPA document for the Cliff Project dating to July 12, 2018: a Categorical Exclusion determination predating the 2023 Plan. **Exhibit 1**, Categorical Exclusion Determination (July 12, 2018) ("2018 CE Determination").

16.     The Cliff Project and closure of the Paseo will directly violate the 2023 Plan, which determined it was necessary to gradually capture the community cats in the vicinity of each feeding station, and remove feeding stations along the Paseo only after all community cats in a given area had been removed. The Cliff Project will instead immediately prohibit access to most of the

feeding stations necessary to the continuation of ACA's and SAG's administration of the TNR Program. The closure will also imperil the survival and well-being of the community cats, causing them direct harm, suffering, and an immediate threat to their survival; outcomes far worse than those posed by the 2023 Plan, which was itself overwhelmingly opposed by the public.

17.    The 2018 CE Determination for the Cliff Project also violated NEPA when it was made, as it incorrectly concluded that no extraordinary circumstances existed along the Paseo, despite the longstanding existence of an MOU with SAG governing access to the Paseo and NPS' knowledge and endorsement of the existing TNR program as a party to that MOU.

18.    Further, the Categorical Exclusion determination for the Cliff Project was required to be supplemented after the adoption of the 2023 Plan, as the 2023 Plan dictated requirements for maintaining feeding stations along the Paseo, was an existing NEPA documented project, and created new circumstances that should have been considered by NPS prior to administering the Cliff Project.

19.    The 2023 Plan even noted the possibility for future restoration work, including the Cliff Project, and did not indicate that the Cliff Project would interfere with the requirement for implementing the selected alternative 3.

20.    NPS was thus aware of the Cliff Project, could have created specific provisions for the Cliff Project renovations that would allow deviation from the requirements of NPS' preferred alternative, and declined to do so.

21.    The Cliff Project and Paseo closure will also result in the immediate violation of Puerto Rico Act Number 154-2008, 154-1998, and State Office of Animal Control Law Number 36-1984 governing the humane treatment of stray animals, as community cats in the area of the feeding stations would be subject to starvation and dehydration, lack of medical care provided as

a part of the TNR program, and would endure significant and inhumane hardship.  This is an additional extraordinary circumstance requiring additional NEPA analysis prior to proceeding with closing the Paseo.

## JURISDICTION AND VENUE

22.    This action arises under NEPA, 42 U.S.C. § 4321 *et seq*. through the APA, 5 U.S.C. § 500 et seq., which waives Defendants' sovereign immunity and provides for judicial review.

23.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701 – 706 ("APA") because this action arises under the federal laws of the United States and involves a final agency action.

24.    The Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and 5 U.S.C. §§ 701 – 706.

25.    There exists between the parties an actual, judiciable controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202.

26.    Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) as the National Park Service and the U.S. Army Corps of Engineers are agencies of the United States and are headquartered in this district.

## PARTIES

27.    Plaintiff ACA is a global non-profit organization whose mission is to protect and improve cats' lives.  ACA's advocacy, humane care, education, and outreach, and law and policy activism have transformed communities and set the standard for the humane treatment of all cats and kittens. ACA empowers and mobilizes individuals, advocates, grassroots groups, shelters, veterinary professionals, and elected officials across the United States and around the world to improve their communities for cats through nonlethal, evidence-based approaches. ACA is the

leading expert and a pioneer of TNR and has decades of experience working with localities to implement successful TNR programs. ACA's supporters are a discrete group of individuals, worldwide, who share a common interest in supporting the health and well-being of community cats all over the world and donate to ACA because ACA is institutionally committed to that mission. That commitment extends to Puerto Rico, where ACA has spent decades supporting and promoting TNR programs. This includes mobilizing thousands of supporters and expending money and on-the-ground labor to promote the health and well-being of community cats within the Commonwealth. Specifically, ACA has provided significant funding for cat food, TNR, medications, and other needed veterinary care for community cats living along the Paseo, and has expended significant labor and funding to bring its expertise, equipment, supplies, labor, and more to Puerto Rico—involving extensive travel by staff—to help the cats of the Paseo and beyond. Additionally, ACA has met with, advised, and spoken at length with local advocates, animal welfare organizations, and stakeholders, and plans to expand education and advocacy efforts to protect and improve the lives of community cats on the Paseo and in Old San Juan. ACA has organizational standing because NPS' Cliff Project will:

a. Injure and impede its ability to carry out its global mission to promote, operate, and support TNR programs as the only humane and effective approach to community cats. NPS' plan to end ACA's and SAG's access to the Paseo will inherently inhibit the TNR program and has already forced ACA to divert resources to resist the Paseo closure and further harm to ACA's decades-long investment of time and resources in Puerto Rico.

b. Further, NPS' decision to end access to the Paseo would cause damage to ACA's organizational purpose and mission to promote the humane, effective treatment of

community cats, with TNR programs as a central element. This includes

diminishing the ability of one of ACA's Feral Friends Network® organizations,

Plaintiff SAG, to carry out the TNR program at the Paseo.

28.    ACA also has associational standing because it has supporters in Puerto Rico and

all over the world who cherish and visit the cats along the Paseo in Old San Juan. NPS' Cliff

Project and closure of a large portion of the Paseo will injure ACA's associational interests by

injuring ACA's supporters' recreational and aesthetic interests in viewing and enjoying the cats

within the Paseo, and ripple effects from the Cliff Project, such as the knowledge that the federal

government is enacting a deadly campaign against and showing extreme indifference to

community cats who are simply living in peace in their natural home, threatens ACA's supporters'

general enjoyment of the Paseo.

29.    Plaintiff SAG is a duly registered 501(c)(3) non-profit organization in the

Commonwealth of Puerto Rico dedicated to the welfare and care of the cats of Old San Juan.  SAG

was created in 2004 to humanely manage the community cat population around historic Old San

Juan, particularly around the Paseo.  SAG has organizational standing because SAG's entire

purpose is to provide for the health and well-being of San Juan's community cat population, and

to manage the TNR program at the Paseo.  In fact, SAG was specifically incorporated as a non-

profit due to NPS' requirement that the group that would manage and administer the TNR program

be an incorporated organization.  Halting SAG's access to a significant portion of the Paseo would

thus effectively end SAG's primary organizational purpose for existing in San Juan, Puerto Rico,

impair its ability to maintain the TNR program at the closed portions of the Paseo, and result in

immediate inhumane treatment of the cats for which SAG has an ongoing responsibility to provide

food, care, and medical support.  SAG (and its members) also participated in the public comment

9

process for the 2023 Plan, and SAG has an interest in NPS following the 2023 Plan if and until such time as it is set aside or revised.

30.    SAG also has associational standing.  SAG's members include volunteers who consistently dedicate at least eight hours a month of on-the-ground labor, time, and other efforts to help achieve the organization's mission and purpose.  SAG's members elect SAG's board of directors, and have a direct investment in SAG's mission and purpose to promote the TNR program at the Paseo.  SAG's members also regularly visit the Paseo and the community cats that live there. SAG's members have a recreational and aesthetic interest in both viewing the community cats and the other wildlife of the Paseo.  NPS' Cliff Project and closure of a large portion of the Paseo will injure SAG's associational interests by injuring SAG's members' recreational and aesthetic interests in viewing and enjoying the cats within the Paseo, and ripple effects from the Cliff Project, such as the knowledge that the federal government is enacting a deadly campaign against and showing extreme indifference to community cats who are simply living in peace in their natural home, threatens SAG's supporters' general enjoyment of the Paseo.

31.    Defendant United States National Park Service is an agency within the Department of the Interior and was created by Congress to preserve, unimpaired, the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations. NPS manages the San Juan National Historic Site.

32.    Defendant Darrell Echols, Acting Regional Director of the South Atlantic-Gulf region of the National Park Service, is responsible for the strategic planning and direction, policy oversight, and assistance in public involvement, media relations, and programs for parks within the region, including the San Juan National Historic Site. On November 21, 2023, Mr. Echols' predecessor Mark Foust signed and approved the National Park Service's FONSI for the 2023

Plan.  Mr. Echols is also the official responsible for reviewing staff recommendations, reviewing any NPS-specific NEPA documentation for the Cliff Project, considering and rejecting alternatives, and ultimately approving the Cliff Project.  He is sued in his official capacity.

33.    Defendant Jessica Bowron, Comptroller and Acting Director of the National Park Service, heads the National Park Service, which manages all national parks, most national monuments, and other natural, historical, and recreational properties, including the San Juan National Historic Site. She is sued in her official capacity.

34.    Defendant Doug Burgum, United States Secretary of the Interior, heads the United States Department of the Interior, which is charged with stewarding public lands, increasing environmental protections, and pursuing environmental justice.  He is sued in his official capacity.

35.    Defendant Myrna Palfrey, Superintendent of the San Juan National Historic Site, manages all Park operations and programs, including NPS' 2023 Plan. On November 8, 2023, she signed and recommended approval of the 2023 FONSI. She is sued in her official capacity.

36.    Defendant United States Army Corps of Engineers is a federal agency under the Department of Defense.  The Corps' authority is limited to the authority granted to it by Congress and the Constitution of the United States.  The Jacksonville District of the Corps is the sub command district for the Cliff Project at the Paseo.

37.    Colonel Brandon L. Bowman, sued in his official supervisory capacity, is the District Commander of the Corps' Jacksonville Division. As District Commander, he is the official ultimately responsible for administering and managing the Corps' projects and for ensuring the Jacksonville District implements and complies with applicable laws and regulations.  Colonel Bowman is also the official responsible for reviewing staff recommendations, reviewing any

Corps-specific NEPA documentation for the Cliff Project, considering and rejecting alternatives, and ultimately approving the Cliff Project.

## STATUTORY FRAMEWORK

### A.  National Environmental Protection Act.

38.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment.

39.     NEPA imposes substantial procedural requirements to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

40.     NEPA has two main aims: requiring agencies to (1) "consider every significant aspect of the environmental impact of a proposed action" and (2) "inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *Robertson*, 490 U.S. at 349.

41.     "To ensure a well-considered decision, NEPA requires that when an agency proposes a 'major Federal action[ ] significantly affecting the quality of the human environment,' the agency must prepare and circulate for public review and comment an environmental impact statement (EIS) that examines the environmental impact of the proposed action and compares the action to other alternatives.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

42.    When developing an EIS, NEPA requires an agency to: (i) consider reasonable alternatives to the proposed action; and (ii) take a "hard look" at the environmental consequences of the decision. *See* 42 U.S.C. § 4332(2)(C)(i)–(iii).

43.    However, not all agency actions require an EIS. *Theodore Roosevelt*, 616 F.3d at 503. "If it is unclear whether an action will 'significantly affect[ ] the quality of the human environment,' 42 U.S.C. § 4332(2)(C), agencies may [first] prepare an environmental assessment [("EA")]," *id.*; which is "a more limited document," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

44.    Further, Department of Interior ("DOI") and NPS regulations have identified categories of actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an EA or EIS, known as Categorical Exclusions. *Public Employees for Env't Responsibility v. National Park Service,* 605 F.Supp.3d 28, 55 (D.D.C. 2022). NPS has two sources for Categorical Exclusions: The DOI's NEPA regulations, which are applicable to all agencies within Interior, and the NPS section of the Departmental Manual, which is applicable only to NPS. *See* 43 C.F.R. § 46.205; 43 C.F.R. § 46.210[3]; Department of Interior Department Manual ("DM") 516 DM 1; 516 DM 2; 516 DM 12; NPS NEPA Handbook (2015), at Section 3.1.[4]

45.    DOI Categorical Exclusions that negate the need for an EA or EIS include routine, non-significant actions such as routine transactions and business operations; policies, directives,

---

[3] Prior to promulgating expanded NEPA Regulations on July 3, 2025, DOI's NEPA regulations only supplemented the Council on Environmental Quality ("CEQ") regulations. *See* National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29,498 (July 3, 2025).
[4] The authority of agencies to adopt categorical exclusions is also recognized in NEPA. *See e.g.* 42 U.S.C. § 4336c.

regulations, and guidelines that are of an administrative or procedural nature; and educational activities. 43 C.F.R. § 46.210.

46.     NPS Categorical Exclusions also include actions related to administration (516 DM 12, Section 12.5(A)), and include additional activities such as actions related to development (*id.* at Section 12.5(C)) and actions related to grant programs (*id.* at 12.5(F)).

47.     Even if a Categorical Exclusion applies to a given action, the agency has an additional obligation to evaluate the action for "extraordinary circumstances in which a normally excluded action may have a significant effect and require additional analysis." 43 C.F.R. § 46.205(c). If an extraordinary circumstance is found to apply to an action otherwise covered by a Categorical Exclusion then "further analysis and environmental documents must be prepared." *Id.* at (c)(1).

48.     The DOI's regulations define a set of extraordinary circumstances that will require NEPA analysis, including actions that have a significant impacts on public health and safety; have "a direct relationship to other actions that implicate potentially significant environmental effects" (43 C.F.R. § 46.215(e)); have "significant impacts on properties listed or eligible for listing in the National Register of Historic Places as determined by the bureau" (*id.* at (f)); and "[c]ontribute to the introduction, continued existence, or spread of noxious weeds or nonnative invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species" (*id.* at (i)).

49.     NPS' NEPA handbook adopts the same extraordinary circumstances, and adds actions that "have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources" (NPS NEPA Handbook (2015), at Section

14

3.5(c)); and actions that "violate a federal law, or a state, local, or tribal law or requirement imposed for the protection of the environment" (*id.* at 3.5(i)).

50.    The decision to invoke a Categorical Exclusion and its application under NEPA are reviewed under the arbitrary and capricious standard. *Back Country Horsemen v. Johanns,* 424 F.Supp.2d 89, 99 (D.D.C. 2006)*.*

**B. Administrative Procedure Act.**

51.    The APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *See also Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

52.    Only "final agency actions" are reviewable. 5 U.S.C. § 704. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow.

53.    Under section 706 of the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

54.    In addition, a court must hold unlawful agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at § 706(2)(C).

55.    In general, an agency decision is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

56.     As to whether an agency's actions are in excess of statutory jurisdiction, authority, or short of statutory right, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand.") (internal quotation marks and citations omitted).  "To determine whether the agency's action is contrary to law, [courts] look first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); *see also id.* at 1082 ("Agency authority may not be lightly presumed.").  Further, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369, 412 (2024).

57.     The APA provides a cause of action to challenge any final agency action where there is no other adequate remedy in court. 5 U.S.C. § 704. NEPA contains no specific judicial review provisions, so federal agency actions governed by these laws, including the 2018 CE Determination at issue here, are subject to judicial review under the APA. *Gov't of the Province of Manitoba v. Salazar*, 691 F.Supp.2d 37, 40 n. 1 (D.D.C. 2010).

**D.  The National Park Service's Management of Park Lands.**

58.     The National Park Service Organic Act of 1916, 16 U.S.C. §§ 1-4, since amended and recodified at 54 U.S.C. § 100101 *et seq*., governs the National Park Service' management of Park lands.

59.     The Director of the National Park Service is directed to prepare and revise general management plans for each System unit of the National Park System.  54 U.S.C. § 100502.

60.    A "System unit" is defined as an area described in § 100501 of the National Park Service Organic Act (54 U.S.C. § 100102), which includes "any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes" (54 U.S.C. § 100501).

61.    The general management plans for each System unit shall include, among other things, measures for the preservation of the area's resources.  54 U.S.C. § 100502(1).

62.    Further, the Secretary, "acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).

63.    Further, the "authorization of activities [on Park lands] shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established."  *Id.* at (b)(2).

**E.  The National Park Service's Authority Over Non-Park Lands.**

64.    NPS has adopted a host of regulations governing activities within national park units.  These NPS regulations apply, *inter alia*, within "[t]he boundaries of federally owned lands and waters administered by the National Park Service" and within "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters."  36 C.F.R. §§ 1.2(a)(1), (3).

65.    NPS regulations generally do not apply to "non-federally owned lands and waters ... located within National Park System boundaries" (*Id.* § 1.2(b)) unless they are navigable waters (*Id.* § 1.2(a)(3)) or for lands over which the United States holds less than a fee interest, and then only "to the extent necessary to fulfill the purpose of the National Park Service administered interest *and compatible with the nonfederal interest*" (*Id.* § 1.2(a)(5)).  Under the regulations, and as relevant here, "boundary" "means the limits of lands or waters administered by the National Park Service as specified by Congress." *Id.* § 1.4(a).  This means that NPS regulations do not apply to both (1) lands outside of a national park (or national historic site boundary); and (2) any non-federally owned lands within a national park (or national historic site boundary) except to the extent compatible with the nonfederal interest.

66.    Separately, NPS has restricted authority over National Recreation Trails.  National Recreation Trails may be designated by the Secretary of the Interior or Secretary of Agriculture. 16 U.S.C. § 1243.  However, when a trail is in or reasonably accessible to urban areas, "consent of the States, their political subdivisions, or other appropriate administering agencies" is required, and when trails are in areas owned or administered by States or privately owned lands, written consent is similarly required.  *Id.* at (b)(i)-(iii).  National *Recreation* Trails are distinguished from National *Scenic* and National *Historic* Trails, the latter of which require Congressional enactments to be established and are subject to stricter oversight.  *See* 16 U.S.C. § 1244.

67.    According to the NPS, for National Recreation Trails, "there is no designated Federal oversight responsibility, investment, management, or other involvement beyond the designation recognition."  *See* National Recreation Trails – FAQ, What is the difference between NRTs    and    National    Scenic    and    Historic    Trails"    (available    at

https://www.nps.gov/subjects/nationaltrailssystem/national-recreation-trails-faqs.htm    (Last visited December 8, 2025).

68.    According to NPS Director's Order #45, National Recreation Trails "may also be administered by the Service, though not as units of the national park system. *In all cases, the Service will cooperate with other land managers, nonprofit organizations, and user groups to facilitate appropriate trail use in accordance with the laws and policies applicable to such trails*, and to the extent that trail management and use would not cause unacceptable impacts." Director's Order #45 at Section 3.1 – Management Policies (available at https://www.nps.gov/subjects/nationaltrailssystem/management.htm (Last visited December 8, 2025).

69.    Further, according to NPS Director's Order #45, parts 1 through 5 of Title 36 of the *Code of Federal Regulations* apply to the national trail system, except that those regulations only apply to trails under "State or local ownership, or privately owned, and administered by the NPS for trail purposes pursuant to an agreement with the landowner, to the extent that such regulations are consistent with the agreement. (The term "agreement" is used here as the term "cooperative agreement" is used in the National Trails System Act, although the agreements will be "general agreements" or "memoranda of understanding" within the meaning of Director's Order #20: Agreements)." *Id.* at Section 3.12 – Regulations.   This means that the Department of Interior's Code of Federal Regulations only apply to National Recreation Trails to the extent an agreement has been entered into with a local authority, and only to the extent that such regulations are consistent with such agreement.

## FACTUAL ALLEGATIONS

### A. The Formation of the San Juan National Historic Site and the Paseo.

70.     Puerto Rico is a territory of the United States.  Puerto Rico was ruled by the Spanish until December 10, 1898, when the United States and Spain signed the Treaty of Paris of 1898. Puerto Rico then became a Commonwealth in union with the United States.  Puerto Rico experienced a steady progression in the exercise of self-governance in the early 1900s, starting with the first organic act for Puerto Rico in 1900, and a July 1, 1902 grant of all public lands and buildings not reserved by the United States to Puerto Rico.  *See* 48 U.S.C. § 746 ("All public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in the island of Puerto Rico and not reserved by the President of the United States prior to July 1, 1903, pursuant to authority vested in him by law, are granted to the government of Puerto Rico, to be held or disposed of for the use and benefit of the people of said island.").

71.     Pursuant to the July 1, 1902 grant of lands to Puerto Rico, the United States could reserve lands in Puerto Rico prior to July 1, 1903.  President Theodore Rosevelt made two such reservations on June 26, 1903 and June 30, 1903, which reserved certain lands in Puerto Rico, including in San Juan, Puerto Rico.  Proclamation 502 (June 26, 1903)[5] Proclamation 503 (June 30, 1903)[6].

---

[5] Available at https://www.presidency.ucsb.edu/documents/proclamation-502-reservation-lands-puerto-rico-for-naval-purposes#:~:text=Proclamation%20502%E2%80%94Reservation%20of%20Lands,Purposes%20%7C%20The%20American%20Presidency%20Project (Last visited December 8, 2025).
[6] Available at: https://www.presidency.ucsb.edu/documents/proclamation-503-reservation-lands-puerto-rico (Last visited December 8, 2025).

72.    In 1917, Congress passed the Jones Act, which granted authority to Puerto Rico over non-reserved lands and increased the scope of Puerto Rican self-governance.  Pub. L. 368 (March 2, 1917), H.R. 9533.

73.    Specifically, the government of Puerto Rico was granted control of all property which may have been acquired by the United States, including "all the harbor shores, docks, slips, reclaimed lands and all public lands and buildings not heretofore reserved by the United States for public purposes," and all "harbor areas and navigable streams and bodies of water and submerged lands underlying the same" not previously reserved by the United States.  *Id.* at Sec. 7, 8.

74.    Puerto Rico became a U.S. Commonwealth and Territory in 1952 *See* H.J. Res. 430 approving the constitution of the Commonwealth of Puerto Rico, as enacted July 3, 1952, is Public Law 447, 82d Congress (66 Stat. 327), which became effective on July 25, 1952.

75.    The Park was designated as a national historic site by the Secretary of the Interior through the establishment order for the San Juan National Historic Site.  *Fed. Reg.* Doc 49-1402 (Feb. 25, 1949) ("1949 Enactment").  In that designation, the Secretary designated "the fortresses of El Morro and San Cristobal, Casa Blanca, and El Canuelo on Cabras Island, including the areas shown on the diagram, marked 'Exhibit A.'"  *Id.*

76.    The Exhibit A showing the designated boundaries of the San Juan National Historic Site was not included in the 1949 Enactment in the *Federal Register*.  However, a copy of that referenced map was included in a February 28, 1951 internal memorandum in the National Park Service that sought to clarify the Park's boundaries, and showed that the boundary of the Park was the external walls of the fortress, and did not extend to the land beyond the fortress walls.  **Exhibit 2,** 1951 NPS Memorandum, at p. 5.  A copy is reproduced below:



77.    That same memorandum included an "Exhibit C" which was the culmination of the National Park Service's investigation of the Park's boundaries and was intended to "define the boundaries in the cooperative agreement between the Department of the Interior and the Department of the Army" (Exhibit 2 at p. 6), which also concluded that the boundaries of the Park ended at the fortress walls, and did not extend onto the land beyond the walls.  **Exhibit 3**, Exhibit C to 1951 NPS Memorandum.  A copy is reproduced below:



78.     These maps confirm that the boundaries of the Park as of 1951 and as of the Park's designation as a National Historic Site did not extend beyond the fortress walls, and did not include the lands or beach beyond the fortress walls.

79.     Similarly, the 1972 National Register of Historic Places nomination for the San Juan Historic Zone recognized the same fortress wall boundaries of the Park.

80.     On September 29, 1976, a cooperative agreement was entered into between the Department of the Interior and Puerto Rico (the "1976 CA").

81.     The 1976 CA recognizes that portions of the Park are under the ownership/title of Puerto Rico.  *Id.*

82.     While the 1976 CA contains some maps of the Park that indicate its boundaries may extend past the existing fortress walls, there is no reference to any subsequent Congressional enactment or *Federal Register* publication that would have authorized such an extension.  As such, the 1949 Enactment in the *Federal Register* setting the boundaries of the Park still applies.

23

83.    Here, the Paseo is located outside the Park boundaries according to the 1949 *Federal Register* enactment.  As such, NPS regulations do not apply to the Paseo, and NPS lacks authority and jurisdiction to implement the Cliff Project (as well as 2023 Plan) on the Paseo and to impede ACA's and SAG's access to the Paseo.  36 C.F.R. §§ 1.2(a)(1), (3), (b).

84.    Further, even for the portions of the Paseo that may overlap or be inside Park boundaries (if any), portions of the Park are also owned by Puerto Rico and thus excluded from NPS authority and jurisdiction except to the extent compatible with Puerto Rico law.

## B. The Formation of the Paseo del Morro and its Designation as a National Recreation Trail.

85.    The San Juan National Historic Site is subject to a 1984 General Management Plan ("1984 GMP").  **Exhibit 4**, 2023 Free-Ranging Cat Management Plan Environmental Assessment (August 4, 2023)**,** at 54.[7]

86.    However, the 1984 GMP was created before the Paseo, and did not discuss free ranging cats.  *Id.*

87.    The 1984 GMP did, however, state that due to the relatively small size of the national historic site and its urban setting, no action plans such as fire management or feral animal control are needed.  *Id.*

88.    The area that is the Paseo now originally served as a maintenance access route that was constructed in 1995 as a dirt path.  ***Id.*** at 1.  That dirt path was then paved in 1999, with funds from the Puerto Rico Tourism Company ("PRTC") through a cooperative agreement between the PRTC and NPS.  *Id.*

---

[7] Pagination for **Exhibit 4**, the 2023 EA, refers to the internal pagination of the document.

89.     The Paseo is entirely outside of the fortress walls, and thus, is also entirely outside of the Park boundaries as designated in the 1949 Enactment.  Use of the gate to the Paseo is governed by an agreement between NPS and the Puerto Rico Commonwealth government. NPS_0526.

90.     The Paseo later became a National Recreation Trail in 2001. *Id.*

91.     The Paseo (and associated National Recreation Trail) was and is subject to existing memoranda of understanding ("MOUs") with the PRTC at the time of the 2023 Plan development. That MOU is the January 23, 2023 MOU between the PRTC and NPS.  **Exhibit 5** ("2023 MOU").

92.     The 2023 MOU recognizes that the Park was established pursuant to the February 14, 1949 enactment (Fed. Reg. Doc. No. 49-1402) and does not reference any subsequent enactments for the Park, confirming the Park is the size declared in the 1949 enactment.  *Id.* at 1.

93.     The 2023 MOU states that the agreement and rights of the parties "shall be governed by and construed in accordance with the applicable laws of Puerto Rico, excluding its conflicts of law provisions and of Federal law."  *Id.* at 5.   Further, in a prior 2014 Memorandum of Understanding with the PRTC, the NPS "agree[d]: . . . [t]o contribute and coordinate with the Municipality of San Juan and non-profit organizations *for the humanely* [sic] *control of the feral cat population currently inhabiting the Paseo . . . .*".

94.     Upon information and belief, that 2023 MOU has been extended with the PRTC and remains applicable at the Paseo in a substantially similar form.

95.     The Paseo (and associated National Recreation Trail) is also subject to existing MOUs with SAG.  *See* **Exhibit 6,** MOUs between NPS and SAG.  Those MOUs obligate NPS to, among other things, "allow unlimited access to members of [SAG] for activities related to feeding and trapping of cats, and for population surveys" (*id.* at 2, 4), for the maintenance of "feeding

25

stations for the cats" (*id.* at 3, 4), for "inform[ing the PRTC] officials of the present agreement and the need to enforce these rules" (*Id.* at 4), and that NPS "will continue to support [SAG] with cages and/or other equipment to facilitate the [TNR] program" (*id.*).

96.     Circa 2012, NPS proposed an extension of the existing Paseo.  When NPS provided notice of a preparation of an EIS for the extension of the Paseo in 2012, it noted that segments of the extension would occur "within and outside of the NPS boundary" for the Park, and would require the involvement of multiple entities, including the Municipality of San Juan and the Commonwealth of Puerto Rico and neighborhoods along the trail corridor."  77 Fed. Reg. 68,416 (Nov. 15, 2012).  The extension of the Paseo has not been built and the EIS has not been completed. However, this 2012 notice evidences that NPS believed at the time that portions of the Paseo were under, and subject to, local control.

97.     As such, the Paseo (and associated National Recreation Trail) is thus subject to existing MOUs between NPS and both SAG and the PRTC, requiring NPS to abide by those existing MOUs and coordinate with local authorities on the management of the Paseo as a National Recreation Trail pursuant to Director's Order #45.

C. **The Community Cats' Presence on the Paseo and Current Requirements under the 2023 Plan Regarding the Continued Presence and Support of the Community Cats.**

98.     San Juan, Puerto Rico, is home to a very large and cherished community cat population. Community cats occupy a significant place in the culture of San Juan. In fact, the cats are so popular that their images are regularly featured on souvenirs.

99.     Community cats have lived in the area that is now the Paseo for decades and throughout Old San Juan for centuries, predating the existence of the Paseo.  The area that is the Paseo now originally served as a maintenance access route that was constructed in 1995 as a dirt path.

100.    After the Paseo was created, community cats already in the area quickly made their home along the new path—an inevitable result given that cats were already living on those grounds and in the area and given the number of community cats in Puerto Rico.

101.    In December 2003, the United States Department of Agriculture, the Animal and Plant Health Inspection Service ("APHIS"), and Wildlife Services, in cooperation with NPS, published an environmental assessment proposing various alternatives to manage the cat population in the Commonwealth of Puerto Rico (the "2003 EA"). The agencies' stated reasons for action were the following:

> 1) the sheer abundance of cats in some areas, 2) the unpleasant site[sic] of cat corpses, or of individuals in poor condition, 3) the profusion of kittens, often in poor health—a female may produce 2 or 3 litters of up to 10 kittens per year, 4) annoying caterwauling, 5) nocturnal fighting, 6) trampling on, digging up, or defecating on gardens, vegetable patches, etc., 8) [sic] disturbing rubbish bins and scattering litter, 9) they will often enter homes and other buildings uninvited, 10) they will occasionally kill or scare birds, fish or other animals, 11) risk of attacks on babies in prams (baby carriage), children, or other pets, 12) the possible health risks from the transmission of various diseases from cats to pets or humans (particularly children); including ringworm, cat scratch fever and toxoplasmosis,[8] 13) they may be breeding grounds for fleas, and 14) the foul smell and maggots/flies resulting from the excess food left around for feral cats by over-enthusiastic cat lovers.

102.    In 2004, NPS and APHIS began discussion regarding a "free-ranging cat management program" at the San Juan National Historic Site. Due to public concerns and protests, NPS did not move forward with efforts to remove the cats under the 2003 EA. SAG, the Puerto Rican Feral Cats Association, the Society for the Prevention of Cruelty against Animals of Puerto Rico, and Animal Control Solutions developed a plan to work together to implement the TNR program for the management of "free-ranging" cats at the Paseo.

---

[8] NPS has yet to demonstrate any evidence of disease transmission between community cats in the Paseo and Paseo visitors despite alleging this was a concern since 2003. Importantly, the 2003 EA *does not* classify the community cats as an invasive species.

103.    In 2005, NPS entered a Memorandum of Understanding with SAG authorizing the

TNR program (the "2005 MOU"). The 2005 MOU granted SAG unlimited access to the Paseo to

establish a TNR program, supported by limited funding from NPS to provide traps and materials

to aid the initial trapping effort and five feeding stations to feed the cats returned to the Park after

they were neutered, eartipped, and evaluated by a veterinarian pursuant to the TNR program.

**Exhibit 6** at 2-3.

104.    In 2008, premised in large part on the success of the TNR program in managing the

community cat population in the Paseo, NPS and SAG entered into another Memorandum of

Understanding, extending SAG's unlimited access to the Park and increasing the number of

feeding stations to eight ("2008 MOU").  *Id.* at 4.

105.    The 2008 MOU provides that "The National Park Service, San Juan National

Historic Site will continue to allow unlimited access to members of [SAG] for activities related to

feeding and trapping cats, and for population surveys."

106.    The 2008 MOU also adds that SAG "will continue to work with National Park

Service staff in the development/construction of Paseo del Morrow Phase[sic] II work,

include[ing] cooperating with NPS personnel to keep cats feeding out of harms way during

construction." *Id.*

107.    The Phase II work on the Paseo was completed prior to March of 2013, and is no

longer relevant.  *See Extension of Paseo del Morro*, Newsletter (available at:

*https://parkplanning.nps.gov/showFile.cfm?sfid=149855&projectID=38376* (last visited Dec. 8,

2025) at 1 (noting NPS proposed an extension of the Paseo to be completed in "seven phases of

which two . . . are already completed").

108.    While the Phase II work on the Paseo was completed over a decade ago, the 2008 MOU demonstrates that NPS understood the need to facilitate reasonable access to the Paseo so that the TNR program and the associated feeding and care of the community cats could continue during construction.

109.    Since the 2005 MOU, almost two decades ago, the TNR program has successfully managed the cat population, addressing many of the issues cited in the 2003 EA by reducing procreation and mating behavior among the cats and preserving the cats' historical, social, and cultural role within the Park and in the broader Puerto Rican community.

110.    The 2008 MOU remains in effect as of the filing of this complaint.

**D. NPS' 2023 Plan to Eradicate the Cat Population in the Paseo.**

111.    In the fall of 2022, NPS began the public scoping comment period to for a new, radically different, and inhumane community cat management plan for the Paseo that would reverse the years of successful cooperation with SAG.

112.    NPS thereafter published the 2023 EA on August 4, 2023.  NPS announced the alternatives purported to be under consideration:

> The draft Free-Ranging Cat Management Plan/Environmental Assessment evaluates three alternatives for management of the free-ranging cats in the park. Under the no-action alternative (alternative 1), no changes would be made to the current management of free-ranging cats. Under the original proposed action (alternative 2), the NPS would enter into an agreement with an organization(s) or agency(s) to remove the cats from the park. Following analysis of the public scoping comments, the NPS added an alternative that revised the original proposed action. The revised proposed action (alternative 3 / NPS preferred alternative) would allow an animal welfare organization six months to trap and remove cats from the park with the use of the current feeding stations, after which time the feeding stations would be permanently removed from the park.[9]

---

[9] https://www.nps.gov/saju/learn/news/san-juan-national-historic-site-announces-public-meeting-to-present-draft-free-ranging-cat-management-plan-and-environmental-assessment.htm    (Last visited Dec. 8, 2025).

113.    In November 2023, NPS released the 2023 FONSI, which announced the selected action NPS had chosen to manage the community cat population in the Paseo – alternative 3. **Exhibit 7**.[10]

114.    Under alternative 3, an animal welfare organization would be selected by NPS for conducting the removal of cats from the Paseo.  **Exhibit 4** at 15; **Exhibit 7** at 3.

115.    Alternative 3 requires that the animal welfare organization first trap the community cats in the vicinity of a given feeding station.  Only after the removal of the community cat population dependent on a particular feeding station would the animal welfare organization remove the feeding station.  Therefore, removal of the feeding stations, and the related deprivation of daily feeding and care, is the last step in NPS' 2023 Plan.  **Exhibit 4** at 15-16; **Exhibit 7** at 4.

116.    Alternative 3 requires applicable permits, including relocation permits from the Puerto Rico Department of Natural and Environmental Resources, to be obtained by the animal welfare or cat removal agencies prior to community cat removal.  **Exhibit 4** at 15; **Exhibit 7** at 9.

117.    Alternative 3 does allow for habitat modification during the trapping phase, but notes that it would be limited by the cultural landscape at the park and would likely be implemented to discourage cat migration back into the Paseo, rather than for the trapping or removal of cats already within the Paseo.  **Exhibit 4** at 13, **Exhibit 7** at 4.

118.    The trapping and removal by the animal welfare organization would occur over a 6-month period, with the potential for a 6-month extension, before the feeding stations are removed in full if substantial progress is being made. Thus NPS' 2023 Plan contemplated that the feeding stations would be available to the community cats for at least 6 to 12 months after the initiation of the Plan. **Exhibit 4** at 15-16; **Exhibit 7** at 16.

---

[10] Pagination for **Exhibit 7**, the 2023 FONSI, refers to the internal pagination of the document.

119.    Further, the NPS plan contemplated, and specifically rejected the possibility of solely removing the feeding stations along the Paseo due to the negative impacts that would occur, including: causing (1) "the cats to disperse around the park or possibly other parts of Old San Juan, rather than concentrating them near the feeding stations;" (2) causing the community cats to "switch to preying on native wildlife, such as reptiles or birds;" (3) the potential to "increase impacts on park resources;" and (4) the "hardship" placed on the community cats "accustomed to having food provided on a daily basis." **Exhibit 4** at 16.  For those reasons, "removing the feeding stations only was dismissed from consideration" by NPS.  *Id.* at 17.

120.    Finally, if no animal welfare organization can be located, NPS would proceed with removal of the community cats by a removal agency under alternative 2.  Like alternative 3, the removal agency cannot remove a feeding station until the cats in the given area have been trapped. **Exhibit 4** at 15; **Exhibit 7** at 3.

121.    Separately, the 2023 EA specifically contemplated the Cliff Project:

The park has one recently completed project (maintenance on the northwest walls of El Morro) and several ongoing actions that would affect visitor experience (replacement of the lights along the Paseo, *stabilizing the cliff at San Fernando Bastion*, and rehabilitation of the Paseo and El Morro nature trail, as well as routine maintenance of vegetation and historic structures in the park). *These actions may require closures that would affect visitors for short periods*; however, in the long term, these projects would benefit visitors, providing safer access to park resources.

**Exhibit 4** at 26 (emphasis added).

122.    NPS recognition of the Cliff Project in the 2023 EA, acknowledging that the Paseo may be closed "for short periods" for "visitors" while simultaneously creating requirements that the community cats be removed gradually prior to the removal of any feeding station shows that NPS' most recent actions would directly violate the 2023 Plan.  *Id.*

123.    NPS could have created specific provisions for the Cliff Project renovations, exempted them from the requirements of alternative 3 (after appropriate consideration and analysis), and declined to do so.

**E. ACA's and SAG's Challenge to the 2023 Plan in the Related Litigation.**

124.    ACA and SAG have challenged NPS' 2023 Plan in separate, but related, actions. *See Alley Cat Allies, Inc. v. United States Natl Park Serv.*, 1-24-cv-876 (Lead Case, Consolidated with *Save-a-Gato v. United States Natl Park Serv.*, 25-cv-1873) (D.D.C.) (the "Related Litigation").

125.    Plaintiff SAG filed a separate complaint at the same time as Plaintiff ACA's amended complaint, and the two actions have now been consolidated. *See Alley Cat Allies, Inc.*, 1-24-cv-876*, at Aug. 19, 2025 Minute Order.

126.    In that litigation, ACA and SAG have argued that the 2023 EA and FONSI violated NEPA and the APA, that an EIS was required, and that NPS lacks jurisdiction over the Paseo.

127.    In the Related Litigation, ACA first moved for a temporary restraining order and preliminary injunction, seeking to halt NPS from implementing the 2023 Plan.  *See Alley Cat Allies, Inc.*, 1-24-cv-876 at ECF No. 22.  However, under an agreement reached with NPS, ACA agreed to withdraw its motion in lieu of expedited summary judgment briefing.  *Id.* at ECF No. 23. NPS also agreed to provide thirty (30) days' notice prior to authorizing removal of any of the community cats on the Paseo.  *Id.*

128.    The agreement remains in place today, and NPS has not provided the required 30 days' notice that it is implementing the 2023 Plan and authorizing the initiation of the process of removing community cats from the Paseo.

129.    Expedited summary judgment briefing has not yet concluded at this time, primarily due to two circumstances outside of Plaintiffs' control.

130.    First, late into the initial summary judgment briefing, Plaintiff ACA discovered that a significant portion of the administrative record for the 2023 Plan had been left out of the administrative record.   This necessitated NPS filing a supplement to the administrative record (*Alley Cat Allies, Inc.*, 1-24-cv-876 at ECF No. 44), Plaintiff ACA moved for leave to file for an amended complaint (*id.* at ECF No. 47), and the Court ultimately granted ACA's motion and allowed ACA to amend its complaint (*id.* at ECF No. 54).

131.    Second, the recent government shutdown occurred shortly after NPS filed its answer and then final supplemental administrative record in the Related Litigation.  NPS counsel was not authorized to work during the shutdown, which prevented the parties from conferring on a briefing schedule.  *Id.* at ECF No. 63.

**F.  The Cliff Project at the Paseo.**

132.    The purported NEPA compliance for the Cliff Project is the 2018 CE Determination.  **Exhibit 1**.  That determination lists the project as "Stabilize El Morro Slope San Fernando Bastion" under PEPC Project Number 7620.  *Id.* at 1; *see also* NPS NEPA Handbook (2015), at Section 3.1(C)(19).

133.    The 2018 CE Determination did not indicate that the slope stabilization work for the Cliff Project would require closure of the Paseo.  *Id.*

134.    Instead, the 2018 CE Determination indicated that failure to conduct the stabilization work for the Cliff Project would require permanent closure of the Paseo: "Failure to complete this project will result in the permanent closure of Paseo Del Morro due to the major safety hazards falling boulders represent."  *Id.*

135.    The 2018 CE Determination included little in the way of description of what the

ongoing impacts of the Cliff Project would be, other than a short description of the project:

> In the 1990s, the Army Corps of Engineers performed a shotcrete application of
> approximately 75% of the hillside.   This project will address the remaining
> unprotected portions of the slope.   Project is divided in five stages:   [1]
> Mobilization, General Requirements and Demobilization: This item consists of
> costs associated with mobilization, general requirements and demobilization. [2]
> Slope Preparation:  This item consists of all activities required to prepare the slope
> or cliff face for application of shotcrete including, but not limited to the removal of
> vegetation and loose or unstable bedrock.   The area to be prepared consists of
> 34,665 sq. ft. [3] Sand Seam Treatment:  This item consists of treating the sand
> seams in the existing bedrock.  12,727 CF will be treated with this work. [4] Pre-
> tensioned Soil and Rock Anchors.  This item consists of the installation of (359)
> pre-tensioned soil and rock anchors.  [5] Pneumatically Applied Concrete.  This
> item consists of the pneumatic application of concrete to the slope, approximately
> 34,665 sq. ft.

> *Id.*

136.    Even the short project scope description in the 2018 CE Determination shows that

significant community cat habitat modification is possible on the Paseo, including removal of

vegetation and loose rock in which the community cats reside.

137.    Further, the activities associated with pneumatic application of concrete to the slope

could create considerable stress in native wildlife in the area, including the community cats.

138.    The 2018 CE Determination did not mention or address how the longstanding 2008

MOU with SAG would be impacted during the Cliff Project.

139.    The Cliff Project was not conducted in 2018.  The Cliff Project was funded under

the August 4, 2020 Great American Outdoors Act National Parks and Public Land Legacy

Restoration Fund.

140.    The Great American Outdoors Act did not name specific projects that would

receive Legacy Restoration Fund ("LRF") funding, but instead provided for a submission of

priority projects to Congress.  Public Law 116–152 (Aug. 4, 2020), 134 Stat. 682, at 685 (Codified at 54 U.S.C. § 200401, § 200402(g)).

### E.  NPS Notifications Regarding the Cliff Project.

141.    During the government shutdown, NPS' counsel reached out to Plaintiffs' counsel on November 6, 2025 to inform them that, separate from the 2023 Plan and the Related Litigation, NPS would be implementing "a long-anticipated cliff stabilization project at the San Fernando Bastion" on the Paseo that "aims to stabilize the cliff face at the San Fernando Bastion, which provides structural support to the Castillo's esplanade"  (the "Cliff Project").

142.    In the same notification, NPS stated that the Cliff Project would be undertaken in coordination with the Corps.

143.    NPS noted that the Cliff Project was anticipated to take place over the course of about 18 months once it begins, but that there "is no determined date for official work site closures because the Park Service is awaiting archeological permits.  Once permits are issued, NPS will work with the contractor to identify an appropriate project start date.  Right now, NPS advises it receives three-week construction look-ahead updates."

144.    NPS indicated that "because of the necessary closures, any existing feeding stations in the identified work site area will be inaccessible during the duration of the project."  This would immediately end ACA's and SAG's access to critical feeding stations along the Paseo as shown below:



145.    This existing closure area contains four of six current active feeding stations maintained by SAG along the Paseo (feeding station 1 is not currently active):



146.    This November 6, 2025 notification was the first time Plaintiffs ACA and SAG had ever been made aware that the Cliff Project would revoke access to approximately half of the Paseo, and over half of existing feedings stations, for a period of up to 18 months.

147.    NPS' intent to deviate from its own selected and preferred alternative 3, and to engage in an extended closure of the Paseo in violation of the requirements of alternative 3 was never discussed in the 2023 Plan.

148.    NPS' anticipated closure would cut off ACA's and SAG's access to a significant portion of the Paseo, and would physically strand the community cats located at feeding stations 4, 5, 6, and 7 from their primary food source and the related health care they receive.

149.    This is because the causeway between feeding stations 3 and 4 is almost 700 feet long, reaches extreme temperatures during the day, and the community cats generally will not migrate large distances in a short period of time, if at all:



150.    Further, the community cats would likely be discouraged by new construction activity and structures from moving in the direction of the lower portion of the Paseo.

151.     In response to the closure of access to existing feeding stations, NPS stated to ACA and SAG that NPS "will not object should Save-A-Gato choose to relocate any stations in the Cliff Project area to an accessible portion of the San Juan Site before the Project start date."

152.     This is not sufficient, as there is not adequate space in the small area below the planned closure zone to set up acceptable feeding stations or to accommodate the number of cats that would be forced into that small area.  The community cats exist in colonies around individual feeding stations at the Paseo, and are territorial.   Moving an existing colony from a closed feeding station into a non-closed feeding station would thus have a high likelihood of fighting, causing injury to the relocated community cats.

153.     Further, in ACA's and SAG's experience, when feeding stations are moved as a part of an existing TNR program, the movement must be at a slow pace of 10-15 feet every 10 days in order to continue to encourage cats to move from the familiar location into a new area. While NPS has not provided a firm start date other than to indicate access may be closed starting on December 15, 2025, there is not (and was not) sufficient time to initiate and complete the process of moving the feeding stations from their decades-old locations to new locations outside of the closed area prior to project start, even had Plaintiffs started on NPS' first vague notice on November 6, 2025.

154.     Finally, in ACA and SAG's experience, it is almost certain that many of the community cats would not move even if the feeding stations could be slowly moved to the lower portion of the Paseo.  That is because cats are habit-forming animals that rely on familiar routines and environment.   Attempts to change those routines cause stress and anxiety for the cats, decreasing the likelihood of success.   Further, there are known cats in the vicinity of the feeding stations subject to closure that are physically disabled, making it even less likely those cats will

move to other feeding stations.  Unmonitored and cared for community cat populations that remain at the closed areas of the Paseo would be subject to increased stress and incidence of disease. Further, if any new cats migrate into this area, they will not be targeted for spay and neuter services, contributing to an ultimately increased cat population.

155.    Despite the suddenly announced plan to unilaterally close the Paseo in a manner that clearly violates the NEPA-analyzed requirements for community cat removal under the 2023 Plan, NPS stated that the "Cliff Project is entirely unrelated to the removal of free-ranging cats and the related management plan."

156.    The suddenly announced Cliff Project turns the challenged 2023 Plan on its head: rather than first gradually removing the community of cats over a 6 – 12 month period, and only then removing the feeding stations as required under the 2023 Plan, the Cliff Project immediately cuts off the feeding stations, leaving the community cats to starve and depriving them of regular monitoring and medical care by ACA and SAG. If left unchecked, the Cliff Project, without any notice, evaluation, or public input, effectively eliminates and supersedes the 2023 Plan.

157.    On November 18, 2025, NPS provided a second update on the Cliff Project, stating that the fence closure could now "occur, at the earliest, in two weeks."  This accelerated the schedule from the November 6, 2025, email in which NPS had no estimated date for a closure, was awaiting permits, and advised it received three-week construction look-ahead updates.

158.    ACA and SAG informed NPS and the Corps of their objection to the plan to close the Paseo without adequate accommodation for the TNR and feeding program on November 20, 2025 by two separate letters.

159.    In those letters, ACA and SAG offered multiple options to allow access to the feeding stations to maintain the TNR program, including reasonable conditions and restrictions on

access (such as time, manner, and safety restrictions). ACA and SAG also notified NPS and the Corps that extraordinary circumstances existed at the Paseo that required additional NEPA analysis such as would negate a categorical exclusion determination.

160.    The Corps responded on November 25, 2025, deferring a response to the Department of Justice.

161.    NPS responded on November 25, 2025, stating that it would not reconsider its decision to revoke access to the upper portion of the Paseo. NPS stated would provide a limited concession of moving the lower gate approximately 180 feet, as shown below:



162.    Besides providing access to one additional feeding station (station 4), NPS' offer to move the gate 180 feet provides little realistic relief to ACA and SAG, and the community cats residing above that point of the Paseo. That is because the lower portion of the Paseo is physically separated from the upper portion by a causeway between feeding stations 3 and 4 that is almost 700 feet long, reaches extreme temperatures during the day, and the community cats generally will not migrate large distances in a short period of time. Further, it is likely that construction activities between feeding stations 4 and 5-7 may deter the cats from moving southward.

163.    In that same November 25, 2025 email, NPS provided for the first time the 2018 CE Determination to ACA and SAG, and acknowledged that while the "Corps oversees the entirety of the project as it relates to construction contracting and execution," the "National Park Service, however, retains jurisdiction and responsibility over the Site and its management, including for decisions related to Site closures."

164.    Plaintiffs responded on November 26, 2025, accepting NPS' offer to move the lower Paseo gate 180 feet, but reiterating their objections to the Cliff Project, the harms it would impose on ACA and SAG, their members, and the community cats.

165.    Plaintiffs reiterated an offer to look for reasonable solutions to Paseo access, including phased access during construction and reasonable restrictions on that access in that November 26, 2025 response.

166.    On December 2, 2025, Plaintiffs followed up with NPS, again requesting NPS reconsider its position to revoke access to the upper portion of the Paseo.

167.    In that correspondence, Plaintiffs requested additional information about the scope of the Cliff Project, including where construction would take place, and in what phases. *Id.*

168.    NPS responded for a final time on December 4, 2026, noting that NPS could not allow ACA or SAG access to the Paseo during construction, as any exceptions to allow the public to access the "safety corridor" would create unacceptable risks.

169.    In that same December 4, 2026 response, NPS notified ACA and SAG that it has received final permits for the Cliff Project, and that the closure of the Paseo would take place "on or after December 15, 2025."

170.    NPS again invited ACA and SAG to hurriedly move the feeding stations on the Paseo, ignoring ACA's and SAG's prior assertions that feeding stations could not be moved that rapidly or all at once.

171.    NPS then stated that ground disturbing activities may begin as early as December 8, 2025, and that if ACA or SAG wished to move feeding stations after December 8, 2025, they would need to coordinate with identified Corps employees for access to those Paseo sites.

172.    As of December 8, 2025, construction activities were taking place along the Paseo, including construction of the frames of gates at both closure points for the upper portion of the Paseo.  Additionally, clearing of brush and fauna was actively occurring near feeding station number 6, including brush where the community cats typically sought shelter and habitat.

173.    A sign at one of the constructions staging areas indicated that the project started on June 13, 2025, well before any notice was provided to Plaintiffs ACA and SAG.

**G.  The Categorical Exclusion for the Cliff Project Failed to Identify Clear Extraordinary Circumstances, and Should Have Been Revisited in Light of the 2023 Plan.**

174.    In the 2018 CE Determination, NPS found that the "C.19 Construction or rehabilitation in previously disturbed or developed areas" applied.  **Exhibit 1** at 2.

175.    The 2018 CE Determination also found that no extraordinary circumstances were relevant to the determination.  *Id.* at 3.  This is incorrect in several ways.

176.    First, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project has "significant impacts" on "cultural resources."  *Id.* at p.3, section B.  The community cats at the Paseo are a significant cultural resource in San Juan, and construction activities should have been anticipated to have an impact on the community cats living in the very area that is subject to renovation activities.

177.    Further, the 2008 MOU with SAG was known to NPS at the time of the 2018 CE Determination, as NPS was a party to that agreement.  It was no secret that SAG representatives were conducting daily TNR activities (as endorsed by NPS in the 2008 MOU) on the Paseo at that time, as SAG representatives had to regularly coordinate with NPS personnel in order to coordinate access to the Paseo.

178.    Second, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project has highly controversial environmental effects (*id.* at p.3, Section C), highly uncertain and potentially significant environmental effects, or unique or unknown environmental risks (*id.* at p.3, Section D).  Many of those who commented on the 2023 EA directed NPS to scientific literature on the Vacuum Effect, a scientific phenomenon whereby new cats move in to take advantage of the resources that sustained prior cats who were removed from a given area, and then reproduce back to capacity or even greater.  NPS' failure to consider these comments is at issue in the Related Litigation, and remains so in NPS' plan to close half the Paseo under the Cliff Project.  Given the existing Related Litigation challenging the 2023 Plan, and the effects of the Cliff Project on the 2023 Plan, including the requirement to only remove feeding stations after the capture of community cats, the CE Determination was no longer valid and required revisitation.

179.    Third, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project would have a significant impact.  The very reason for the TNR program's existence is to stabilize the Paseo community cat population, including ensuring that food and water stations remain clean, cats are provided for medical care when necessary, and that cats are trapped, neutered, and returned after being eartipped.  Prematurely ending this program, in direct violation of how the TNR program should be phased out under the 2023 Plan, will create unhealthy and unsafe conditions and lead to population destabilization

180.    Fourth, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project violates federal, state, local, or tribal law or requirements for the protection of the environment. *Id.* at p.3, Section I. In the 2023 FONSI, NPS explicitly recognized that Puerto Rico Act Number 154, *Animal Protection and Welfare Act*, and Law Number 36, *Law of the State Animal Control Office Attached to the Department of Health*, are local laws governing the humane treatment of community cats, and that NPS would seek to be consistent with those laws. Cutting off access to the feeding stations at the Paseo on short notice essentially guarantees that the community cats at this isolated portion of the Paseo will be subject to starvation, dehydration, increased risk of illness, suffering, and even death. This is especially true if any of the construction and renovation activities destroy the existing habitat the community cats are currently residing in. Further, the cats that remain (or any cats that migrate in) will not be spayed or neutered, and thus the population of cats will grow. Given how NPS has chosen to implement the Cliff Project, and especially in light of NPS' analysis in the 2023 Plan, an extraordinary circumstance exists regarding whether NPS' implementation of the Cliff Project would violate local animal welfare laws in Puerto Rico.

181.    Fifth, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project could contribute to the introduction, continued existence, or spread of non-native invasive species known to occur in the area. *Id.* at p.3, Section L. While Plaintiffs vigorously dispute NPS' prior determination that the community cats of the Paseo are an invasive species, and have challenged that determination in the Related Litigation, NPS' 2023 Plan specifically determines that the community cats are invasive species. Barring access to ACA and SAG to implement the existing TNR, which is designed to stabilize the population of community cats, may end up increasing the number of cats in the closed area of the Paseo, as spay and neuter services

44

will no longer be provided.  Importantly, the severity and extent of these effects are unknown, as NPS had declined to conduct an environmental analysis of the planned closure of the Paseo. However, NPS did reject an alternative that would have removed feeding stations only for this very reason. **Exhibit 4** at 16-17.

182.    Sixth, the extraordinary circumstances checklist required NPS to assess whether the Cliff project has a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects. *Id.* at p.3, Section F.  For all of the reasons outlined above, the 2023 Plan, NPS acknowledgement that the 2023 Plan required an EA, and the environmental impacts in the EA and their relationship to the Cliff Project, present extraordinary circumstances that require additional analysis, at least as of the date of its 2025 implementation.

183.    Seventh, the extraordinary circumstances checklist required NPS to assess whether the Cliff Project would have "significant impacts on properties listed or eligible for listing in the National Register of Historic Places as determined by the bureau." *Id.* at p.3, Section G.  For all of the reasons stated above, the Cliff Project will have significant impacts on the Paseo and the San Juan National Historic Site, the latter of which is a National Historic Site and UNESCO World Heritage Site.

### F.  NPS' and the Corps' Implementation of the Cliff Project Violates the 2023 Plan.

184.    Even if the Cliff Project 2018 CE Determination was valid when created in 2018 (it was not), NPS' implementation of the Cliff Project now violates its existing and superseding 2023 Plan, which mandates how feeding stations are managed, and eventually removed, from the Paseo.

185.    The 2023 Plan is clear that a feeding station in a given area may not be removed until after the community cats in the vicinity of the feeding station have first been captured and removed from the Paseo.

186.    The 2023 Plan is also clear that habitat modification may not occur absent concurrent efforts to trap and remove the community cats of the Paseo.

187.    Importantly, NPS rejected an alternative that would have only included removing the feeding stations without capturing the community cats due to concerns of wildlife predation, increased impacts on park resources, and the hardship that option presented for the community cats. **Exhibit 4** at 16-17.

188.    The 2023 Plan underwent NEPA review with an EA and FONSI determination, and is binding on NPS' activities on the Paseo, including those under the Cliff Project.

189.    The Cliff Project, without evaluation or public input, arbitrarily and completely reverses the 2023 Plan, eliminating most of the feeding stations at the outset of the projects and causing the protected community cats to suffer.

190.    Further, the Cliff Project is likely to cause additional harms to the community cats through (1) the destruction of habitat and cover currently utilized by the community cats; (2) injury to the cats through presence of construction equipment; and (3) stress caused to the cats by the scope of construction.

191.    To the extent NPS and the Corps implement the Cliff Project, NPS is violating the 2023 Plan and would effectively eliminate the 2023 Plan, since the community cats will not survive the Cliff Project's arbitrarily imposed requirements.

## FIRST CLAIM FOR RELIEF

*Violation of the Administrative Procedure Act and the National Park Service Organic Act – Defendants lack authority over the Paseo.*

192.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into each of the counts set forth below.

193.    NPS and the Corps are violating the APA, 5 U.S.C. §§ 551 *et seq.*, because their attempt to regulate the Paseo (and associated National Recreation Trail) is "not in accordance with law", "contrary to constitutional right" or "power", and in excess of NPS' "statutory jurisdiction, authority, or limitations, or short of statutory right".  5 U.S.C. § 706(2)(A),(B), (C).

194.    The 1949 Enactment setting the boundaries of the San Juan National Historic Site did not include the areas beyond the existing fortress walls.

195.    NPS' authority under the National Park Service Organic Act is limited to the lands and waters within system units.  54 U.S.C. § 100101; 54 U.S.C. § 100102(6); 54 U.S.C. § 100501.

196.    As such, NPS and the Corps lack the power or authority to regulate the Paseo as the Paseo is outside of the San Juan National Historic Site boundaries.

197.    Portions of the San Juan National Historic Site remain the property of Puerto Rico and are non-federal lands, and NPS' (and the Corps') authority over such lands is applicable only to the extent compatible with the nonfederal interests of Puerto Rico.  36 C.F.R. § 1.2(b).

198.    Further, NPS' own regulations and Director's Order #45 require that NPS' administration of the Paseo can only proceed "the extent that such regulations are consistent with the" existing MOUs.  Director's Order #45 at Section 3.12 – Regulations.

199.    As such, even for the portions of the Paseo within the San Juan National Historic Site (if any) but residing on non-federally owned lands, NPS and the Corps lacks authority to regulate those lands without ensuring compatibility with Puerto Rico Laws.

200.    NPS' and the Corps' actions seeking to close the Paseo, and modify the existing habitat of the community cats are not in accordance with law; contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitations and short of statutory right in violation of the APA, 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF

*Violation of the National Environmental Policy Act and the Administrative Procedure Act – Inadequate Categorical Exclusion Determination*

201.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into each of the counts set forth below.

202.    NPS and the Corps violated NEPA, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, in preparing the 2018 CE Determination for the Cliff Project.

203.    First, NPS and the Corps violated NEPA by failing to identify extraordinary circumstances that required the development of additional NEPA analysis in the 2018 CE Determination.

204.    Second, NPS and the Corps violated NEPA by failing to update the 2018 CE Determination due to the passage of time between the determination and project action.

205.    Third, NPS and the Corps violated NEPA by failing to update the 2018 CE Determination to reflect the changed requirements of the 2023 Plan, and the changed nature of implementing the Cliff Project not reflected in the 2018 CE Determination such as an 18 months' closure of approximately half of the Paseo.

206.    Fourth, NPS and the Corps violated NEPA by failing to update and/or supplement the 2018 CE Determination after creation of the 2023 Plan, which created new extraordinary circumstances that required additional environmental analysis.

207.    As such, NPS' and the Corps' 2018 CE Determination is arbitrary, capricious, and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

*Violation of National Environmental Policy Act and the Administrative Procedure Act – Failure to Supplement the Categorical Exclusion Finding in Light of 2023 EA/FONSI and Plaintiffs' Notifications to Defendants*

208.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into each of the counts set forth below.

209.    NPS and the Corps violated NEPA, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, by failing to supplement the 2018 CE Determination in light of the 2023 EA and FONSI for the 2023 Plan, and in light of Plaintiff's notification to NPS and the Corps that the 2018 CE Determination was no longer sufficient.

210.    The 2023 Plan requires specific treatment of the community cats at the Paseo based on a NEPA analysis that was subjected to public notice and comment, including a gradual and delayed removal of the feeding stations at the Paseo in order to effectuate the humane removal of the community cats.

211.    The 2023 Plan was created by NPS, and NPS was aware of the Cliff Project during the creation of the 2023 Plan.  NPS cannot now avoid the requirements of the 2023 Plan which was developed under public notice and comment through the Cliff Project.

212.    NPS' and the Corps' plan to cut off access to a significant, isolated portion of the Paseo that contains at least half of the existing feeding stations at that Paseo implicates significant environmental impacts and extraordinary circumstances that require NPS to revisit and supplement its 2018 CE Determination, and conduct either an EA or EIS as appropriate.

213.    As such, NPS' and the Corps' 2018 CE Determination is arbitrary, capricious, and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

*Violation of the Administrative Procedure Act – Actions in Direct Violation of the 1984 GMP, 2023 Plan, and the National Park Service Organic Act*

214.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into each of the counts set forth below.

215.    NPS and the Corps violated the APA, 5 U.S.C. §§ 551 *et seq.*, by engaging in a final agency action to cut off Plaintiffs' access to the Paseo to administer the TNR Program under the 2023 Plan.

216.    The 2023 Plan is a management plan developed under the 1984 GMP and the National Park Service Organic Act, and controls NPS' administration of the Park.

217.    NPS and the Corps are violating the clear terms of the 2023 EA and 2023 FONSI under the 2023 Plan, which requires NPS to continue the TNR program until such time as the 2023 Plan is implemented.

218.    Implementing the 2023 Plan requires that:

a.    NPS First engage with an animal welfare organization or cat removal organization prior to removing feeding stations at the Paseo;

b.    Only then allow the animal welfare organization or cat removal organization to engage in community cat removal in a given area prior to removing feeding stations;

c.    Not engage in habitat modification until after selecting an animal welfare organization or cat removal organization.

219.    NPS and the Corps are violating the 2023 Plan (and thus the 1984 GMP) by closing the upper portion of the Paseo without adequate time for Plaintiffs ACA and SAG to move the existing feeding stations.  This amounts to a *de facto* removal of feeding stations, without first trapping and removing the cats in the vicinity of those feeding stations, in violation of the 2023 Plan.

220.    Further, NPS and the Corps construction activities have included, and will continue to include, destruction of existing habitat of the community cats without the required corresponding trapping and removal of the cats, as the ground clearing activities necessary for the Cliff Project have currently destroyed, and will continue to destroy, existing habitat of the community cats in violation of the 2023 Plan.

221.    NPS' and the Corps' actions will impair ACA's and SAG's ability to continue the TNR program on the upper portion of the Paseo.

222.    NPS' and the Corps' actions will also cause harm, suffering, distress, and death to the community cats of the Paseo.

223.    Finally, NPS' and the Corps' implementation of the Cliff Project will violate the 1984 GMP and 2023 Plan by creating the potential for strains on the Park's resources and possible increased predation on wildlife due to the removal of the feeding stations.

224.    As such, NPS' and the Corps' indicated final decision to proceed with the Cliff Project and block Plaintiffs ACA's and SAG's access to the upper portion of the Paseo is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law in violation of the APA, 5 U.S.C. § 706(2)(A)-(D).

## FIFTH CLAIM FOR RELIEF

*Violation of the Administrative Procedure Act – Actions in Direct Violation of the Operative Memorandum of Understanding with Plaintiffs*

225.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs into each of the counts set forth below.

226.    NPS and the Corps violated the APA, 5 U.S.C. §§ 551 *et seq.*, by engaging in a final agency action to cut off Plaintiffs' access to the Paseo to administer TNR Program under the still effective 2008 MOU.

227.    The 2008 MOU remains active until NPS selects an animal welfare organization or animal removal agency under the 2023 Plan.

228.    NPS and the Corps will imminently violate the terms of the existing MOU with SAG that requires NPS to provide unlimited access to SAG to the Paseo while the TNR program is active when they close access to the upper portion of the Paseo.

229.    As such, NPS' indicated final decision to proceed with the Cliff Project and block Plaintiffs ACA's and SAG's access to the upper portion of the Paseo is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law in violation of the APA, 5 U.S.C. § 706(2)(A)-(D).

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiffs  request  this Court:

A.    Declare that Defendant lack jurisdiction over the Paseo and lack authority to close the Paseo and exclude Plaintiffs from the Paseo.

B.    Declare that Defendants violated NEPA and the APA and that the 2018 CE Determination is arbitrary and capricious, and contrary to law;

C.    Declare that Defendants violated NEPA and the APA by failing to update or supplement the 2018 CE Determination before relying on the 2018 CE Determination to implement the Cliff Project;

D.      Declare Defendants violated the APA by failing to follow their own 2023 Plan in implementing the Cliff Project, including by violating the clear terms for the gradual capture of community cats and removal of feeding stations at the Paseo;

E.      Enjoin Defendants from effectuating the Cliff Project to the extent they will prevent access to Plaintiffs ACA and SAG until either (1) the NEPA analysis of the 2018 CE Determination has been updated; or (2) the 2023 Plan has been fully implemented or otherwise resolved in the Related Litigation;

F.      Order Defendants to prepare an EA or EIS for the 2018 CE Determination and Cliff Project;

G.      Grant Plaintiffs their costs, expenses, attorneys' fees, and any other properly recoverable costs; and

H.      Grant such other and further relief as the Court may deem just, equitable and proper.


Dated: December 8, 2025


                              Respectfully submitted,


                              /s/ Paul M. Seby
                              Paul M. Seby (DC Bar No. CO000129)
                              Matthew K. Tieslau (DC Bar No. CO00130)
                              Greenberg Traurig, LLP
                              1144 15th Street, Suite 3300
                              Denver, CO 80202
                              (303) 572-6500 telephone
                              (303) 572-6540 facsimile
                              sebyp@gtlaw.com
                              tieslaum@gtlaw.com


                              Attorneys for Plaintiffs
                              Alley Cat Allies Incorporated and
                              Save-A-Gato, Inc.