**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ALLEY CAT ALLIES, INC. *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES NATIONAL PARK<br>SERVICE, *et al.*,<br><br>　　　　　Defendants. |

Civil Action No. 25-4269 (CKK)

**MEMORANDUM OPINION**
(January 28, 2026)

Since 2005, Plaintiffs Alley Cat Allies Incorporated ("ACA") and Save-A-Gato, Inc. ("SAG") have partnered with Defendant National Park Service ("NPS") to support and administer a Trap-Neuter-Return ("TNR") program for wild cats that live on the Paseo del Morro National Recreation Trail (the "Paseo") in the San Juan National Historic Site (the "Park") in San Juan, Puerto Rico, which NPS manages. The TNR program was established to reduce the wild cat population on the Paseo. Through the program, cats are live trapped, assessed by a veterinarian, spayed or neutered, vaccinated, and then either put up for adoption (kittens and socialized adults) or released to the location where they were trapped (antisocial adults). Plaintiffs maintain six feeding stations (containers holding food and water) along the Paseo to facilitate live trapping.

Starting as early as February 2, 2026, NPS will implement a safety closure along a portion of the Paseo while heavy construction is done to reinforce a cliff that overlooks the Paseo and supports the Park's historic fortifications (the "Cliff Project"). The area of NPS' planned closure encompasses three of the six feeding stations on the Paseo, and therefore the closure will prevent Plaintiffs from maintaining half of the TNR program's feeding stations as they are currently located. Plaintiffs claim that their interests in supporting and administering the TNR program and

1

their members' interest in observing and enjoying the wild cats on the Paseo will be irreparably harmed if they are prevented from maintaining these feeding stations during the Cliff Project closure.

Accordingly, Plaintiffs seek a preliminary injunction directing NPS and the other federal Defendants to provide Plaintiffs' representatives with limited, supervised access to the closure area while the closure is in place so Plaintiffs can continue to maintain the three feeding stations within the closure area. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **DENY** Plaintiffs' [8] Motion for Preliminary Injunction.

## I. BACKGROUND

The National Park Service ("NPS") manages the San Juan National Historic Site (the "Park"), the only national park unit in Puerto Rico. *See* 2023 Plan, Dkt. No. 15 Ex. G at 6. The Park is comprised of the principal fortifications associated with the city of Old San Juan and most of what remains of the fortress walls that surround Old San Juan. *See* Defs.' Opp'n, at 6. These fortifications "exemplify important developments in military architecture and engineering spanning almost five centuries (16th through 20th centuries) and represent the oldest fortifications of European design in the United States." 2023 Plan, Dkt. No. 15 Ex. G at 6. The fortifications

---

[1] The Court's consideration has focused on Plaintiffs' Complaint, Dkt. No. 1 ("Compl."); Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 8 ("Pls.' Mot."); Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction, Dkt. No. 8-1 ("Pls.' Mem."); the Declaration of Zaenid Duprey Perez, Dkt. No 8-12 ("Perez Decl."); the Declaration of Dr. Alba Michelle Gonzalez, Dkt. No. 8-13 ("Gonzalez Decl."); the Declaration of Charlene Pedrolie, Dkt. No. 8-14 ("Pedrolie Decl."); the Declaration of Ana María Salicrup, Dkt. No. 8-15 ("Salicrup Decl."); the Declaration of Justin Hucke, Dkt. No. 8-16 ("Hucke Decl."); the Declaration of Danamarie Pannella, Dkt. No. 8-17 ("Pannella Decl."); Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 14 ("Defs.' Opp'n"); the Declaration of Myrna Palfrey, Dkt. No. 15 ("Palfrey Decl."); the Declaration of Brad Lenz, Dkt. No. 16 ("Lenz Decl."); the Declaration of Wilberto Cubero del Toro, Dkt. No. 17 ("Cubero del Toro Decl."); the Declaration of Miguel Angel Naveira-Guzman, Dkt. No. 18 ("Naveira-Guzman Decl."); the Administrative Record for the Partial Closure of the Paseo del Morro Nat. Rec. Trail, Dkt. Nos. 19–22 ("Closure Record"); the Administrative Record for the Cliff Project, Dkt. Nos. 23–29 ("Cliff Project Record"); and Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 31 ("Pls.' Reply").

were designated a national historic site in 1949.  *Id*.  In 1961, they were transferred to NPS and the Commonwealth of Puerto Rico.  *Id*.

In 1985, NPS issued its Final General Management Plan ("GMP") for the Park to provide guidance for the preservation, use, development, and operation of the area.  *See* 1985 GMP, Dkt. No. 14-1.  The 1985 GMP states that the Park was established for "two primary reasons:" the "preservation of historic resources and visitor use."  *Id*. at 55.  Accordingly, the 1985 GMP explains that NPS would manage the Park's natural resources "so as to enhance the historic resources and the visitor experience," which would primarily involve maintaining "the grounds and the natural foundations on which the fortifications rest."  *Id*.  The 1985 GMP warned that the "greatest danger" to the Park was the potential "collapse of the fortifications" caused by the continual erosion of the cliffs upon which the fortifications were built.  *Id*.  NPS had "undertaken about $12 million worth of foundation stabilization work" at the time of the 1985 GMP to prevent such collapse.  *Id*.  The 1985 GMP and estimated that "$18 million of additional work [would] be needed to complete all necessary stabilization."  *Id*.

### A.  The Paseo del Morro, Cats, and the 2023 Plan

At the turn of the 20th Century, the waters of the San Juan Bay were in direct contact with the Park's southern fortification wall.  *See* 2023 FONSI, Dkt. No. 15, Ex. H at 23.  In the early 1990s, NPS began placing riprap (typically a foundation of stones or concrete thrown together to prevent erosion) along the southern fortification wall to expand a dirt path.  Defs.' Opp'n, at 7.  This dirt path was finished by 1995 and was originally used by NPS as a maintenance access route.  2023 FONSI, Dkt. No. 15, Ex. H at 23.  In 1999, however, the dirt path was paved over and turned into a three-quarter-mile walking path.  Defs.' Opp'n, at 7.  In 2001, this path was designated as a national recreation trail and became known as the Paseo del Morro National Recreational Trail (the "Paseo").  2023 Plan, Dkt. No. 15 Ex. G at 1.

3

A population of "free-ranging" cats "began to colonize" the Paseo shortly after it was constructed. *Id*. NPS defines "free-ranging" cats as cats that "spend time outside with the ability to roam freely and may or may not have an owner." *Id*. Because free-ranging cats are "an invasive species in any habitat," NPS began to explore options for removing free-ranging cats from the Paseo and the rest of the Park. Defs.' Opp'n, at 8. In 2004, NPS began discussions with the U.S. Department of Agriculture Animal and Plant Health Inspection Service ("APHIS") regarding a free-ranging cat management program at the Park. 2023 Plan, Dkt. No. 15 Ex. G at 5. NPS eventually reached an agreement to remove free-ranging cats from the Park with the Puerto Rican Tourism Company, which offered to "sponsor most of the cost." *Id*. However, due to "public concerns," NPS ultimately "did not move forward with efforts to remove cats from the [P]ark." *Id*. Instead, NPS opted "to implement a trap-neuter-return (TNR) program for the management of free-ranging cats at the Paseo." *Id*.

TNR programs "work[] to reduce free-ranging cat populations by removing kittens and socialized cats for adoption and stabilizing the remaining population by sterilizing cats, thus ending reproduction." *Id*. To administer a TNR program, free-ranging cats must be "live trapped, assessed by a veterinarian, spayed or neutered, vaccinated, and released to the location where they were trapped" or put up for adoption. *Id*. "TNR programs often involve the development of feeding stations because feeding the cats can help volunteers trap the cats and monitor the population." *Id*. These feeding stations are typically "small plastic containers containing food and water." Palfrey Decl. ¶ 15, Dkt. No. 15. NPS' "expectation of the TNR program was that the number of cats would decrease through attrition to a point of no cats within the [P]ark." 2023 Plan at 6.

In 2005, NPS and Plaintiff Save-A-Gato, Inc. ("SAG") executed a Memorandum of Understanding ("MOU") that established the TNR program on the Paseo. *See* 2005 MOU, Dkt. No. 1-7 at 2–3; Compl. ¶ 4. There were 120 cats living on the Paseo in 2005, according to the 2005 MOU. *Id*. ¶ 1 (stating that "this number will be used as the baseline"). Under the 2005 MOU, NPS would purchase six traps and two pairs of gloves for SAG to support its "on-going trapping activities," bear the cost of installing an "informational sign at the entrance of [the] Paseo" regarding SAG's activities, and "inform Tourism officials" of "the need to enforce" the rules outlined in the MOU. *Id*. ¶¶ 2, 9. SAG, in turn, would remove twelve cats from the Paseo's population of 120 within twelve months, meet quarterly or as needed with Park management, and conduct quarterly population surveys with NPS representatives resulting in a written report to NPS. *Id*. ¶¶ 3–5. The 2005 MOU further provided that NPS would "continue to allow" members of SAG "unlimited access" to the Paseo "for activities related to feeding, trapping, and population surveys" of free-ranging cats. *Id*. ¶ 6. It also provided that NPS and SAG would "maintain . . . five (5) feeding stations along the Paseo" for the estimated 120 cats living there. *Id*. ¶¶ 1, 8.

NPS and SAG executed a second MOU regarding the Paseo's TNR program in 2008. *See* 2008 MOU, Dkt. No. 1-7 at 4. According to the 2008 MOU, the population of cats on the Paseo had dropped to 95. *Id*. ¶ 1. NPS represented that it would "continue to allow" members of SAG "unlimited access" to the Paseo, "continue to support" SAG "with cages and/or other equipment to facilitate the program," and increase the number of feeding stations permitted on the Paseo from five (5) to eight (8). *Id*. ¶¶ 5, 7, 10 (adding that feeding stations would be "limited only to those mutually agreed areas"). SAG represented that it would not introduce new cats on the Paseo, as, according to the MOU, the reduction of the cat population on the Paseo had been and would be "attained by natural attrition." *Id*. ¶ 2. SAG also represented that it would "continue to work with

[NPS] staff in the development/construction of Paseo del Morrow [sic] Phase II work," which would include "cooperating with NPS personnel to keep cats feeding out of harms way during construction." *Id.* ¶ 9. Other than that, the 2008 MOU largely reiterated the provisions of the 2005 MOU.

By 2023, NPS had determined that the TNR program was not effectively decreasing the free-ranging cat population along the Paseo, as the estimated cat population along the Paseo had in fact increased from 120 cats in 2005 to 200 cats in 2023. 2023 Plan, Dkt. No. 15 Ex. G at 6. Accordingly, on August 4, 2023, NPS published to the public an Environmental Assessment ("EA")—namely, NPS' *Free-Ranging Cat Management Plan EA*—that identified the following three alternatives for addressing the free-ranging cat populations in the Park: (i) the "no-action" alternative (Alternative 1); (ii) the "original proposed action," under which NPS would contract with a removal agency to remove free-ranging cats from the Park (Alternative 2); and (iii) the "revised proposed action," under which NPS would contract with an animal welfare organization to trap and remove free-ranging cats from the Park (Alternative 3). Defs.' Opp'n, at 9.

On November 21, 2023, NPS published a Finding of No Significant Impact ("FONSI") announcing that it had selected Alternative 3. *Id.* NPS' 2023 FONSI explains that the designated animal welfare organization would be able to provide food to the free-ranging cats in the Park "via continued use of the existing feeding stations for a discrete period of time (up to 6 months) to aid in the trapping and removal efforts." 2023 FONSI, Dkt. No. 15 Ex. H at 4. At least one feeding station was to be removed each month during this six-month period until all feeding stations were removed. *Id.* The 2023 FONSI also directed that no new feeding stations could be added, and that all unauthorized feeding would be prohibited. *Id.* Finally, the 2023 FONSI provided that if no legitimate animal welfare organizations showed interest in serving as the designated animal

welfare organization under Alternative 3, then NPS would move on to the last phase of Alternative 3, which involved employing the type of removal agency contemplated in Alternative 2 to remove free-ranging cats from the Park. *Id*. at 5.

Plaintiffs sued NPS over its adoption of the 2023 Plan on March 27, 2024. Defs.' Opp'n, at 10. Plaintiffs' action (the "2023 Plan Litigation") was randomly assigned to another Judge in this District and is ongoing. *See Alley Cat Allies, Inc. v. United States Natl Park Serv.*, 24-cv-876 (D.D.C.) (RDM). On August 21, 2024, NPS issued a solicitation for letters from animal welfare organizations interested in working with NPS to implement Alternative 3 of the 2023 Plan. Palfrey Decl. ¶ 8. NPS held the request open for thirty days but did not receive any statements of interest. *Id*. Plaintiff SAG, in fact, informed NPS that it would not be applying for consideration. *Id*. NPS therefore made plans to continue with Alternative 3 by employing a removal agency rather than an animal welfare organization. *Id*. According to Plaintiffs, NPS represented in the 2023 Plan Litigation that it would not authorize the removal of free-ranging cats from the Park prior to May 15, 2026. Pls.' Mem., at 43.

### B. The Cliff Project

On November 6, 2025, counsel for NPS informed counsel for Plaintiffs that, separate from the 2023 Plan and the 2023 Plan Litigation, NPS would be implementing "a long-anticipated cliff stabilization project" (the "Cliff Project") along the Paseo in coordination with the Army Corps of Engineers (the "Corps"). Pls.' Mem., at 9 (quoting NPS Conferral (Nov. 6, 2025), Dkt. No. 8-2 at 1). NPS informed Plaintiffs that it would be closing a portion of the Paseo during construction on the Cliff Project, and that there were four feeding stations located within the identified work site area that would be "inaccessible during the duration of the project." NPS Conferral (Nov. 6, 2025), at 2. NPS added, however, that it would not object to Plaintiffs relocating any of the four feeding stations identified within the closure area to an accessible area of the Paseo outside of the closure

area before the Project start date.  Pls.' Mem., at 10.  NPS had not yet determined a date for "official work site closures" at the time of this initial communication,[2] but it informed Plaintiffs that it anticipated the Cliff Project would take about 18 months once it began.  *Id*. at 9.

The Cliff Project "consists of installing rock anchors and applying shotcrete to stabilize the natural cliff face . . . overlooking the Paseo."  Defs.' Opp'n, at 11.  In the 1990s, Defendants "performed a shotcrete application of approximately 75%" of this area; the Cliff Project "will address the remaining unprotected portions."  *Id*.  Defendants claim that the Cliff Project "is imperative for the protection and continued preservation of the Park's historic fortifications," as further erosion of the cliff face "could result in the collapse of a whole section of the fortification" if left untreated.  *Id*. (citing 1985 GMP, Dkt. No. 14-1 at 43).  Defendants explain that natural weathering has already caused "serious landslide and rockslide events" in the area, like in 2012 when "episodes of torrential rain" led to a rockslide that caused "the detachment of boulders of approximately 5 feet wide and 7 feet long onto the Paseo."  *Id*. (citing Cliff Stabilization Project File Documents, Dkt. No. 14-2 at 13 (the "Cliff Project File")).  Accordingly, Defendants add that failure to complete the Cliff Project "could result in the permanent closure of the Paseo due to the major safety hazards falling boulders represent."  *Id*.

NPS authorized the Cliff Project in 2018.  *See* Defs.' Opp'n, at 12; Pls.' Mem., at 7.  As part of this authorization, the Park Superintendent issued NEPA and National Historic Preservation Act determinations that "found the Cliff Project to fit within a pre-established categorical exclusion."  Defs.' Opp'n, at 12.  Specifically, the Superintendent found that the Project fit within the categorical exclusion for "construction or rehabilitation in previously disturbed or developed areas" because "shotcrete treatment was previously applied in the area" and untreated areas were

---

[2] NPS informed Plaintiffs that it was still "awaiting archeological permits" and was receiving "three-week construction look-ahead updates."  Pls. Mem., at 9.

"increasingly becoming a threat for the resource and a safety hazard for visitors and employees that use Paseo del Morro daily."  Cliff Project File, Dkt. No. 14-2 at 15 (capitalization modified). The Superintendent also found that no extraordinary circumstances applied to the Project.  *Id*. at 15–6.  Accordingly, the Cliff Project was categorically excluded from further NEPA analysis (the "CE Determination").  *Id*.; Defs.' Opp'n, at 12.

The Cliff Project was not funded in 2018.  Rather, the Cliff Project was funded in 2020 after NPS submitted the Project proposal to Congress for funding under the Great American Outdoors Act, Legacy Restoration Fund ("LRF").  Defs.' Opp'n, at 12 (citing Lenz Decl., Dkt. No. 16 ¶ 8).  Approximately $17 million has been allocated to NPS for the Project.  *Id*.  Pursuant to statute, the Corps is "providing project and construction management services to NPS to ensure the Cliff Project is executed."  *Id*.  On July 29, 2024, the Corps published a solicitation for construction bids for the Cliff Project.  *Id*.  The Corps awarded the construction contract on May 1, 2025, and on June 13, 2025, it issued the contractor a Notice to Proceed.  *Id*.

NPS' November 6, 2025, notification to Plaintiffs regarding the Cliff Project came approximately five months after the Corps issued its chosen contractor a Notice to Proceed. Plaintiffs claim that NPS' November 6 notification "was the first time [they] had ever been made aware" that the Cliff Project would prevent them from accessing portions of the Paseo and the feeding stations thereon.  Pls.' Mem., at 10.  Plaintiffs assert that the 2018 categorical exclusion determination for the Cliff Project "did not address or consider the two MOUs between NPS and SAG" regarding the TNR program.  *Id*. at 8.  Defendants do not rebut this assertion.  The 2023 Environmental Assessment ("EA") for the 2023 Plan, however, did address the Cliff Project, describing it as one of "several ongoing actions that . . . may require closures that would affect visitors for short periods."  *See id*. at 8–9.

NPS provided a second update to Plaintiffs on November 18, 2025. Pls.' Mem., at 10. In this update, NPS informed Plaintiffs that the Cliff Project closure would "occur, at the earliest, in two weeks." *Id*. Plaintiffs responded on November 20, informing NPS and the Corps of their objections to the planned Cliff Project closure. *Id*. at 11. In their response, Plaintiffs "offered multiple options" to NPS and the Corps to continue to allow their access to the feeding stations during the Cliff Project closure. *Id*. Plaintiffs also told NPS and the Corps that "moving the feeding stations in such a short period of time was not possible" because "the cats needed to be slowly coaxed to a new location over a period of months." *Id*. Finally, Plaintiffs told NPS and the Corps that "extraordinary circumstances existed on the Paseo that required additional NEPA analysis such as would negate the 2018 CE Determination" that authorized the Cliff Project. *Id*.

NPS responded to Plaintiffs on November 25, 2025. Defs.' Opp'n, at 13. NPS offered to shrink the area of the Cliff Project closure by approximately 100 feet to allow Plaintiffs to maintain access to one of the feeding stations within the original closure area but emphasized that public safety prevented it from making any further exceptions. *Id*. Plaintiffs accepted NPS' offer to shrink the area of the Cliff Project closure but reiterated their other objections and their offer to coordinate on alternative solutions. Pls.' Mem., at 12–3. On November 25, NPS officially decided that it would close off approximately 1,730 feet of the Paseo—an area encompassing three feeding stations, per NPS' offer to Plaintiffs—from public access during the Cliff Project construction in order to "protect the public and minimize liability to NPS" within "the most active areas" of Cliff Project construction. Palfrey Decl., Dkt. No. 15 ¶ 13. Under this plan, Plaintiffs will still have access to approximately 3,239 feet of the Paseo, upon which three of the Paseo's six active feeding stations are located. *Id*.

On December 4, NPS informed Plaintiffs that it had received final permits for the Cliff Project and that the Cliff Project closure would occur "on or after December 15, 2025." Pls.' Mem., at 13. NPS also informed Plaintiffs that ground disturbing activities could begin as early as December 8, and that if Plaintiffs wanted to move any of the feeding stations within the area scheduled for closure after December 8, they would need to coordinate with the Corps for access. *Id*. Since December 8, "SAG representatives have had a Corps representative escort while they maintain existing feeding stations" that are located within the area scheduled for closure. *Id*. at 14. NPS has extended the earliest expected date for the Cliff Project closure numerous times since December 8. Currently, NPS represents that the Cliff Project closure will start at the earliest on February 2, 2026. *See* Defs.' Not. of Resp. to Order, Dkt. No. 11.

### C.  The Present Action

Plaintiffs filed this action on December 8, 2025, bringing claims against NPS, the Corps, and individual officers acting in their official capacities for violations of the APA and NEPA. *See* Compl., Dkt. No. 1.

On December 16, Defendants filed a Notice of Related case, claiming that Plaintiffs' action was "related" to the 2023 Plan Litigation and should therefore be transferred under Local Rule 40.5(b)(2) to the Judge in this District currently presiding over the 2023 Plan Litigation, Judge Randolph D. Moss.

On December 19, Plaintiffs filed a motion to preliminarily enjoin NPS from preventing their access to the feeding stations within the Cliff Project closure. Pls.' Mot., Dkt. No. 8. The Court granted Defendants' request for an extension of time to respond to Plaintiffs' motion, which Plaintiffs consented to, while Judge Moss determined whether this action was sufficiently "related" to the 2023 Plan Litigation to justify transfer under the Local Rule. Judge Moss ultimately determined that this action was not sufficiently related to the 2023 Plan Litigation.

Defendants filed their opposition to Plaintiffs' motion for preliminary injunction on January 9, 2026. Defs.' Opp'n, Dkt. No. 14. On January 16, Defendants filed the administrative record with the Court. *See* Dkt. Nos.' 19–29.

On January 20, Plaintiffs replied to Defendants' opposition. Plaintiffs also filed a motion objecting to Defendants' production of the administrative record on the same day, which Defendants responded to on January 23. In a nutshell, the parties dispute whether the entire administrative record for the 2023 Plan should be included in the administrative record for this action. The Court need not resolve this dispute to rule on Plaintiffs' motion for preliminary injunction and shall therefore resolve it at a later date. Accordingly, Plaintiffs' motion for preliminary injunction is now ripe.

*    *    *    *

Plaintiffs claim to have framed their request for preliminary relief "as narrowly as possible." Pls.' Reply, at 6. They argue that an injunction from the Court "need only be reasonably tailored" to allow SAG representatives "limited and supervised" access to the area of the Cliff Project closure so they can "continue administering the TNR program and supplying the feeding stations" while the closure is in place during construction. *Id*. at 23. NPS argues that allowing such access would create "a risk of safety that the Park is not willing nor should be reasonably expected to accommodate." Defs.' Opp'n, at 42. NPS also argues that it "lacks the workforce to undertake" the supervision suggested by Plaintiffs, although it agrees that such supervision would be necessary given recent "surreptitious action" they claim has been taken by SAG representatives. *Id*. at 42–3.[3]

---

[3] Defendants claim that since filing this action, Plaintiffs have added new additional feeding stations outside and inside the area of the Cliff Project closure without informing or obtaining authorization from NPS. *See* Defs.' Opp'n, at 37 n.10, 42–3. Plaintiffs dispute this characterization, claiming that they have not added new stations but rather "increased the food and water capacity of existing feeding stations." Pls.' Reply, at 10 n. 6.

## II. LEGAL STANDARD

The Administrative Procedure Act ("APA") provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  If final agency action is shown to be arbitrary and capricious or contrary to law, the reviewing court must "set aside" the action.  *Id.* § 706.  Section 705 of the APA provides that a reviewing court may, on such conditions as may be required and to the extent necessary to prevent irreparable injury, issue "all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.

Courts in the D.C. Circuit assess requests for preliminary injunctions by using a four-part standard.  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 121 (D.D.C. 2025) (LLA); *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020) (RDM); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (PLF); *see Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).  To obtain a preliminary injunction, a plaintiff must establish (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [their] favor," and (4) that "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When the Government is the opposing party, as it is in this case, the balance-of-equities and public-interest factors "merge," and courts address those factors together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

To obtain a preliminary injunction, "the movant has the burden to show that all four *Winter* factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation modified).  Before the Supreme Court announced its decision in *Winter*, courts in this Circuit applied a "sliding-scale" approach to the preliminary-injunction factors, under which "a strong showing on one factor could make up for a weaker

showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). In the years since *Winter*, courts in this Circuit have repeatedly declined to decide "whether the sliding-scale approach remains valid." *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). However, this Circuit has held variously that a failure to show a substantial likelihood of standing, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015), success on the merits, *Ark. Dairy Co-op Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009), or irreparable harm, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336–37 (D.C. Cir. 2024), are each independently fatal to a request for injunctive relief.

### III. ANALYSIS

The Court finds that Plaintiffs have standing to bring their motion for preliminary injunction on their own behalf and on behalf of their members. However, the Court determines that Plaintiffs have failed to demonstrate that they or their members are likely to suffer an irreparable injury in the absence of a preliminary injunction. *Winter*, 555 U.S. at 24. Accordingly, because a failure to show irreparable harm is independently fatal to a request for injunctive relief, the Court concludes that Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction. *Alpine Sec. Corp.*, 121 F.4th at 1336–37.

### A. Plaintiffs have shown a substantial likelihood of Article III standing.

The federal judicial power is confined to the resolution of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").

"A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561). At the pleading stage, a plaintiff need only "state a plausible claim" to standing. *Food & Water Watch*, 808 F.3d at 913. Plaintiffs seeking a preliminary injunction, however, face "a significantly more rigorous burden to establish standing." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (citing *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)). A plaintiff seeking a preliminary injunction must show a "substantial likelihood" of standing. *Food & Water Watch*, 808 F.3d at 913. Moreover, a plaintiff seeking a preliminary injunction cannot rely on past injuries alone to establish standing; they must show that they are either "suffering an ongoing injury" or facing "an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).

The Plaintiffs in this case are organizations. When an organization seeks to establish standing, it may do so in two ways. It may show that it has "organizational standing" to sue on its own behalf. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 393 (2024). Or it may demonstrate that it has "associational standing" to sue on behalf of its members. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs assert both forms of standing.

In determining whether Plaintiffs have established a substantial likelihood of either form of standing, the Court "must be careful not to decide the questions on the merits for or against" the Plaintiffs. *Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024) (citing *City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam)). The Court "must therefore assume that on the merits the Plaintiffs would be successful in their claims." *Id*. (capitalization modified).

1.    <u>Plaintiffs have shown a substantial likelihood of organizational standing.</u>

An organization that seeks to sue on its own behalf for injuries it has sustained must establish organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 393 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982)).  To establish organizational standing, an organization must satisfy the usual standards for Article III standing that apply to individuals. *Id.* at 393–94.  In other words, they must show that they have (i) "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (ii) that their injury "was likely caused by the defendant;" and (iii) that the injury "would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423.

To establish injury in fact, an organization must show that it "has suffered a concrete and demonstrable injury to [its] activities" rather than a mere "setback to its abstract social interests." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093–94 (D.C. Cir. 2015) (citation omitted).  Courts ask two questions when making this determination: *first*, whether the challenged conduct "injured the organization's interest;" and *second*, whether the organization "used its resources to counteract that harm." *People for the Ethical Treatment of Animals*, 797 F.3d at 1094 (citing *Havens Realty Corp.*, 455 U.S. at 379; *Equal Rights Ctr.*, 633 F.3d at 1140) (citation modified).

To show an injury to its interests, an organization must show that the challenged action has "perceptibly impaired" its ability to provide services for its members or "directly affected and interfered with [its] core business activities." *Havens*, 455 U.S. at 379; *All. for Hippocratic Med.*, 602 U.S. at 395.  "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).  Regarding an organization's use of resources to counteract the alleged harm, an

organization cannot "spend its way into standing," and therefore an organization will not suffer an injury in fact unless its expenditure of resources "subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).

To establish redressability, an organization must show that their alleged injury "likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. Redressability and causation are "often 'flip sides of the same coin.'" *Id*. at 380–81 (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). Accordingly, "if a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id*. at 381 (capitalization modified).

\*      \*      \*      \*

Plaintiffs have a concrete interest in effectively administering the TNR program on the Paseo. For over a decade, ACA has worked "on the ground" to "establish, support, and administer" the TNR program on the Paseo by, among other things, providing SAG with "cat food, medical supplies, TNR, and veterinary services." Pls.' Mem., at 17–8. SAG, for its part, "has been responsible for administering the TNR program on the Paseo since its inception in 2005." *Id*. at 18. Plaintiffs claim that SAG's administration of the Paseo's TNR program is governed by its "existing" MOUs with NPS, which Plaintiffs argue provide SAG "unlimited access to the Paseo until the TNR program is terminated." *Id*. The terms of SAG's MOUs with NPS support Plaintiffs' claim. *See* 2005 MOU, Dkt. No. 1-7; 2008 MOU, Dkt. No. 1-7 at 4 ¶¶ 5, 7.

Defendants argue that Plaintiffs cannot demonstrate injury in fact because they "have no legally protected right to access areas within the Park." Defs.' Opp'n, at 18–19. But "the 'legal interest' test goes to the merits;" "the question of standing is different." *Ass'n of Data Processing*

*Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970) (capitalization modified).  A "legally protected interest" for purposes of Article III injury-in-fact "refer[s] only to a cognizable interest." *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014) (citing *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *Lujan*, 504 U.S. at 560) (explaining that *Lujan* found "a cognizable interest in observing animal species without considering whether the plaintiffs had a legal right to do so").  And Plaintiffs have a cognizable interest in effectively administering the TNR program based on their investment and "decades-long partnership" with NPS—initiated through two MOUs—to "run the TNR program on the Paseo."  Pls.' Mem., at 29.  In fact, the record suggests that Plaintiff SAG exists solely because of this partnership, as it "was specifically incorporated as a non-profit due to NPS' requirement that the group that would manage and administer the TNR program be an incorporated organization."  Compl., ¶ 29.  To the extent Defendants argue that the MOUs between NPS and SAG "no longer address[] the facts on the ground or the parties' current understanding," this is a determination better left to the merits.  Defs.' Opp'n, at 20.  And "when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."  *Parker*, 478 F.3d at 377, *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008); *Tanner-Brown*, 105 F.4th at 444; *City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam).

Accordingly, through their consistent investment in the Paseo's TNR program, consistent work to maintain and administer the Paseo's TNR program, and their alleged agreement with NPS to administer the Paseo's TNR program, Plaintiffs have shown that they have a concrete interest in effectively administering the Paseo's TNR program.

The Cliff Project closure will likely harm Plaintiffs' interest in effectively administering the Paseo's TNR program because it will perceptibly impair their ability to trap cats on the Paseo.

TNR programs "often involve the development of feeding stations" because feeding stations "help volunteers trap the cats and monitor the population."  2023 Plan, Dkt. No. 15 Ex. G at 1.  When it comes to the three main elements of a TNR program—trap, neuter, return—trapping is likely the most important.  Without trapping, a TNR program could neither neuter nor vaccinate cats living in the wild.  *See* Pedrolie Decl. ¶ 28, Dkt. No. 8-14; Salicrup Decl. ¶ 29, Dkt. No. 8-15.  And without the ability to neuter and vaccinate, a TNR program could not effectively monitor and reduce a cat population.  *Id*.  Accordingly, interference with a TNR program's feeding stations will likely equate to interference with "critical TNR functions."  *Id*.

The Cliff Project closure will prevent Plaintiffs from using three of the six feeding stations they currently maintain on the Paseo.  Pls.' Mem., at 27.  The closure will therefore impair Plaintiffs' ability to trap cats on the Paseo generally.  The closure will also impair Plaintiffs' ability to neuter the cats located within the area of the closure, which, according to the record, will likely lead to an increase in the cat population on the Paseo.  Pls.' Mem., at 39–40.  Such an increase would interfere with the goal of the TNR program to decrease the Paseo's cat population "through attrition to a point of no cats."  2023 Plan, Dkt. No. 15 Ex. G at 6; *see also* 2005 MOU, Dkt. No. 1-7 at 2 ¶ 1 (providing that the Paseo's then-current population of 120 cats would "be used as the baseline" for SAG's work); 2008 MOU, Dkt. No. 1-7 at 4 ¶ 2 (stating that the reduction of the Paseo's cat population "has been and will be attained by natural attrition").  Finally, the closure will impair Plaintiffs' ability to provide other veterinary services, such as vaccination, for the cats located within the area of the closure.  Pls.' Mem., at 39–40.  The record suggests that this will likely lead to an increased need for veterinary services in the future, which will in turn lead to increased expenditures for Plaintiffs.  *Id*.

Accordingly, the Court determines that the Cliff Project closure will likely harm Plaintiffs' interest in effectively administering the TNR program on the Paseo because it will substantially impair their ability to trap cats on the Paseo. *See Food & Water Watch*, 808 F.3d at 919.

The Court also finds that Plaintiffs have expended resources to mitigate the harm they anticipate will be caused by NPS' temporary closure of the Paseo. *See People for the Ethical Treatment of Animals*, 797 F.3d at 1094.

Plaintiff ACA has "dispatched representatives" to San Juan to "assist SAG in exploring ways to mitigate" the harm they anticipate will be caused by the Cliff Project closure. Pls.' Mem., at 18. Plaintiffs represent that ACA will continue "to mobilize additional resources and increase spending by diverting resources to San Juan in order to minimize the emergency situation that will occur if NPS cuts off access to the Paseo." *Id.* Plaintiff SAG, in turn, has directed its representatives to "spend extra time on the Paseo in an effort to mitigate the harms the closure will impose." *Id.* at 19. Plaintiffs have therefore shown that they have dedicated more resources than usual to the Paseo in response to the planned Cliff Project closure. *See Food & Water Watch*, 808 F.3d at 920.

In sum, the Court concludes that the Cliff Project closure is sufficiently likely to cause Plaintiffs an Article III injury. Not only will the closure perceptibly impair Plaintiffs' ability to administer critical TNR functions, but Plaintiffs have increased their expenditures in an effort to mitigate the harm that is likely to flow from this impairment.

The Court also concludes that Plaintiffs' claimed injury would be redressed by a favorable ruling on the merits. Defendants' argument to the contrary largely mirrors their prior argument regarding Article III injury. Specifically, Defendants claim that the Court could not redress

Plaintiffs' alleged injuries because there is "no legal requirement that would allow the Court to order that NPS allow Plaintiffs access to any particular area of the Park." Defs.' Opp'n, at 20–1.

Defendants' argument is premised on too narrow a view of Plaintiffs' requested relief. Plaintiffs seek an order that enjoins NPS from blocking their access to the three feeding stations that are within the area of the planned Cliff Project closure. Plaintiffs can obtain such an order by succeeding on the merits. For instance, if Plaintiffs were to succeed on their claim that the 2018 CE authorizing the Cliff Project violated NEPA or the APA, then, as Plaintiffs point out, one likely remedy would be to vacate the 2018 CE determination, which would in turn remove the necessary basis for NPS' planned Cliff Project closure (i.e., the Cliff Project itself). *See* Pls.' Reply, at 3–4. This would likely provide Plaintiffs continuing access to their feeding stations in the near-term; in the long-term, it could perhaps lead to the type of supervised access that Plaintiffs currently seek if NPS were to revisit the 2018 CE determination and conclude that such access is warranted. Alternatively, Plaintiffs could obtain a similar remedy if they were to succeed on their claim that the Cliff Project closure violates NPS' 2023 Plan.

In "reviewing the standing question," courts "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha*, 320 F.3d at 235. Accordingly, because a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," the Court concludes, based on the above, that Plaintiffs' alleged injuries could be redressed by a favorable ruling on the merits. *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *see also Bird v. Barr*, No. 19-CV-1581 (KBJ), 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (explaining that "a proper motion for a preliminary

injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation") (emphasis in original).

   2. <u>Plaintiffs have shown a substantial likelihood of associational standing.</u>

  A membership organization has associational standing to bring suit on behalf of its members if it can establish that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  The Court determines that Plaintiffs have met these requirements.

  *First*, Plaintiffs have established that their members would otherwise have standing to sue in their own right based on their "recreational and aesthetic interests in viewing and enjoying the cats within the Paseo." Pls.' Mem., at 20, 41.  The desire to "observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63; *see also Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (en banc) (explaining that there is a cognizable "aesthetic interest in observing animals living under humane conditions").  Through sworn declarations, Plaintiffs have established that their members have aesthetic and recreational interests in viewing and enjoying cats that live within the Cliff Project closure and have concrete plans to do so in the future.  Perez Decl. ¶¶ 26–30; Hucke Decl. ¶¶ 3–6, ¶¶ 9–10; Salicrup Decl. ¶¶ 34–5.  The Cliff Project closure will harm Plaintiffs' members' interest because it will prevent them from accessing the area in which these cats are primarily located.  And as the Court explained above, a favorable ruling on the merits would redress this harm.

  *Second*, Plaintiffs' members' interest in viewing and enjoying the cats within the Paseo is germane to Plaintiffs' organizational purposes.  As explained above, both ACA and SAG serve

the purpose of preventing cruelty to the cats that live on the Paseo by supporting and administering the Paseo's TNR program. *See* Pls.' Mem., at 37–9. Plaintiffs' members' interest in viewing and enjoying cats on the Paseo living under humane conditions is directly related to this purpose. *Third*, and finally, this Court's review of agency action under the APA will not require the participation of Plaintiffs' individual members. *See Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 9 (D.D.C. 2019) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

Accordingly, the Court concludes that Plaintiffs have standing to bring their motion for preliminary injunction on behalf of their members.

**B. Plaintiffs have not made a sufficient showing of a likelihood of irreparable harm.**

To obtain a preliminary injunction, Plaintiffs must show that the Cliff Project closure will irreparably harm either their organizational interests in effectively administering the TNR program or their members' aesthetic interests in observing the cats on the Paseo. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that a plaintiff's "failure to show any irreparable harm is [] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief").

To meet the high standard set for irreparable injury, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). In other words, they must show that there is "a clear and present need for equitable relief to prevent" an injury that could not be adequately remedied at a later date. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up). Furthermore, because the Court "must decide whether the harm will *in fact* occur," Plaintiffs "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur

in the near future," and "show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id*. (emphasis in original).

*    *    *    *

As previously detailed, Plaintiffs currently maintain six feeding stations along the mile-long Paseo as part of the TNR program. NPS' Cliff Project closure will close a third of a mile of the Paseo and prevent Plaintiffs' representatives from accessing—and therefore maintaining—three of the six feeding stations. Plaintiffs claim that the closure will irreparably harm their interest in administering the TNR program on the Paseo because it will "disrupt[] the conditions that make humane management of cat colonies possible" and thereby "undo years of work by ACA and SAG to ensure that the community cats of the Paseo are spayed and neutered, treated against illness, and allowed to live without distress." Pls.' Mem., at 38. Plaintiffs further claim that the closure will irreparably harm their members' "recreational and aesthetic interests in viewing and enjoying the cats within the Paseo" because it will cause irreparable harms to that cats that reside within the area of the closure. *Id*. at 41.

On November 6, 2025, NPS gave Plaintiffs the opportunity to relocate the three feeding stations within the area of the Cliff Project closure to anywhere along the remaining 3,239 feet of the Paseo that will not be subject to the closure. *Id*. at 39. Plaintiffs have chosen not to do so because they claim it would not mitigate any potential harms to the cats within area of the closure. Specifically, Plaintiffs argue that the cats that use the feeding stations within the area of the closure will be unlikely to migrate to feeding stations at other locations, and that even if they did migrate, they would be subject to harms from cats at other nearby feeding stations that are territorial. *Id*.

24

1.    <u>Plaintiffs have not shown a likelihood of irreparable harm to their interest in effectively administering the Paseo's TNR program.</u>

Plaintiffs have not established irreparable harm to their organizational interests. The temporary Cliff Project closure will not prevent Plaintiff ACA from continuing to support the TNR program, nor will it prevent Plaintiff SAG from continuing to administer the TNR program. *See* Defs.' Opp'n, at 35. Defendants represent that ACA can continue to advocate for and support the TNR program on the Paseo during the temporary Cliff Project closure, and that SAG can continue to administer the TNR program on the parts of the Paseo that remain open. Defs.' Opp'n, at 35. Furthermore, the closure will not harm Plaintiffs' interest in using the 2023 Plan Litigation to advocate for the TNR program on the Paseo because, contrary to Plaintiffs' argument, the record does not suggest that the closure will lead to a "significantly reduced number of [] cats left for Plaintiffs to protect" in the 2023 Plan Litigation. Pls.' Mem., at 43. Rather, the record suggests— and Plaintiffs argue extensively—that the closure could potentially lead to an *increase* in cats living on the Paseo, if anything. *See id*. at 39–41.

While the Cliff Project closure will likely impair Plaintiffs' ability to trap cats on the Paseo and thereby harm Plaintiffs' interest in effectively administering the TNR program, these harms are not irreparable. A temporary decrease in veterinary care for the cats on the Paseo caused by a decrease in trapping will not eradicate the entire population of cats on the Paseo; rather, at most, a temporary decrease in veterinary care could ultimately lead to a long-term increase in veterinary expenditures by Plaintiffs. This injury could be adequately redressed by compensatory relief at a later date. *See Va. Petroleum Jobbers Ass'n*, 259 F.2d at 925. In addition, although the record suggests that NPS chose to implement the 2023 Plan—NPS' plan to end the TNR program on the Paseo—because the Paseo's cat population has increased since the TNR program was established,

Plaintiffs have offered no support for the inference that a further increase in the cat population on the Paseo will in any way affect the future of the Paseo's TNR program.

Plaintiffs also argue that the Cliff Project closure will irreparably harm the cats living within the closure and thus harm their interest in the humane treatment of the cats. As the Court will explain in detail below, Plaintiffs have not substantiated this claim in the record. Furthermore, the relevant interest at stake for Plaintiffs as organizations is their support and administration of the TNR program. Because the Court determines that the Cliff Project closure will not harm the cats within the closure in a way that causes irreparable harm to the TNR program, the closure will not cause Plaintiffs irreparable harm. *See All. for Hippocratic Med.*, 602 U.S. at 393–5; *see also New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 150 n. 5 (D.D.C. 2016) (KBJ) (citing *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 336–37 (D.C. Cir. 2003)) (explaining that under most circumstances, an "alleged harm to an animal, in and of itself, is not a sufficient injury to support a legal action in federal court").

> 2.   <u>Plaintiffs have not shown a likelihood of irreparable harm to their members'
> interest in viewing and enjoying cats on the Paseo.</u>

Plaintiffs have also failed to show that the Cliff Project closure will irreparably harm their members' aesthetic and recreational interests in observing cats on the Paseo.

To start, the Cliff Project closure will not harm Plaintiffs' members' interest in observing the general cat population on the Paseo because the closure will not directly impact most of the cats living on the Paseo. Current estimates suggest that only 34 of the "well over" 200 cats currently living on the Paseo are "located" at the feeding stations with the closure area. Perez Decl., Dkt. No. 8-12 ¶ 18; Palfrey Decl. ¶ 15, Dkt. No. 15. In November 2025, the Park used cameras to track cat activity at each of the Paseo's six feeding stations over a three-day period and found that cats utilized the stations located outside the closure area roughly 680 times, while they

only utilized the stations located within the closure roughly 210 times.  Naveira-Guzmán Decl. ¶¶

6–7, Dkt. No. 18.  Accordingly, to the extent Plaintiffs claim that the closure will irreparably harm

their members' interest in viewing cats on the Paseo generally, the Court finds that a "sufficient

number" of cats will remain on the Paseo to "satisfy Plaintiffs' [members'] interest in observing

and enjoying" them on the Paseo.  *Colorado Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 219–20

(D.D.C. 2015) (CRC) (quoting *Habitat for Horses v. Salazar*, 745 F.Supp.2d 438, 448 (S.D.N.Y.

2010)) (explaining that "there is 'no enforceable right to observe a particular number of animals'").

     Furthermore, Plaintiffs have not substantiated their claim that the Cliff Project closure will

irreparably harm the individual cats living within the area of the closure.  Plaintiffs come up short

on this claim for the following reasons.

     *First*, the cats living within the area of the Cliff Project closure will likely be able to obtain

food and water without relying on the feeding stations.  Cats "become predators when allowed to

roam" like they do on the Paseo.  2023 Plan EA, Dkt. No. 15 Ex. G at 7 ("They are indiscriminate

in what they kill, and they are often surplus killers, not always eating what they kill.").  They have

been known to prey on at least 248 different species, and "have contributed to the extinction of at

least 63 native species" across the globe, including in many island environments.  *Id*. at 32.  This

is one of the reasons why NPS decided against removing the Paseo's feeding stations all at once

in its 2023 Plan, because "in the absence of the feeding stations, the cats could switch to preying

on native wildlife, such as reptiles or birds."  *Id*. at 16.  Plaintiffs' conclusory claims that the cats

located within the Cliff Project closure will "struggle to find sufficient food through scavenging

and other sources" because they "are not natural hunters" are therefore unavailing.  Gonzalez

Decl., ¶ 14; Perez Decl., ¶ 15.

*Second*, the cats located within the area of the Cliff Project closure will likely travel outside the closure to obtain food and water from the other feeding stations on the Paseo. Plaintiffs claim that cats "tend to seek to stay in an existing familiar environment" and argue that the cats located within the closure area are unlikely to travel to feeding stations outside the closure area because it would require passing through active construction and traversing almost 700 feet, including a portion that goes through a "narrow causeway." Gonzalez Decl. ¶ 12; Perez Decl. ¶ 22(e); Pannella Decl. ¶ 8(a). But the cats do not need to relocate their home to make use of the other feeding stations, and even if they did, there is no evidence to suggest that the rest of the Paseo is not a "familiar environment." The planned Cliff Project construction should not prevent the cats from traveling outside the area of the closure, as the record shows that cats "can become habituated to frightening devices," such as "electronic guards, pyrotechnics, propane cannons, and lights," that are employed to "scare them from using certain areas." 2023 Plan EA, at 18. Finally, Plaintiffs' claim that the cats will not travel 700 feet for food and water is not sufficiently likely given the evidence in the record suggesting that cats would need to be relocated at least 4 to 5 miles away from the Paseo to prevent them from returning back home, with reports of some cats "traveling up to 80 miles to return home."[4] Gonzalez Decl. ¶ 12(c); *see also* 2023 FONSI, Dkt. No. 15 Ex. H at 20 (public comment expressing concern that cats would "migrate outside the park boundary to more convenient food sources" if the feeding stations were removed).

*Third*, the record does not support Plaintiffs' claim that the cats located within the closure area will be prevented from using other feeding stations because "each feeding station has its own colony of cats that is resistant to migration from the neighboring colony." Pls.' Mem., at 39. NPS'

---

[4] Plaintiffs mention in passing that at least two of the cats located at feeding station 6, which is within the Cliff Project closure area, have physical disabilities. Plaintiffs provide the conclusory argument that these disabilities "would prevent migration." Pls.' Reply, at 12. This conclusory statement is insufficient to establish irreparable harm on its own.

2023 Plan EA states that "it is typical for free-ranging cats to travel among populations."  2023 Plan EA, at 17.  In fact, an NPS study done in conjunction with its 2023 Plan EA concluded that cats were "unlikely to be territorial" because it observed many of the cats "using multiple feeding stations along the Paseo" over an extended period of time.  *Id.* at 6.  Plaintiffs' submissions in the record reaffirm this finding.  For instance, the record shows that Plaintiffs maintain feeding stations "that are of an appropriate volume for the size of the colony around each feeding station, in part to deter additional cats from migrating into a given area over time."  Perez Decl. ¶ 13.  Furthermore, Plaintiffs repeatedly emphasize their concern that the population of cats on the Paseo will increase due to the Cliff Project closure because "new non-neutered cats [will] migrate into the closed area, increasing the possibility of population expansion."  *Id.* ¶ 27.  The record therefore suggests that cats migrating between feeding stations on the Paseo is a common occurrence.

*Fourth*, Plaintiffs terminated two feeding stations in the past, and the record does not suggest that any harm came from these terminations.  The 2008 MOU between SAG and NPS provided that there would be eight feeding stations on the Paseo.  *See* Palfrey Decl. ¶ 15.  At the time the 2023 Plan EA was drafted, however, there were only seven feeding stations on the Paseo.  *See* 2023 Plan EA, at 2.  Plaintiffs terminated another feeding station since then, as there were only six feeding stations on the Paseo at the time Plaintiffs filed this action.  *See* Salicrup Decl. ¶ 27.  Plaintiffs have not shown that any harm came from their termination of two feeding stations.  Nor have they shown that they took any specific measures to prevent such harm from occurring.  Accordingly, the present record suggests that feeding stations have been removed in the past without harm to the cat population on the Paseo.  *See Wisconsin Gas Co.*, 758 F.2d at 674.

*Fifth and finally*, the record suggests that Plaintiffs could mitigate the potential harm caused by the Cliff Project closure by either moving the three feeding stations located within the

closure area to a different location on the Paseo outside the closure area or by increasing the capacity of the existing feeding stations located outside the closure area. *See* Defs.' Opp'n, at 37. As explained above, cats will likely travel outside the closure area to use feeding stations elsewhere on the Paseo, and increasing the number of feeding stations outside the closure or the capacity of existing stations located outside the closure would provide the cats with more options and prevent any possibility of overcrowding. Defendants point out that Plaintiffs appear to have acknowledged as much by adding "new additional feeding stations outside the closure area" since filing this action. *Id*. at 37 n. 10. Plaintiffs contest Defendants' assertion by arguing that they have not added new stations but rather "increased the food and water capacity of existing feeding stations." Pls.' Reply, at 10 n. 6. Either way, Plaintiffs appear to have taken action since filing their motion for preliminary injunction that suggests they can provide for the cats that are located within the closure area by either moving the three feeding stations out of the closure area or by adjusting the "appropriate volume" of the existing feeding stations outside the closure area to accommodate an increase in use. *See* Perez Decl. ¶ 13.

Accordingly, the Court concludes that there is no "clear and present need for equitable relief to prevent" an irreparable injury to Plaintiffs' members' aesthetic and recreational interests in viewing and enjoying cats on the Paseo.

Plaintiffs also claim that their members' "general enjoyment of the Paseo" will be disturbed by the thought that "the federal government is enacting a deadly campaign against and showing extreme indifference to" the free-ranging cats of the Paseo, "who are simply living in peace in their natural home." Pls.' Mem., at 20–1, 41. This argument is also insufficient to establish irreparable harm.

NPS is not waging a "deadly campaign" against the cats that live on the Paseo; the Cliff Project closure is not a Trojan Horse.  NPS has determined that the Cliff Project closure is necessary to protect the public from the "heavy equipment, grade fencing, and potentially unstable circumstances" associated with a long-standing construction project to stabilize the eroding cliffs that serve as the foundation for the Park's historic fortifications.  Defs.' Opp'n, at 41–2.  The purpose of the Park is to "preserve, protect, and interpret" these fortifications, which were designated a national historic site in 1949.  Palfrey Decl. ¶ 4; 1985 GMP, Dkt. No. 14-1, at 55; 2023 Plan EA, at 6 (explaining that the fortifications "represent the oldest fortifications of European design in the United States").  If the Cliff Project is not implemented, there will be "additional and accelerating damage" to the foundation upon which these fortifications are built, which may result in "irreversible loss of historic fabric and landscape features."  Lenz Decl. ¶ 13.  Failure to complete the Cliff Project will also put visitor safety at risk, as the cliff scheduled to be fortified also supports "a busy public area of nearly 12 acres" that is used by visitors.  Palrefy Decl. ¶ 4.  In addition, "NPS may be forced to close the Paseo" to protect the public from the "ongoing threat of falling boulders and rockslides" if stabilization does not occur.  Lenz Decl. ¶ 15; Defs.' Opp'n, at 11 (explaining that in 2012, "episodes of torrential rain" led to a rockslide that caused "the detachment of boulders of approximately 5 feet wide and 7 feet long onto the Paseo").

Furthermore, the record shows that NPS has exhibited anything but "extreme indifference" toward the Paseo's cat population.  After Plaintiffs contacted NPS with concerns over the Cliff Project closure, NPS adjusted the area of the closure so that it only encompassed three feeding stations rather than four.  Defs.' Opp'n, at 13.  NPS spent $4,800 relocating the safety fencing to reflect this adjustment.  Palfrey Decl. ¶ 16.  NPS has also given Plaintiffs the opportunity to move the three feeding stations located within the closure area to other locations on the Paseo outside

the closure area, but Plaintiffs have so far refused.  Defs.' Opp'n, at 13.  Finally, since December 8, Corps representatives, through the authorization of NPS, have been escorting Plaintiffs through preliminary construction to the three feeding stations that are within the scheduled closure area so Plaintiffs can continue to maintain those stations before the closure begins.  Pls.' Mem., at 13. These facts undermine any claim that NPS has shown extreme indifference toward the cats of the Paseo and cut against any suggestion that NPS may take actions that harm the cats unnecessarily while carrying out the Cliff Project.

Finally, the record does not support Plaintiffs' claim that their members view the Paseo as the "natural home" of the free-ranging cats currently living there.  As the Court has detailed, the Paseo did not exist until NPS created it in the 1990s.  2023 FONSI, Dkt. No. 15, Ex. H at 23.  Free-ranging cats began to colonize the Paseo shortly after it was constructed.  2023 Plan, Dkt. No. 15 Ex. G at 1.  Considering this, the Paseo appears to be a relatively new home to the free-ranging cats of San Juan.  Moreover, NPS has designated free-ranging cats as an invasive species to the Park ecosystem, which undercuts the reasonableness of the belief that their relatively new "home" of the Paseo is indeed a "natural" one.  *See* Defs.' Opp'n, at 8–9.

Accordingly, the Court concludes that Plaintiffs have not established a likelihood of harm, let alone irreparable harm, to their members' general enjoyment of the Paseo.

*       *       *       *

The Court concludes that Plaintiffs' members are not likely to suffer an irreparable injury in the absence of a preliminary injunction.  *Winter*, 555 U.S. at 22.  They do not face an irreparable harm to their interests in observing and enjoying cats on the Paseo because the Cliff Project closure will not directly affect most of the cats on the Paseo, and the record suggests that any cats that are directly affected by the closure will be able to obtain food and water from alternative sources or

other feeding stations outside the closure area. Furthermore, Plaintiffs do not raise a colorable claim that their members' general enjoyment of the Paseo will be harmed by the Cliff Project closure.

## IV. CONCLUSION

Because Plaintiffs have failed to show that the Cliff Project closure is likely to cause irreparable harm to either their interest in administering the TNR program or their members' interest in observing and enjoying cats on the Paseo, the Court concludes that Plaintiffs have failed to make the "clear showing" required to obtain the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22. Accordingly, the Court shall **DENY** Plaintiffs' [8] Motion for Preliminary Injunction. A separate Order will accompany this Memorandum Opinion.


**Dated:**  January 28, 2026


COLLEEN KOLLAR-KOTELLY
United States District Judge