**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLEY CAT ALLIES INCORPORATED, <br><br> and <br><br> SAVE-A-GATO, INC. <br><br>     Plaintiffs, <br><br> v. <br><br> UNITED STATES NATIONAL PARK SERVICE, *et al*., <br><br>     Defendants. | Civil Action No. 1:25-cv-04269 (CKK) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    The San Juan National Historic Site ................................................................ 3

    B.    The Paseo del Morro, Free-Ranging Cats, and the 2023 Management Plan .......... 4

    C.    The Cliff Stabilization Project ......................................................................... 8

    D.    Cliff Project Safety Closure ............................................................................11

    E.    Procedural Background.................................................................................... 12

LEGAL FRAMEWORK...................................................................................................... 13

    A.    Management of the Park .................................................................................. 13

    B.    The National Environmental Policy Act........................................................... 15

STANDARD OF REVIEW ................................................................................................. 16

ARGUMENT........................................................................................................................ 17

    I.    The Park Service and Park Superintendent have broad authority to temporarily close parks to protect public safety, and the 2023 Plan does not diminish this authority............................................................................... 18

        A.    The 2023 Plan is not an additional General Management Plan. ............... 18

        B.    The safety closure did not violate the 2023 Plan. .................................... 23

    II.    NPS did not violate NEPA. .................................................................... 27

        A.    The safety closure was not a post hoc rationale and is a discrete agency action, separate from the Cliff Project......................................... 27

            1.    The safety closure is a discrete agency action ............................. 28

            2.    Plaintiffs cannot assert a new claim in their summary judgment motion, and in any case, the safety closure was properly promulgated under 36 C.F.R. §§ 1.5 and 1.7.................. 30

        B.    NPS reasonably determined that extraordinary circumstances are not present. ........................................................................................... 32

        C.    NPS was not required to "reassess" its 2018 CE. .................................... 38

i

III.    The appropriate remedy is remand without vacatur............................................ 41

CONCLUSION.................................................................................................................... 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal v. U.S. Nuclear Regul. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 41

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.,*
461 U.S. 402 (1983) ................................................................................................ 17

*Am. Wild Horse Campaign v. Bernhardt,*
442 F. Supp. 3d 127 (D.D.C. 2020) ........................................................................ 21

*Am. Wildlands v. Kempthorne,*
530 F.3d 991 (D.C. Cir. 2008) ................................................................................ 17

*\*Back County Horsemen of Am. v. Johannas,*
424 F. Supp. 2d 89 (D.D.C. 2006) .......................................................................... 33

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*
462 U.S. 87 (1983) .................................................................................................. 15

*Checkosky v. SEC,*
23 F.3d 452 (D.C. Cir. 1994) .................................................................................. 41

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ................................................................................................ 10

*City of Port Isabel v. FERC,*
130 F.4th 1034 (D.C. Cir. 2025) ............................................................................. 41

*Cloud Found., Inc. v. Salazar,*
999 F. Supp. 2d 117 (D.D.C. 2013) ........................................................................ 16

*Conservation Cong. v. U.S. Forrest Serv.,*
No. CIV. 12-02416, 2013 WL 2457481 (E.D. Ca. June 6, 2013) ........................... 35

*Dakota Rural Action v. U.S. Dep't of Agric.,*
668 F. Supp. 3d 1 (D.D.C. 2003) ............................................................................ 32

*\*Davis v. Latschar,*
202 F.3d 359 (D.C. Cir. 2000) ........................................................................... 13, 24

*Defs. of Wildlife v. Jewell,*
815 F.3d 1 (D.C. Cir. 2016) .................................................................................... 17

*Earthworks v. Dep't of the Interior,*
105 F.4th 449 (D.C. Cir. 2024) ............................................................................... 33

*\*Earthworks v. U.S. Dep't of the Interior,*
496 F. Supp. 3d 472 (D.D.C. 2020) ........................................................................ 33

*Esch v. Yeutter,*
876 F.2d 976 (D.C. Cir. 1989) ..................................................................................... 10

*Franks v. Salazar,*
816 F. Supp. 2d 49 (D.D.C. 2011) ................................................................................ 31

*Front Range Equine Rescue v Vilsack,*
753 F. Supp. 3d 6 (D.D.C. 2024) .................................................................................. 37

*Fund for Animals v. Williams,*
391 F. Supp. 2d 191 (D.D.C. 2005) .............................................................................. 10

*Fund for Animals, Inc. v. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) ....................................................................................... 30

*J.A. Jones Mgmt. Servs. v. FAA,*
225 F.3d 761 (D.C. Cir. 2000) ..................................................................................... 17

*Marin Audubon Society v. Federal Aviation Administration,*
121 F.4th 902 (D.C. Cir. 2024) .................................................................................... 16

*Mayo v. Reynolds,*
875 F.3d 11 (D.C. Cir. 2017) ........................................................................... 39, 40, 41

*Milk Indus. Found. v. Glickman,*
132 F.3d 1467 (D.C. Cir. 1998) .................................................................................... 17

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ....................................................................................................... 17

*Nat'l Archives & Recs Admin. v. Favish,*
541 U.S. 157 (2004) ..................................................................................................... 29

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior,*
No. 20-3706, 2024 WL 1344450 (D.D.C. March 29, 2024) ............................... 22, 23

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ....................................................................................................... 22

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,*
448 F. Supp. 2d 1 (D.D.C. 2006) .................................................................................. 10

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.,*
918 F.3d 151 (D.C. Cir. 2019) ..................................................................................... 29

*Red Lake Band Chippewa Indians v. U.S. Army Corps of Eng'rs,*
636 F. Supp. 3d 33 (D.D.C. 2022) ................................................................................ 36

*Reed v. Salazar,*
744 F. Supp. 2d 98 (D.D.C. 2010) ......................................................................... 16, 34

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ............................................................................................... 15, 40

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013)..................................................................... 34, 38

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ................................................................................................ 15

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017)............................................................................. 16

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.D.C. 2021).................................................................................. 36

*Taylor v. Mills*,
  892 F. Supp. 2d 124 (D.D.C. 2012)....................................................................... 31

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ................................................................................................... 16

*W. Org. of Res. Councils v. Zinke*,
  892 F.3d 1234 (D.C. Cir. 2018)........................................................................ 15, 22

*W. Watersheds Project v. U.S. Forest Serv.*,
  No. CV-11-08128, 2012 WL 6589349 (D. Ariz. Dec. 17, 2012) ....................... 35, 36

*Walen v. United States*,
  246 F. Supp. 3d 449 (D.D.C. 2017)............................................................. 23, 28, 31

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013)............................................................................... 15

**Statutes**

31 U.S.C. § 1535(a) ..................................................................................................... 10

42 U.S.C. § 4332(2)(C)................................................................................................ 15

42 U.S.C. §§ 4321-4370m-12 ..................................................................................... 15

5 U.S.C. § 702............................................................................................................... 16

5 U.S.C. § 706............................................................................................................... 10

5 U.S.C. § 706(1).......................................................................................................... 22

5 U.S.C. § 706(2).......................................................................................................... 22

5 U.S.C. § 706(2)(A)..................................................................................................... 16

54 U.S.C. § 100502................................................................................................. 13, 18, 20

54 U.S.C. § 100751(a) ................................................................................................. 14

54 U.S.C. §§ 100101.................................................................................................... 21

54 U.S.C. §§ 100501-07 .......................................................................................... 22, 24

U.S.C. § 100502 ................................................................................................................. 18

**Regulations**

36 C.F.R. § 1.2(d) (2025) .................................................................................................. 25

36 C.F.R. § 1.5 (2025) ............................................................................ 12, 25, 27, 29, 32

36 C.F.R. § 1.5(a) (2025) ...................................................................................... 24, 28, 31

36 C.F.R. § 1.5(a)(1) (2025) ............................................................................................. 14

36 C.F.R. § 1.5(b) (2025) .................................................................................................. 32

36 C.F.R. § 1.7 (2025) ........................................................................................... 12, 27, 29

36 C.F.R. § 1.7(a) (2025) .................................................................................................. 31

36 C.F.R. § 2.1(d) (2025) .................................................................................................. 25

36 C.F.R. § 220.6 (2024) ................................................................................................... 35

36 C.F.R. § 220.6(b)(1), (2) (2024) .................................................................................. 35

36 C.F.R. Chapter 1 (2025) ............................................................................................... 14

36 C.F.R. pts. 1-7 .............................................................................................................. 32

40 C.F.R. § 1501.3 (2023) ................................................................................................. 16

40 C.F.R. § 1501.4(a) (2023) ............................................................................................ 33

40 C.F.R. § 1502.9 (2023) ................................................................................................. 40

40 C.F.R. pts. 1500-08 ...................................................................................................... 16

43 C.F.R. § 1601.0-5(n) (2023) ......................................................................................... 22

43 C.F.R. § 46.205(c)(1) (2024) ....................................................................................... 33

43 C.F.R. § 46.215 (2024) ................................................................................. 33, 34, 35, 36

43 C.F.R. §§ 46.205-46.215 (2024) .................................................................................. 40

43 U.S.C. §§ 46.200-46.240 (2024) .................................................................................. 33

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................................................... 15

48 Fed. Reg. 30 (June 30, 1983) ....................................................................................... 32

51 Fed. Reg. 15,618 (Apr. 25, 1986) ................................................................................ 16

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................................. 16

87 Fed. Reg. 23,453 (Apr. 20, 2022) ................................................................................ 16

Executive Order 13751 ........................................................................................................ 5

**INTRODUCTION**

Representing 500 years of history, the San Juan National Historic Site (the "Park") is federal land managed by the National Park Service ("NPS" or "Park Service") as a unit of the National Park System for the purpose of preserving, protecting, and interpreting the oldest and largest Spanish fortification system in the United States. At the Park (like all other units of the National Park System), the Park Service is entrusted to preserve unimpaired the natural and cultural resources for the enjoyment and education of this, and future generations. And as the Park is a National Historic Site, the paramount focus of this duty is to protect the Park's historic sites, buildings, and objects of national significance for the benefit of the public.

As NPS emphasized in its 1985 Final General Management Plan ("GMP"), the greatest danger to the Park is the potential collapse of the fortifications by the continual erosion of the cliffs upon which the fortifications were built. Previously, NPS undertook $12 million worth of foundation stabilization work through a series of contracts administered by the U.S. Army Corps of Engineers (the "Corps"), to stabilize approximately 75% of the cliffside. However, stabilization of the cliffside was not finished. Accordingly, in 2018, NPS authorized the San Fernando Cliff Stabilization Project ("Cliff Project") to treat the remaining unstable portions of the fortification cliffside. Before deciding to proceed with the Cliff Project, the Park Service evaluated potential impacts to environmental, historical, and cultural resources as required under the National Environmental Policy Act ("NEPA") and National Historic Preservation Act. With respect to NEPA, the Park Service determined that the Cliff Project fit within a categorical exclusion and because no extraordinary circumstances were present, no further NEPA analysis was required.

The Cliff Project, however, was delayed due to a lack of available project funding, and it was not until 2025 that NPS received the necessary funding and the Cliff Project was initiated.

1

On November 25, 2025, prior to the initiation of construction activities, the Park Superintendent determined it necessary to implement a safety closure along a portion of the Paseo del Morro National Recreation Trail (the "Paseo"), adjacent to the Cliff Project area, to ensure public safety and to minimize liability risks because the area will be an active construction zone.

In this case, Plaintiffs Alley Cat Allies ("ACA") and Save-A-Gato ("SAG") (together "Plaintiffs") challenge the Park Service's authority to implement the temporary safety closure and its NEPA analysis for the Cliff Project. Plaintiffs allege that the Park Service cannot implement the closure because it is inconsistent with a separate, and unrelated, project—namely the Park Service's 2023 Free-Ranging Cat Management Plan ("2023 Plan")—developed by NPS to address a free-ranging cat population that has colonized the Paseo since 1999. In separate litigation before this Court, Plaintiffs have challenged the 2023 Plan and seek to have it vacated. However, in this litigation, Plaintiffs challenge NPS' compliance with the same 2023 Plan— incorrectly claiming that NPS is violating its terms by implementing the safety closure, and that NPS violated NEPA by failing to adequately evaluate alleged impacts of the Cliff Project on the invasive cats.

Plaintiffs' claims lack merit. First, NPS and the Park Superintendent unquestionably has authority and discretion to manage the Park to ensure public safety and to protect Park resources. The 2023 Plan does not displace NPS' general management authority—including its decision-making authority with respect to other projects—nor its authority (and responsibility) to ensure the safety of visitors and employees. But even setting that aside, the 2023 Plan in no way limits the Park Service's discretion to close areas of the Park. Finally, with respect to NEPA, Plaintiffs' assertion that the Park Service's invocation of a Categorical Exclusion ("CE") for the Cliff

2

Project was unlawful because it failed to evaluate free-ranging cats as "an extraordinary circumstance," has no basis in the law or common sense.

The Court should grant summary judgment for Defendants[1] on all claims.

**STATEMENT OF FACTS**

**A.  The San Juan National Historic Site**

The San Juan National Historic Site was established to preserve "historic sites, buildings, and objects of national significance" including "ancient fortifications," which possess "exceptional historical and architectural interest for the Nation."  NPS_103.  The Park comprises the principal fortifications associated with the city of Old San Juan, including the Castillo San Felipe del Morro ("Castillo del Morro"), the Castillo San Cristobal, and most of what remains of the fortress walls that surround Old San Juan.  NPS_22.  Almost all the fortifications sit on a rocky promontory more than 80 feet above sea level.  NPS_9.

In September 1985, NPS issued its Final General Management Plan to provide guidance for the preservation, use, development, and operation of the Park.  *See* NPS_1.  The GMP emphasizes that the Park was established for "two primary reasons:" (1) "preservation of historic resources" and (2) "visitor use."  NPS_67.  Accordingly, the GMP explains that NPS would manage the Park's natural resources "so as to enhance the historic resources and the visitor experience."  NPS_67.  Because of the "relatively small size" of the Park and its urban setting, the GMP described that natural resource management would primarily involve maintaining "the grounds and the natural foundations on which the fortifications rest."  GMP 67.

---

[1] Defendants are the U.S. NPS, Jessica Bowron, Acting Director of the Park Service, Darrell Echols, Acting Regional Director of the South Atlantic-Gulf region of the Park Service, Doug Burgum, U.S. Secretary of the Interior, and Myrna Palfrey, Superintendent of the Park.

The GMP describes that the San Juan Bay "shoreline has receded, and the foundation has eroded because of weathering and wave action…which threaten the collapse of the fortifications." NPS_67. "This threat presents the greatest danger to the national historic site." NPS_67. Thus, the GMP explained that to protect and preserve the fortifications:

> [T]he National Park Service has undertaken about $12 million worth of foundation stabilization work through a series of contracts administered by the Corps of Engineers. An estimated $18 million of additional work will be needed to complete all necessary stabilization. Work that is being completed includes protection of the wall foundation from San Juan Gate to Santa Elena Bastion….Work that is underway includes protection of the eroding shore between Santa Elena Bastion and El Morro's west wall (highest priority)….Additional work will be done on…El Morro's north wall.

NPS_67. The GMP has no mention of free-ranging cats. *See* NPS_1-136.

**B. The Paseo del Morro, Free-Ranging Cats, and the 2023 Management Plan**

At the turn of the 20th century, the waters of the San Juan Bay interacted directly with the Park's southern fortification wall, rendering the area below the fort inaccessible. NPS_1056. In the early 1990s, NPS began to place riprap adjacent to the wall and by 1995, a path in the area was completed and used by NPS as a maintenance access route. NPS_958, 1056. In 1999, the path was paved over and converted into a three-quarter mile walking path, following the shoreline at the base of the west walls, beginning at the San Juan Gate, and continuing to the northern front of the Castillo del Morro. NPS_958, 1056. In 2001, the path was designated a national recreational trail and became known as the Paseo del Morro. NPS_958.

Shortly after the construction of the Paseo, a population of free-ranging cats[2] began to colonize the area. NPS_958. The Park Service deems the cats "invasive species" at the Park.

---

[2] The term "free-ranging cats," as used in the relevant Park Service documents, refers to "cats, regardless of ownership status, that spend time outside with the ability to roam freely." NPS_958. In this brief, the terms "free-ranging cats" and "cats" will be used interchangeably.

4

NPS_958, 1055; *see* Jan. 28, 2026 Mem. Op. at 4, 32, Dkt. No. 35.[3]  To comply with relevant authorities on invasive species (including Executive Order 13751, which directed all federal agencies to, *inter alia*, "eradicate and control populations of invasive species"), the Park Service explored various options (including with the assistance of other federal agencies and non-profit organizations) to remove the cats from the Park.  NPS_1055.  For example, in 2005 NPS engaged with SAG to implement a trap-neuter-return ("TNR") program for the management of cats at the Paseo, with the expectation that the number of cats would decrease through attrition to a point of no cats within the Park.  NPS_962-63.  TNR programs work to reduce cat populations by removing kittens and socialized cats for adoption, euthanizing those cats with health issues, and stabilizing the remaining population by sterilizing cats, thus ending reproduction.  NPS_962.  To administer a TNR program, cats must be "live-trapped, assessed by a veterinarian, spayed or neutered, vaccinated, and released to the location where they were trapped" or put up for adoption.  *Id.*  TNR programs often involve the use of feeding stations to facilitate trapping cats and monitoring the population.  *Id.*

In 2005, NPS signed a Memorandum of Understanding ("MOU") with SAG addressing the feeding, trapping, surveying, and ultimately, the removal of free-ranging cats from the Park.  *Id.*  Under the 2005 MOU, SAG agreed to remove 12 cats from the Paseo within a year.  *Id.*  At the time, the population baseline was estimated to be 120 cats, and the use of five (5) feeding stations was approved.  *Id.*  In 2008, NPS and SAG executed a second MOU to continue TNR efforts along the Paseo, largely reiterating the provisions of the 2005 MOU.  NPS_379.  Notably, however, the 2008 MOU represented that the population count along the Paseo was 95 cats, and

---

[3] All docket citations use the ECF page header stamp numbering, not the page numbering physically stamped on the file.

the reduction of the cat population "has been and will be attained by natural attrition." *Id.* NPS, among other things, represented it would continue to allow SAG access to the Park for TNR-related activities and authorized an increase in the number of feeding stations from five (5) to eight (8), but stated that the feeding stations would be limited only to those mutually agreed areas. *Id.*

After many years of TNR, NPS determined the efforts proved ineffective at decreasing the population along the Paseo, as the estimated cat population, in fact, increased from 120 cats in 2005 to 200 cats in 2023. NPS_962-63. Accordingly, on August 4, 2023, after undertaking a fulsome NEPA process involving multiple opportunities for public input, NPS released its *Free-Ranging Cat Management Plan EA*, with an identified purpose and need to address the cat population within the Park. NPS_1000-02, 1035-36. The EA identified three alternatives: (i) the "no-action" alternative (Alternative 1); (ii) the "original proposed action," under which NPS would contract with a removal agency to remove cats from the Park (Alternative 2); and (iii) the "revised proposed action," under which NPS would contract with an animal welfare organization to trap and remove cats from the Park (Alternative 3), with the potential for NPS to contract a removal agency to remove the cats as provided for in the original proposed action. NPS_969-73.

On November 21, 2023, NPS issued its Finding of No Significant Impact ("FONSI"), announcing it selected Alternative 3. NPS_1036. The FONSI explains that under Alternative 3:

> The animal welfare organization will be able to provide food to the cats in the park via continued use of the existing feeding stations for a discrete period of time (up to 6 months) *to aid in the trapping and removal efforts*. During this time, the animal welfare organization will gradually remove the feeding stations with all feeding stations within the park eliminated by the end of the 6-month period. *At least one feeding station* will be removed per month until all feeding stations have been removed. During this 6-month period, no new feeding stations will be added, and existing feeding stations will not be allowed to increase in size. The feeding stations will be removed completely and permanently from the park. All unauthorized feeding of the cats in the park is prohibited.

6

NPS_1037 (emphasis added).  Alternative 3 also provides that if no legitimate animal welfare organization seeks to become the contracted organization to perform the removal, NPS will move to the last phase of this alternative, which would involve employment of a removal agency to remove cats from the Park as described in Alternative 2.  NPS_1036.  While both alternatives share common removal methods (e.g., live trapping, denning), they present different approaches to removal.  NPS_970-71.  For example, under Alternative 2, a removal agency could use one or more of the strategies described in the EA to humanely remove cats from the Park, and after the agency completes trapping efforts in a certain area, the feeding stations would be immediately removed to concentrate remaining cats for trapping and removal.  NPS_970-71.  The 2023 Plan does not provide any details for the location or number of feeding stations that would be used for trapping, and the 2023 Plan does not mandate that any currently existing feeding stations be used as part of the trapping efforts.  *See* NPS_970-73.  Finally, for both alternatives, "[f]eeding cats within the park would only be allowed to aid in initial trapping efforts, after which all feeding stations would be removed.  All unauthorized feeding would be prohibited."  NPS_970.

Plaintiffs sued NPS over its adoption of the 2023 Plan and the case is ongoing.  *Alley Cat Allies Inc. v. U.S. Nat'l Park Serv.*, 24-cv-876 (D.D.C. filed Mar. 27, 2024).  "On August 21, 2024, NPS issued a solicitation for letters from animal welfare organizations interested in working with NPS to implement Alternative 3 of the 2023 Plan."  Dkt. No. 35 at 7.  "NPS held the request open for thirty days but did not receive any statements of interest."  *Id.*  NPS therefore made plans to move to the last phase of the selected alternative, which will involve employment of a removal agency to remove cats from the Park as described in Alternative 2.  *Id.*

7

### C. The Cliff Stabilization Project

To protect and preserve the historic fortifications and foundations upon which they sit, NPS previously commissioned approximately $12 million worth of cliff stabilization work in the 1980s and 1990s. NPS_67, 321. The previous treatment involved the installation of rock anchors and application of shotcrete[4] to approximately 75% of the hillside and cliffs below the Castillo del Morro and the San Fernando Battery along the northwest boundary of the Park, overlooking the San Juan Bay. NPS_321.

In 2018, NPS authorized the Cliff Project to treat portions of the natural cliff face below the San Fernando Battery and Castillo del Morro that were not previously stabilized and that continue to significantly deteriorate because of constant and aggressive gravitational erosion caused by wind, constant rain, water salinity, and wave action. NPS_321, 794-95. As with the previous stabilization work, the Cliff Project consists of the installation of rock anchors and application of shotcrete to stabilize the natural cliff that makes up the foundation and support for the Castillo del Morro, which sits on a steep slope above the Paseo. NPS 67, 326.

Stabilization of the cliffside is imperative for the protection and preservation of the Park's primary resource—the historic fortifications. NPS_67, 464. Already, natural weathering has caused serious landslide and rockslide events; for example, in 2012, episodes of torrential rain induced a rockslide at the San Fernando Bastion, causing the detachment of boulders of approximately 5 feet wide and 7 feet long to fall onto the Paseo and requiring the immediate closure of the Paseo. NPS_321, 433, 794. If left untreated, the trail could be permanently closed to protect the public from falling boulders, and further erosion could ultimately result in the

---

[4] Shotcrete, or concrete shot treatment, involves the pneumatical application of concrete. NPS_464, 795. NPS also used shotcrete treatment during the construction of the Paseo trail. NPS_464.

8

collapse of a whole section of the fortification. NPS_67, 326, 464.  The Paseo is a key resource, and its closure will directly affect visitors that use the trail for multiple recreation activities, and will disrupt interpretive programs highlighting the major fortifications of the Castillo del Morro. NPS_326, 464.

On August 1, 2018, the Park Service prepared an assessment addressing its obligations under NEPA and National Historic Preservation Act.  NPS_321-25.  Therein, with respect to NEPA, the Park identified that no potential resource impacts would result from the Cliff Project, and instead explained that *without the project*, the Park's historic resources, and the recreation opportunities they provide, would face major impacts.  NPS_326-28.  It further explained that the Cliff Project fit within a pre-established categorical exclusion, and no extraordinary circumstances applied.  NPS_325, 328, 331.  Specifically, the Superintendent found the Cliff Project fit within a pre-established categorical exclusion—"C. 19 Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations" and explained that "shotcrete treatment was previously applied in the area" and untreated areas "are increasingly becoming a threat for the resource and a safety hazard."  NPS_331.  The Superintendent also found that none of the twelve enumerated extraordinary circumstances applied to the project.  NPS_331-332.  Accordingly, the Cliff Project was categorically excluded from further NEPA analysis.  NPS_331, 339.

The Cliff Project was later selected to receive funding, and an NPS and Legacy Restoration Fund ("LRF") project agreement was executed in Fall 2021.  *See* NPS_463.  The LRF project agreement identified that construction drawings and specifications had been completed with fee funding, but contracting could not proceed until construction funds were made available.  NPS_464; *see also* NPS_802.  The agreement anticipated that planned

compliance and construction documents would not be completed until September 2022, and a

construction contract would not be awarded until July 2023.  NPS_471.  The Corps, as the

contracted agency responsible for providing project and construction management services to

NPS pursuant to the Economy Act, 31 U.S.C. § 1535(a), was identified as the responsible agency

for meeting most of the project milestones.  NPS_471; *see* Dkt. No. 35 at 9.  In total, over $16

million has been allocated from NPS to the Corps for the execution of the Cliff Project.

NPS_771.

On July 29, 2024, the Corps published a solicitation with a deadline for offerors to submit

responses by September 10, 2024.  Declaration of Wilberto Cubero del Toro ("Cubero del Toro

Decl.") ¶ 9, Dkt. No. 17.[5]  On May 1, 2025, the Corps awarded the construction contract to

NOVEL Construction, LLC, in the amount of $13,104,687.78.  *Id.*; NPS_715.  On June 13, 2025,

the Corps issued a Notice to Proceed.  Cubero del Toro Decl. ¶ 9; NPS_407.  The contractor

completed pre-construction submittals, obtained the requisite permits, mobilized at the Park, and

completed routine preparations.  Cubero del Toro Decl. ¶ 10.  The current required completion

date for the contractor is December 15, 2026, and if the Government is required to modify the

contract to extend the completion date, there would likely be additional costs to the Government.

---

[5] The APA directs a court reviewing an agency decision to "review the whole record or those
parts of it cited by a party[.]"  5 U.S.C. § 706.  The "whole record" refers to "the full
administrative record that was before the [agency decisionmakers] at the time [they] made [their]
decision."  *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp.
2d 1, 4 (D.D.C. 2006) (alterations in original) (quoting *Citizens to Preserve Overton Park, Inc. v.
Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.
99 (1977)).  However, the D.C. Circuit has indicated that information outside of the record in
some instances may be appropriate to address non-merits issues "in cases where relief is at
issue."  *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197-98 (D.D.C. 2005) (citing *Esch v.
Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1989)).  This brief provides some information regarding the
Cliff Project based on non-record documents for purposes of addressing Plaintiffs' request for
vacatur.  *See* Argument, Section III, *infra*.

*Id.* ¶ 10. If the work were to be suspended altogether for an unreasonable period of time, the contractor may be entitled to an adjustment in contract price caused by the suspension, again resulting in additional costs to the Government. *Id.* ¶ 12.

### D. Cliff Project Safety Closure

On November 6, 2025, NPS, through counsel, informed Plaintiffs of the forthcoming Cliff Project. Mot. for Prelim. Inj. Ex. 1, Dkt. No. 8-2. NPS explained that portions of the Paseo (where active construction will occur) would be closed to the public, including SAG volunteers, to ensure the safety of Park visitors and employees. *Id.* NPS provided a map of the anticipated closure and noted that four (4) SAG-TNR feeding stations were within the identified construction zone. *Id.* Therefore, NPS offered SAG the opportunity to relocate those pre-approved stations along portions of the Paseo that would remain accessible to the public. *Id.* Plaintiffs refused the invitation to relocate the feeding stations from within the active construction area and demanded special access to the closure area. Mot. for Prelim. Inj. Ex. 3 at 5-7, Dkt. No. 8-4. NPS then offered to set back the fencing and minimize the closure by approximately 180 feet. Mot. for Prelim. Inj. Ex. 6 at 1-2, Dkt. No. 8-7. The setback would allow NPS to still effectuate the safety corridor and allow SAG access to feeding station no. 4. *Id.* NPS reiterated, however, that no further exceptions could be made to the closure for safety reasons. *Id.* Plaintiffs "accepted" the relocation of the closure (which cost NPS $4,800 to execute) but continued to demand special access to the construction corridor. Mot. for Prelim. Inj. Ex. 7 at 1, Dkt. No. 8-8; Dkt. No. 35 at 31-32.

On November 25, 2025, NPS made its decision to temporarily close approximately 1,900 feet of the Paseo. SAJU_467. The Park Superintendent's determination explained that the Cliff Project would involve the use of heavy equipment and vehicular operations along the Paseo,

11

necessitating a partial temporary closure to ensure public health and safety and security during the completion of the Cliff Project. *Id.* Public access to the remaining portion of the Paseo from both sides of the trail remains open. *Id.* This Record of Determination ("Determination") was developed pursuant to Management Policies, and NPS instituted the temporary closure in accordance with 36 C.F.R. 1.5 and 1.7 (2025). *Id.*

By December 4, 2025, SAG had not yet relocated the feeding stations, and NPS notified Plaintiffs that the closure would be effectuated as early as December 15. Mot. for Prelim. Inj. Ex. 9 at 1, Dkt. No. 8-10. On December 11, NPS updated Plaintiffs that due to construction delays, the partial closure would not take effect until January 7, 2026. Mot. for Prelim. Inj. Ex. 10 at 2, Dkt. No. 8-11. Plaintiffs continued to demand special access to the safety closure. *Id.* Finally on December 16, over five weeks from when SAG was first offered the chance to relocate the feeding stations, NPS notified Plaintiffs that further construction delays had transpired, and the closure would not be instituted until January 19, 2026. *Id.* at 1.

### E. Procedural Background

Plaintiffs filed this action on December 8, 2025, alleging violations of NEPA and the APA, seeking declaratory and injunctive relief. Compl. Dkt. No. 1. Plaintiffs asserted five claims: (1) NPS lacked authority for the challenged actions because they occur on lands that the outside of the Park Service's management authority; (2) NPS violated NEPA by failing to account for "extraordinary circumstances" when invoking the CE and by not updating its analysis under the CE; (3) NPS violated NEPA by not "supplementing" the CE in light of the 2023 Plan; (4) NPS violated the APA, the Organic Act, and the 2023 Plan by closing a portion of the Paseo; and (5) NPS violated the terms of the 2008 MOU by closing a portion of the Paseo. *Id.* ¶¶ 192-229. Shortly thereafter, on December 19, 2025, Plaintiffs moved for the entry of a

12

preliminary injunction, requesting that the Court enjoin "Defendants' planned action to revoke Plaintiffs' access to the Paseo." Mot. for Prelim. Inj. Ex. 17 at 2, Dkt. No. 8-18. On January 16, 2026, Defendants filed Administrative Records for the partial closure of the Paseo (Dkt. Nos. 19-22) and the Cliff Project (Dkt. Nos. 23-29). On January 20, Plaintiffs moved to complete the record, or in the alternative to supplement the record, Dkt. No. 30, which the Court denied on April 3, 2026. Dkt. No. 55.

On January 28, 2026, the Court issued an Order and Memorandum denying Plaintiffs' Motion for a Preliminary Injunction. Dkt. Nos. 34, 35. On April 15, Plaintiffs filed their Second Amended Complaint, Dkt. No. 57, in which they dismissed their first and fifth claims, *id.* ¶¶ 174-97, and moved for summary judgment on their remaining three claims, Dkt. No. 58.

## LEGAL FRAMEWORK

### A. Management of the Park

Management of the National Park Systems is governed by the National Park System Organic Act, found in Title 54 of the U.S. Code. 54 U.S.C. § 100502. "Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).

The Park Service's management of each national park unit is governed by a General Management Plan prepared for that specific unit. *See* 54 U.S.C. § 100502. These plans must include "(1) measures for the preservation of the area's resources; (2) indications of types and general intensities of development (including visitor circulation and transportation patterns, systems, and modes) . . . ; (3) identification of and implementation commitments for visitor carrying capacities . . . ; and (4) indications of potential modifications to the external boundaries

13

of the System unit . . . ." *Id.*

In addition, the Organic Act instructs the Secretary of the Interior to "prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units" under 54 U.S.C. § 100751(a).  The regulations promulgated under this instruction are located at 36 C.F.R. Chapter 1 (2025).  Among other things, the Secretary's regulations permit a park superintendent to "close all or a portion of a park area to all public use or to a specific use" for purposes of public safety.  36 C.F.R. § 1.5(a)(1) (2025).

The Park Service's management of park units is also instructed by internal guidance documents.  For instance, the Park Service issued the 2006 Management Policies ("Management Policies"), to "improve the internal management of the National Park Service."  Management Policies at 4.[6]  These Management Policies also recognize the authority of Park Service officials to take action to protect public safety.  For example, the Management Policies provide that "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing."  Management Policies § 8.2.5.1 at 105.  Other NPS guidelines similarly reserve to superintendents the "discretion to determine the level of program resources and the types of programs needed to manage visitor risk . . . depend[ing] on the resources, values, park-

---

[6] While the polices are to be followed by NPS employees, they are "not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person."  Management Policies at 4.  U.S. Dep't of Interior, NPS, *Management Policies* (2006), https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf.

14

specific mission, feasibility of various program levels, activities offered at the park, . . . , the history of visitor injury in the park, and available resources." NPS Director's Order #50C at 11.[7]

### B. The National Environmental Policy Act

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal actions." 42 U.S.C. § 4332(2)(C). However, "NEPA is purely procedural." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). It "'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); *see also* 42 U.S.C. §§ 4321-4370m-12. Thus, a court may not require agencies "to elevate environmental concerns over other appropriate considerations." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). When reviewing an agency's choices in undertaking an evaluation under NEPA, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal.,* 605 U.S. at 183 (2025).

NEPA requires that an agency prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). An EIS, however, is not required in every instance. The Council on Environmental Quality ("CEQ") formerly promulgated regulations to guide federal agencies in implementing NEPA, which directed that an agency should first determine the appropriate level of environmental review. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir.

---

[7] U.S. Dep't of the Interior, NPS, *Director's Order #50c: Public Risk Management Program* (2025) https://www.nps.gov/subjects/policy/upload/DO_50C_5-7-2010.pdf.

2018); *see* 40 C.F.R. § 1501.3 (2023).[8]  For instance, an agency is not subject to the NEPA requirement to "prepare an EIS or even an EA if it finds that its proposed action is subject to a 'categorical exclusion.'"  *Reed v. Salazar*, 744 F. Supp. 2d 98, 103 (D.D.C. 2010).  "Once an agency invokes a categorical exclusion, it is free from further obligations under the National Environmental Policy Act."  *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 126 (D.D.C. 2013).

**STANDARD OF REVIEW**

Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA") and its "deferential standard of review."  *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citation omitted).  The APA directs a court to uphold an agency's decision unless it is deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 706(2)(A), 702.  Although the inquiry must be thorough, the standard of review is narrow and highly deferential, and an agency's decisions are entitled to a "presumption of regularity," and a court cannot substitute its judgment for that of the agency decision maker.  *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7, 10 (2001).  The Court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached."

---

[8] The D.C. Circuit in *Marin Audubon Society v. Federal Aviation Administration*, 121 F.4th 902, 908 (D.C. Cir. 2024) held that the CEQ regulations were *ultra vires*.  CEQ's implementing regulations have subsequently been withdrawn and are no longer in effect (but iterations of the regulations were in effect when NPS' challenged analysis was undertaken).  CEQ first promulgated NEPA regulations in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. pts. 1500-08), and made a minor substantive amendment in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986) (codified at 40 C.F.R. pt. 1502).  In 2020, CEQ substantially revised the regulations.  85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. Pts. 1500-08, 1515-18).  The 2020 Regulations became effective on September 14, 2020.  *Id.*  In early 2022, CEQ amended the regulations to restore a few discrete provisions from the 1978 Regulations.  87 Fed. Reg. 23,453 (Apr. 20, 2022) (codified at 40 C.F.R. pts. 1502, 1507-08).  NPS executed the 2018 Categorical Exclusion per the governing NEPA regulations at the time.

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983) (citation omitted).

Under this standard, the Court must determine whether the agency: (1) "relied on factors which Congress ha[d] not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency, or" (4) "offered an explanation . . . so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  This standard of review "presumes agency action to be val*id*." *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008)).

Accordingly, a court should uphold an agency's decision if it finds "adequate support in the record." *J.A. Jones Mgmt. Servs. v. Fed. Aviation Admin.*, 225 F.3d 761, 765 (D.C. Cir. 2000).  Under "familiar and well-established principles," an agency decision is not arbitrary and capricious if the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1476 (D.C. Cir. 1998) (citation modified).

## **ARGUMENT**

Defendants are entitled to summary judgment in their favor.  Plaintiffs' claims, that the Park Service's decision to implement the temporary safety closure violates the 2023 Plan, the Park Service's 1984 General Management Plan, and the Organic Act, are wrong on both the facts and the law.  With respect to NEPA, Plaintiffs' assertions that the Park Service's invocation of a Categorical Exclusion to evaluate the Cliff Project was unlawful because it failed to evaluate the existence of the free-ranging cats as "an extraordinary circumstance," and because NPS did not

17

"revaluate" the CE considering the 2023 Plan, lack merit.  For the reasons explained below, NPS exercised reasonable judgment and met its obligations under NEPA.

## I.  The Park Service and Park Superintendent have broad authority to temporarily close parks to protect public safety, and the 2023 Plan does not diminish this authority.

Plaintiffs' allegation that the 2023 Plan is a General Management Plan and thereby governs all NPS actions at the Park, including determinations by the Park Superintendent concerning visitor and personnel safety, is wrong.  Even more, nothing in the 2023 Plan could be deemed as prohibiting NPS from implementing the safety closure at issue.  As such, the safety closure is not unlawful, nor inconsistent with the 2023 Plan.

### A.  The 2023 Plan is not an additional General Management Plan.

The 2023 Plan was not an addition or supplement to the GMP, but rather, was a plan adopted by the Park to implement a specific management action consistent with the GMP's broader direction.  As such, the 2023 Plan *does* set forth the Park's final agency action addressing how NPS planned to address the free-ranging cat population—but it *does not* purport to govern NPS management actions that have nothing to do with managing the invasive cat population.

As noted above, the Organic Act instructs NPS to prepare a GMP for each unit of the National Park System.  54 U.S.C. § 100502; Legal Framework, Section A, *supra*.  Such plans must include measures for the preservation of the unit's resources.  *Id.* at § 100502(1).  As such, NPS issued a Final GMP to "provide guidance for the preservation, use, development, and operation of the [Park]."  NPS_3.  The GMP states that the Park was established for the "preservation of historic resources and visitor use" and accordingly, the Park's natural resources will be managed "so as to enhance the historic resources and the visitor experience."  NPS_67.  Thus, the GMP laid out a plan "for the preservation and maintenance" of resources, while "allowing passive recreation activities in appropriate areas."  NPS_3.

18

The GMP includes no reference to free-ranging cats, as Plaintiffs acknowledge, and therefore, they do not argue that the 2023 Plan was inconsistent with the GMP itself.  *See* Mem. In Supp. of Mot. for Summ. J. at 29, Dkt. No. 58-1.  Instead, Plaintiffs claim that the Park Service's authority to broadly govern the Park, and thereby implement public safety closures, is somehow constrained by the 2023 Plan—an agency decision document setting forth the Park's plan for addressing a long-standing problem with free-ranging cats.  Plaintiffs specifically claim that the 2023 Plan is a "binding management plan" that "governs NPS' future actions at the [Park] and the Paseo."  Dkt. No. 58-1 at 27.  While Defendants do not dispute that the 2023 Plan is final agency action—it is not a supplement to the Park's 1985 GMP, nor does it constrain the Park Service's ability to implement management actions that are unrelated to addressing the free-ranging cat population at the Park.  Alternatively, Plaintiffs argue that the 2023 Plan is "an additional management plan, separate from but additive to the 1984 GMP."  *Id.* at 29.  But again, there is nothing in the 2023 Plan that indicates NPS intended it to be instructive for anything other than cat population management.

As the Management Policies provide, there are numerous types of plans that the Park Service may adopt while managing a specific Park unit.  *See* Management Policies § 2.2 at 22-23.  The broadest of these is the General Management Plan i.e., the "broad umbrella document that sets the long-term goals for the park based on [its] foundation statement."  *Id.* at 22.  However, parks also prepare a variety of plans with a more limited purpose, including program management plans, strategic plans, annual performance plans, and, of relevance here, "implementation plans."  *Id.* at 23; *see also id.* § 2.3 at 23 (noting that "[e]ach level of planning has a distinct function").  Implementation plans "provide project-specific details needed to implement an action in an area of a park and explain how the action(s) helps achieve long-term

19

goals." *Id.* § 2.2 at 23; *see also id.* at 158 ("An implementation plan may direct a specific project or an ongoing activity.")

Nothing in either § 100502 or the Management Policies supports Plaintiffs' argument that an implementation plan, such as the 2023 Plan, acts as a supplement or extension of the Park's GMP. To the contrary, in fact, as "implementation planning will focus on how to implement activities and projects needed to achieve the desired conditions identified in the general management plan, strategic plan, and program management planning documents." Management Policies § 2.3.4 at 27. Moreover, the Management Policies addressing GMPs do not even contemplate the type of "addition" or "supplement" as Plaintiffs are asserting. *See id.* § 2.3.1.12 at 26.

Nor does anything in the 2023 Plan itself indicate that it purports to be an update or an addition to the GMP, nor that it was intended to provide broad requirements and limitations guiding the Park Service's management of the Park. Rather, consistent with Management Policies, the 2023 Plan was adopted by NPS to address a discrete issue: removing (and ultimately eliminating) the presence of invasive cats at the Park to "improve the safety of visitors and employees, to protect park resources and reduce impacts to native wildlife species associated with free-ranging cats, alleviate nuisance issues, align the visitor experience with the purpose of the park, and bring the park into compliance with existing authorities for invasive species." NPS_1035. And in the FONSI, the Park Service specifically noted the 2023 Plan's consistency with the GMP and the GMP's recognition of Park values and resources. NPS_1070.

Plaintiffs can point to nothing in the 2023 Plan to support their assertion that the 2023 Plan is a general management plan or supplement thereto. For instance, Plaintiffs emphasize that because of its very title—the Free-Ranging Cat *Management Plan*—the agency action is per se, a

20

general management plan in accordance with 54 U.S.C. § 100502. Dkt. No. 58-1 at 29-30. But this argument has no logic—the term "general management plan" as used in § 100502 has a discrete meaning that is not triggered anytime NPS uses the term "management plan" in its decision documents. Next, Plaintiffs suggest that the 2023 Plan is a general management plan because the Park Service "acknowledges [that] the 2023 Plan was developed under NPS' statutory authority in the National Park Service Organic Act…54 U.S.C. §§ 100101 *et seq.*" Dkt. No. 58-1 at 28. In support of their argument, Plaintiffs cite to NPS' Environmental Assessment's ("EA") Appendix A of "Applicable laws, regulations, and policies," where NPS documents its reliance upon "a multitude of laws, regulations, and policies" in the development of the 2023 Plan. NPS_1010. This argument is equally illogical: just like any other action taken by the Park—it had to be consistent with the statutory authority governing the national park system— but this does not mean (nor could be reasonably read to suggest) that the 2023 Plan is a general management plan under § 100502. Finally, while the Park Service of course identifies the 1985 GMP as a general authority—never, anywhere in the 2023 Plan does the Park Service provide any indication that the 2023 Plan is meant to be a supplement or addition to the GMP—and as noted above, such piecemeal revision of a GMP is not contemplated under either the statute or Management Policies. NPS_1011.

Plaintiffs try to buttress their argument with caselaw addressing agency land use plans— but none of these cases support their claim here. For instance, Plaintiffs rely on several cases addressing "resource management plans" and argue that such plans are designed to "guide and *control* future management actions." Dkt. No. 58-1 at 29 (quoting *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020)). As an initial matter, Plaintiffs appear to not recognize that the caselaw they discuss is not referring to generic "Federal agency resource

21

management plans" *see* Dkt. No. 58-1 at 29, but rather "resource management plans" (or

"RMPs") as specifically defined under the Bureau of Land Management's ("BLM") regulations

promulgated under the Federal Land Policy and Management Act ("FLPMA").  *See Norton v. S.

Utah Wilderness All.*, 542 U.S. 55, 59-60, 67 (2004); 43 C.F.R. § 1601.0-5(n) (2023) (defining

"resource management plan").  But the Organic Act, rather than FLPMA, governs the Park

Service's management of National Park System lands.  *See* 54 U.S.C. §§ 100501-07.

In any case, even accepting Plaintiffs' broader contention—that a land use agency must

manage land under its authority consistent with a general land use management plan that the

agency prepared—the caselaw they cite is still inapposite to their claim.  Here, the Park Service

analogue to a BLM RMP is the Park's GMP.  However, Plaintiffs make no argument that the

actions they challenge are inconsistent with the 1985 GMP itself—and as discussed above,

Plaintiffs' argument that the 2023 Plan is an "additive" to the GMP has no basis.

Plaintiffs seek to avoid this problem by arguing that this Court has, in *National Parks

Conservation Association v. U.S. Department of the Interior* ("*NPCA*"), found that the Park

Service can be bound by "more targeted management plans."  Dkt. No. 58-1 at 30.  But *NPCA*

cannot stand the weight Plaintiffs place on it.  In *NPCA*, the Court indicated that a plaintiff may,

in some circumstances, pursue a failure to act claim against an agency under 5 U.S.C. § 706(1),

"where the duty to act stems from an [Record of Decision ("ROD")] with adequately binding

language."  Civ. A. No. 20-3706, 2024 WL 1344450, at *18 (D.D.C. March 29, 2024); *see also

id.* at *17 (noting that the "D.C. Circuit has suggested that 'statements' contained in RODs can

'create[ ] a binding duty' on agencies." (alteration in original) (quoting *W. Org. of Res. Councils*,

892 F.3d at 1245).  It is not clear that this principle can be extended to a claim, like that brought

by Plaintiffs, under 5 U.S.C. § 706(2).  Even more, this principle should not be extended here

22

because NPS *has not begun implementing* the 2023 Plan—it has not removed feeding stations or any invasive cats from the Paseo.  Finally, and most importantly, *NPCA* still does not support Plaintiffs' claim because the 2023 Plan as described in the EA and FONSI does not have "adequately binding language" mandating the use of feeding stations—especially the use of feeding stations to feed and care for cats, as Plaintiffs argue.  Dkt. No. 58-1 at 32; *see* 2024 WL 1344450 at *18.  Specifically, as discussed in more detail below, the 2023 Plan neither mandates that the Park Service take—nor prohibits it from taking—any action related to cat feeding stations.  Plaintiffs also argue that more targeted plans, like that in *Walen v. United States*, 246 F. Supp. 3d 449, 460 (D.D.C. 2017), "create binding obligations on the agency."  Dkt. No. 58-1 at 29-30.  But *Walen* is inapposite.  It was a suit brought under the Federal Tort Claims Act against the United States and therefore was addressing whether the "discretionary function exception" applied.  *Walen* 246 F. Supp. 3d at 453-56.  The Court found that a "draft" Tree Plan imposed mandatory instruction to employees rendering the exception inapplicable.  *Id.* at 456-60.  The court did not address, and certainly did not find, that the draft Tree Plan was final agency action that the Park Service could be challenged for violating under the APA.  *See id.*  And furthermore, as discussed below, the 2023 Plan has no relevant mandatory instructions.

In sum, the 2023 Plan is not a general management plan or additive to the Park Service's 1984 GMP, and the 2023 Plan cannot be construed as restricting the Park Service's ability to make management decisions that have nothing to do with the management of the free-ranging cat population.

### B.      The safety closure did not violate the 2023 Plan.

Even if the 2023 Plan can be construed, as a general matter, as setting forth enforceable obligations with which the Park Service must comply, Plaintiffs' claim still fails because they cannot identify any provision of the 2023 Plan that conceivably could prevent the Park Service

23

from imposing its public safety closure of a portion of the Paseo.  Nothing in the 2023 Plan (or

the 1985 GMP) prevents NPS from implementing a safety closure like the one at issue here.  And

nothing in the 2023 Plan requires the retention of feeding stations in any particular location and

certainly does not require the retention of such feeding stations for the purposes of furthering

TNR efforts.  Lastly, as noted above, NPS has not begun implementing the removal phase of the

2023 Plan.

As an initial matter, the Park Service has unquestionable authority to close parks, or

portions of parks, for variety of reasons, including protecting public safety.  36 C.F.R. § 1.5(a)

(2025).  The Organic Act is silent on the specifics of individual park management, leaving NPS

with "especially broad discretion on how to implement [its] mandate."  *Davis*, 202 F.3d at 365;

*see* 54 U.S.C. §§ 100501-07.  Closures are permissible, for example, when "necessary for the

maintenance of public health and safety[.]"  36 C.F.R. § 1.5(a) (2025).  Pursuant to this authority,

on November 25, 2025, Park Superintendent Palfrey decided to temporarily close approximately

1,900 feet of the Paseo "to ensure public health and safety and security" during the completion of

the Cliff Project.  SAJU_467.

Plaintiffs' argument that the safety closure is "arbitrary and capricious" has no basis.

Dkt. No. 58-1 at 28, 35.  For example, Plaintiffs argue that the safety closure "removed several

feeding stations and stopped the related care without first capturing the [cats] in the vicinity of

those feeding stations, violating the 2023 Plan."  Dkt. No. 58-1 at 32.  But NPS did not remove

nor require the removal of feeding stations used by SAG for TNR efforts.  Rather, NPS issued an

order preventing the public (including Plaintiffs) from accessing the closure area.  Even so, NPS

notified Plaintiffs of the forthcoming conditions and held open the opportunity (for nearly three

24

months) for Plaintiffs to relocate those previously authorized TNR feeding stations elsewhere along portions of the Paseo that would remain accessible to the public.  *See* Dkt. No. 35 at 31-32.

Moreover, absolutely nothing in the 2023 Plan can reasonably be construed as (1) limiting the Park Service's authority, established by regulation, to impose closures for purposes of ensuring public safety; or (2) setting forth an obligation upon NPS to allow for the maintenance of feeding stations that are currently located at the Park to continue to support SAG's TNR efforts.  With respect to the first, the 2023 Plan does not mention the Park Service's authority to institute closures—and it certainly does not say (or even reasonably suggest) that such authority is somehow limited by the 2023 Plan.  Nor could it.  To be sure, Plaintiffs argue that "NPS' regulations recognize the importance and supremacy of management plans," stating that NPS' regulations "shall not be construed to prohibit administrative activities conducted by the National Park Service . . . in accordance with approved general management and resource management plans."  Dkt. No. 58-1 at 28 (quoting 36 C.F.R. § 1.2(d) (2025)).  But the general purpose 36 C.F.R. § 1.2(d) is not, as Plaintiffs imply, to direct that GMPs overrule a Park Service regulation—rather, it is meant to clarify that certain actions (under Parts 2-5, 7, 9, and 13-14) shall not be construed to prohibit administrative activities conducted by NPS in accordance with a GMP.  Even setting this aside, this exception to strict applicability of the Park Service regulations in § 1.2(d)  does not apply to Part 1 of the regulations (which part includes 36 C.F.R. § 1.5, authorizing closures).

With respect to the second, contrary to Plaintiffs' argument, the 2023 Plan does not contemplate—let alone require—the continued existence of SAG's cat feeding stations for the purpose of TNR efforts.  Alternative 3, the selected alternative, provides that if an animal welfare organization was selected to participate in the 2023 Plan, it would be *able* to utilize existing

feeding stations for up to 6 months for the sole purpose of aiding in the trapping and removal efforts, and not for TNR purposes. NPS_1037. The EA also clarified that under both Alternative 3 and Alternative 2, "[f]eeding cats within the park would only be allowed to aid in initial trapping efforts, after which all feeding stations would be removed. All unauthorized feeding would be prohibited." NPS_970. As such, the selected alternative did not contemplate, let alone require, the continued operation of feeding stations for any purpose other than to aid in the trapping of cats for their removal from the Park.

Importantly, however, no animal welfare organizations (including either of the Plaintiffs) responded to NPS' invitation to apply to be designated as the entity responsible for removal efforts. Dkt. No. 35 at 7. As a result, under 2023 Plan, NPS is to move to "the last phase of this alternative, which will employ an organization(s) or agency(s) to remove cats from the park (herein "removal agency"), as described for alternative 2 (see pages 13–15 of the EA)." NPS_1038. As was true for the selected alternative, under Alternative 2, "[f]eeding cats within the park would only be allowed to aid in initial trapping efforts, after which all feeding stations would be removed." NPS_970. This alternative does not provide for any involvement by an "animal welfare organization," much less, for the continued maintenance of existing feeding stations by any such organization. *See* NPS_971-72. And it certainly does not mandate the use of existing feeding stations. NPS_971-72. Stated differently, the 2023 Plan does not require the retention of any particular feeding stations at any particular location along the Paseo for a removal agency to begin its work, and even so, a removal agency has not yet begun (or been authorized to begin) the removal of any cats, nor moved any feeding stations. In sum, the safety closure cannot be construed as a violation of the 2023 Plan.

Plaintiffs' ultimate contention is that the safety closure prevents them from continuing to access all of SAG's TNR cat feeding stations.  But there is nothing in the 2023 Plan that suggests an interim period where an entity (particularly one which is neither a qualified animal welfare organization that the Park Service selected to remove the cats, or a removal agency) is allowed to operate feeding stations for purposes completely unrelated to the trapping of cats for removal from the Park.  The 2023 Plan does not restrict the Park Service's broad authority and discretion to manage the Park to ensure public safety, and NPS' institution of the safety closure is not a violation of the 2023 Plan.

## II.    NPS did not violate NEPA.

Before authorizing the Cliff Project, the Park Service ensured compliance with NEPA by determining (1) that an NPS categorical exclusion applied to the project; and (2) that no extraordinary circumstances existed that prevented the invocation of the applicable CE.  As further explained below, Plaintiffs' assertion that the Park Service's invocation of a CE to evaluate the Cliff Project was unlawful because it failed to evaluate free-ranging cats as "an extraordinary circumstance" and because NPS did not "reevaluate" the CE considering the 2023 Plan has no basis in the law.  NPS reasonably determined that the Cliff Project fit within a pre-established categorical exclusion, and no extraordinary circumstances applied.

The Park Service appropriately discharged its obligations under NEPA using a Categorical Exclusion, and its decision should be afforded substantial deference.  Defendants are entitled to summary judgment on Plaintiffs' NEPA claims.

### A.    The safety closure was not a post hoc rationale and is a discrete agency action, separate from the Cliff Project.

As an initial matter, Plaintiffs insist that the safety closure is not a discrete action, but rather, a "post hoc" assertion that is "part and parcel of the Cliff Project."  Dkt. No. 58-1 at 36-

37.  To the contrary, the November 25, 2025, Determination is a discrete agency decision made by the Park Superintendent pursuant to the discretion granted by 36 C.F.R. §§ 1.5 and 1.7 and relevant NPS management authorities.  *See* Legal Framework, Section A, and Argument, Section I (B) at 24, *supra*.  Ultimately, Plaintiffs' argument is not intended to show some cognizable procedural defect, but instead, intended to buttress their argument that the closure decision was not intended to protect public safety, but rather to surreptitiously "upend[] the 2023 Plan that was developed through the formal public notice and comment procedures of the APA and NEPA." Dkt. No. 58-1 at 38.  The record does not support this argument.

### 1.    The safety closure is a discrete agency action.

As discussed above, the Park Service has unquestionable authority to close parks, or portions of parks to protect public safety.  36 C.F.R. § 1.5(a) (2025).  As to what constitutes a determination applicable to "public health and safety," the Management Policies and NPS Director's Order #50C: Public Risk Management Program ("Order 50C") largely "leave public safety determinations to the discretion of each national park."  *Walen*, 246 F. Supp. 3d at 457-58 (citation modified).  The Management Policies state that "the means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing."  Management Policies § 8.2.5.1 at 105.  The Management Policies include examples of "decisions about whether to install warning signs . . . close roads and trails or install guardrails and fences."  *Id.* Similarly, Order 50C reserves to superintendents "discretion to determine the level of program resources and the type of programs needed to manage visitor risk . . . depend[ing] on the resources, values, park-specific mission . . . the history of visitor injury in the park, and available resources."  Order 50C at 11.  As such, closure determinations are often necessarily informed by the current circumstances existing at the time of the proposed closure.

28

Here, the Park Superintendent made a determination to institute a partial, temporary safety closure of the Paseo based on the available information and circumstances as they existed in November 2025. Superintendent Palfrey explained that the closure was necessary based on her assessment that the Cliff Project would entail activities that will pose a risk to public health and safety along the Paseo, such as the installation of soil and rock anchors, pneumatic application of shotcrete, and the operation and use of vehicles and heavy equipment on the Paseo. SAJU_467. However, the Superintendent limited the closure to the extent she could, ensuring public access would remain available to the remaining portion of the Paseo from both ends of the trail. *Id.* Further, the Superintendent detailed that NPS would post notices of the closure at the Paseo and on the Park website. *Id.* Finally, the Superintendent explained that the Determination was developed according to the NPS Management Policies, and the temporary closure is in accordance with 36 C.F.R. §§ 1.5 and 1.7. *Id.*

There is, of course, no dispute that the need for the safety closure arose from the Cliff Project—the Determination describes as much, explaining the temporary closure to be "necessary to ensure public health and safety and security during the completion of the [Cliff Project]." SAJU_467. Nonetheless, the decision to institute a safety closure was not made until the Cliff Project was initiated and had begun to proceed, and the Superintendent's ability to make a contemporaneous determination of the potential risk to public safety was informed by the actual circumstances on the ground at the time. This was certainly reasonable. Further, the Superintendent described her rational for the closure, and this explanation is subject to the presumption of regularity. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (quoting *Nat'l Archives & Recs Admin. v. Favish*, 541 U.S. 157 (2004) (A "presumption of regularity supports

29

the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.")).  There is no clear evidence that could rebut this presumption—to the contrary, the Park Service's efforts to provide some accommodation to Plaintiffs' efforts to continue to maintain feeding stations during the closure further rebuts any allegation of improper motive.  *See* Dkt. No. 8-7 at 1-2.

Similarly, Plaintiffs argue that the November 25, 2025, Determination is an arbitrary "post hoc document[]" because "NPS announced the [safety closure] to Plaintiffs on November 6, 2025."  Dkt. No. 58-1 at 36-38.  This argument unreasonably (and illogically) attaches legal weight to NPS' good faith conferral with Plaintiffs about the anticipated closure.  The fact that NPS was considering the safety closure and its parameters prior to November 25, 2025, does not make the Determination a post hoc rationalization—such reasoning would illogically (and improperly) label all deliberative processes and preparations to act, as final agency actions. "Much of what an agency does is in anticipation of agency action.  As agencies prepare proposals, conduct studies, meet with . . . interest groups . . . and engage in a wide variety of activities that comprise the common business of managing government programs." *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  Here, conferral with Plaintiffs, because of their pending legal challenge against the NPS for actions along the Paseo, was carried out in anticipation of the final Determination made on November 25, 2025.

> **2.    Plaintiffs cannot assert a new claim in their summary judgment motion, and in any case, the safety closure was properly promulgated under36 C.F.R. §§ 1.5 and 1.7.**

Plaintiffs also argue that regardless of if the Determination can be evaluated independent of the Cliff Project, the safety closure "violates NPS' own regulations."  Dkt. No. 58-1 at 37-38. However, as an initial matter, this is a new claim—that the Park Service violated its regulations

in implementing the safety closure—that Plaintiffs did not include in their original complaint, nor in the amended complaint that Plaintiffs filed immediately before filing their motion for summary judgment. "A plaintiff is not permitted to raise new claims at the summary judgment stage, where those claims were not pleaded in the complaint." *Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012) (citing *Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their amended complaint.")). As such, Plaintiffs' claim that the safety closure "violates NPS' own regulations" is not properly before the Court and should not be considered.

However, even if Plaintiffs were able to pursue their unpled claim, it fails. As explained, Argument, Section I (B), *supra*, NPS has authority to close parks, or portions of parks, for variety of reasons, including to protect public safety. 36 C.F.R. § 1.5(a) (2025). Closures are permissible when a superintendent determines it to be "necessary for the maintenance of public health and safety." 36 C.F.R. § 1.5(a) (2025); *see also Walen*, 246 F. Supp. 3d at 457-58. Here, the Park Superintendent determined it necessary to close a portion of the Paseo "to ensure public health and safety and security" during the completion of the Cliff Project, because it will involve activities that will pose a safety risk, such as the operation and use of vehicles and heavy equipment on the Paseo. SAJU_467. And in compliance with § 1.5(a) , NPS noticed the closure at the Paseo and on the Park website. *Id.* Thus, the temporary safety closure determination was developed in accordance with Management Policies, and 36 C.F.R. §§ 1.5 and 1.7. *Id.*

Next, Plaintiffs argue that the Determination "violated NPS' own regulations for issuing Park closures" because the safety closure was not an emergency and thus, should have been published in the Federal Register. Dkt. No. 58-1 at 37-38. But § 1.5(b) only requires that closures be published as a rulemaking in the Federal Register if they trigger certain criteria—for

31

instance, if a closure or other restriction is of a "nature, magnitude and duration" that will significantly alter public use, will require a long-term modification in the resource management objections of the Park, or is of a "highly controversial nature."  Such is not the case here.  And the preamble for 36 C.F.R. § 1.5 states that "public notice and comment is *not intended to apply* to measures taken to achieve routine resource management objectives, *such as construction*, facility maintenance or rehabilitation, and routine practices which are aimed at preserving the viability, integrity and natural character of the park ecosystem."  48 Fed. Reg. 30,252, 30,261-62 (June 30, 1983) (codified at 36 C.F.R. pts. 1-7, 12) (emphasis added).

Plaintiffs' argument that Federal Register notice was required is ultimately based upon their contention that the safety closure "completely upends the 2023 Plan that was developed through the formal public notice and comment procedures of the APA and NEPA . . . ."  Dkt. No. 58-1 at 38.  As demonstrated above, that simply is not the case: even if the 2023 Plan could be construed as limiting the Park Service's authority and discretion to implement safety-related closures (which of course, it cannot), the closure did not conflict with the 2023 Plan.  Accordingly, Plaintiffs' arguments—even if they were properly before the Court—are without merit.

### B.    NPS reasonably determined that extraordinary circumstances are not present.

Contrary to Plaintiffs' arguments, the record demonstrates the Park Service considered whether extraordinary circumstances would prevent the application of a CE for the Cliff Project and reasonably concluded that none applied.

NEPA and its prior implementing regulations allow an agency to identify categories of actions that normally "do not have a significant effect on the human environment," and then, in coordination with CEQ and through a public notice-and-comment process, the agency may

32

promulgate a regulation identifying such actions to be a "categorical exclusion." *Dakota Rural Action v. U.S. Dep't of Agric.*, 668 F. Supp. 3d 1, 8 (D.D.C. 2003), *dismissed*, No. 23-5158, 2023 WL 5421842 (D.C. Cir. Aug. 21, 2023); *see also Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 493 (D.D.C. 2020) ("Under NEPA, agencies identify classes of actions that 'normally do not have a significant effect on the human environment.'") (quoting 40 C.F.R. § 1501.4(a)), *aff'd sub nom. Earthworks v. Dep't of the Interior*, 105 F.4th 449 (D.C. Cir. 2024). If a CE is determined to initially apply to a proposed action, the agency must evaluate the action for "extraordinary circumstances," which, if found, require analysis and environmental documentation.[9] 43 C.F.R. § 46.205(c)(1) (2024).

The extraordinary circumstances applicable to NPS CEs are in 43 C.F.R. § 46.215 and the Park Service's 2015 NEPA Handbook ("NEPA Handbook").[10] An agency's decision to classify a proposed action as falling within a particular CE will be set aside only if a court determines that the decision was arbitrary and capricious. *Back County Horsemen of Am. v. Johannas*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (citation omitted). Further, the agency's interpretation of the scope of one of its own CE's is "given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Id.* (citations omitted); *see also Earthworks*, 496 F. Supp. 3d at 493 (same).

Here, the Park Service reasonably determined, and Plaintiffs do not dispute, that the Cliff Project fits within a pre-established categorical exclusion—"C. 19 Construction or rehabilitation

---

[9] Plaintiffs' claim that when an agency adopts a categorical exclusion "there is an *assumption* that related extraordinary circumstances may exist and must be analyzed" is incorrect and finds no support in the cited 9th Circuit case nor in 43 U.S.C. §§ 46.200-46.240. Dkt. No. 58-1 at 40.

[10] NPS, *NEPA Handbook* (2015), https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.pdf.

in previously disturbed or developed areas, required to meet health or safety regulations."

NPS_331; *see also* Handbook § 3.3 at 36.  Plaintiffs, however, generally allege the existence of

extraordinary circumstances, and argue that the application of the CE was arbitrary and

capricious because NPS did not sufficiently explain its determination that extraordinary

circumstances did not apply.  Dkt. No. 58-1 at 42-44.  But agencies are "not required to provide

an elaborate explanation of the reasons for applying the categorical exclusion."  *Safari Club Int'l*

*v. Jewell*, 960 F. Supp. 2d 17, 81 (D.D.C. 2013).  And "[b]ecause extraordinary circumstances

are, by definition, extraordinary, it would be inappropriate to require an agency, as a general rule,

to document its consideration of them."  *Reed*, 744 F. Supp. 2d at 116.

In this instance, NPS complied with NEPA when it completed a CE form, containing a

detailed project description with photos, a checklist of potential extraordinary circumstances, and

an Environmental Screening Form of potential impacts.[11]  NPS_326-36; 43 C.F.R. § 46.215

(2024) ("[i]f an extraordinary circumstance is not present, the Responsible Official may

determine that the categorical exclusion applies to the proposed action and conclude review.").

Thus, the Park Service's conclusion that extraordinary circumstances did not exist and that the

action fit within an identified CE complied with applicable regulations, and was reasonable, not

arbitrary and capricious.

Nevertheless, Plaintiffs assert that NPS "failed to perform a proper NEPA extraordinary

circumstances analysis."  Dkt. No. 58-1 at 43; *Reed*, 744 F. Supp. 2d at 116 (explaining that the

---

[11] When using a CE, the NEPA Handbook directs NPS to "create a concise record that identifies the CE being used and which should document: (1) that the proposed action fits within the category of actions described in the CE; and (2) no extraordinary circumstances exist . . . . *The standard NPS practice is to use a Categorical Exclusion Documentation Form*, which can be generated in PEPC, in order to document the required information."  NEPA Handbook § 3.4 at 39 (citation modified).

34

relevant question is "whether there is substantial evidence in the record that an extraordinary circumstance applies."). At the threshold, however, the out of district and unpublished cases Plaintiffs rely upon to support their arguments are inapposite here. Dkt. No. 58-1 at 40. Both *Conservation Cong. v. U.S. Forrest Serv.*, No. CIV. 12-02416, 2013 WL 2457481 (E.D. Ca. June 6, 2013) and *W. Watersheds Project v. U.S. Forest Serv.*, No. CV-11-08128, 2012 WL 6589349 (D. Ariz. Dec. 17, 2012), *aff'd*, 603 F. App'x 612 (9th Cir. 2015), involved challenges to the U.S. Forest Service's ("USFS") use of categorical exclusions where enumerated, agency-specific "resource conditions" must be considered for the agency to determine whether the "degree of the potential effect" warrants further analysis and documentation. *Conservation Cong.*, 2013 WL 2457481 at *6-10; *W. Watersheds Project*, 2012 WL 6589349 at *1-3, 11-18; *see* 36 C.F.R. § 220.6 (2024). But the USFS and NPS categorical exclusions are not identical, nor interchangeable, across the two agencies, and the regulations governing each respective agency's NEPA compliance impose different guidance on the consideration and analysis of extraordinary circumstances. *Cf.* 36 C.F.R. § 220.6 (USFS CEs), 43 C.F.R. § 46.215 (NPS CEs). For example, the USFS regulations (now amended) required the agency to evaluate a "cause-effect relationship between a proposed action and the [proposed action's] potential effect on [] resource conditions" and ultimately, the "degree of [the] potential effect" determines whether an extraordinary circumstance exists, such that an EA or EIS would be required.[12]  36 C.F.R. § 220.6(b) (1), (2) (2024). In contrast, NPS regulations provide that the "applicability of extraordinary circumstances to categorical exclusions is determined by the Responsible Official." 43 C.F.R. §

---

[12] Plaintiffs incorrectly suggest that an agency must "affirmatively conclude that there will be 'no effect' from the CE activity when extraordinary circumstances are present." Dkt. No. 58-1 at 40 (citing *Conservation Cong.*, 2013 WL 2457481 at *8). This is not what 36 C.F.R. § 220.6 requires, and NPS' regulations do not have any comparable affirmative requirement.

46.215 (2024).  Regardless, both cases involved the USFS' use of a CE for projects in areas home to threatened species, and governing circuit case law had recognized that the agency could issue a CE in such instances, so long as the USFS determined such projects would not negatively impact the threatened species.  *Conservation Cong.*, 2013 WL 2457481 at *8; *W. Watersheds Project*, 2012 WL 6589349 at *2, 12.  There are no such analogous circumstances here, and Plaintiffs' argument fails.

Next, Plaintiffs' conclusory assertions that the Cliff Project involved extraordinary circumstances that NPS did not evaluate is not supported by "substantial evidence" in the administrative record.  Dkt. No. 58-1 at 41, 43.  Ultimately, Plaintiffs assert that the Cliff Project could have "potentially" involved the following extraordinary circumstances:

> (1) highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources (NPS_332); (2) contribute[d] to "the introduction, continued existence, or spread of . . . nonnative invasive species" (*id.*); (3) have "a direct relationship to other actions with individually insignificant, but cumulatively significant, environmental effects" such as the existing TNR Program (*id.*); and (4) (5) have "significant impacts on . . . park" lands (*id.*).

*Id.* at 43 (citation modified).  But Plaintiffs' *ipse dixit* does not make it so.

First, as Plaintiffs acknowledge, the record contains MOUs between NPS and SAG, as well as the 2023 Plan decision documents.  *Id.* at 41-43; *see* NPS_379, 953, 946.  Thus, there is no dispute such information about the free-ranging cats was before the relevant decisionmaker at the time of the CE.  The fact that Plaintiffs may view the Cliff Project as an activity that may have "highly controversial environmental effects" upon the invasive cats does not make the NPS' reasonable conclusion, that extraordinary circumstances did not exist, arbitrary and capricious.  Under NEPA regulations, "highly controversial" indicates that a "substantial dispute exists as to the size, nature, or *effect* of the major federal action."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985

F.3d 1032, 1043 (D.D.C. 2021); *see also Red Lake Band Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 63 (D.D.C. 2022) ("To be 'highly controversial', '*something more* is required besides the fact that some people may be highly agitated and be willing to go to court over the matter.'" (citation omitted)).  No evidence of such a controversy exists in the record.  Instead, the "controversy" is Plaintiffs' belief that the Cliff Project would interfere with their TNR efforts.  But NEPA is "not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." *Front Range Equine Rescue v Vilsack*, 753 F. Supp. 3d 6, 12 (D.D.C. 2024) (citations omitted).

Indeed, the proposition that invasive species exist along the Paseo, and that alleged, (at most, partial) interference with Plaintiffs' asserted interest in continuing TNR efforts (trapping and removing cats from the Paseo) is an extraordinary circumstance that NPS should have discussed in detail finds no support in the caselaw or applicable regulations.  And that is particularly true with respect to Plaintiffs' contention that any potential effects on the cats as "invasive species" necessarily rendered invocation of a CE inappropriate in this case.  In particular, Plaintiffs point to no authority indicating that an action that would have a *detrimental impact* on an *invasive species* is somehow an extraordinary circumstance.  To the contrary, Park Service guidance makes clear that an extraordinary circumstance might occur where a proposed project would *contribute to the continued existence or spread of an invasive species* known to occur in the area. NPS_332.  Finally, as it relates to "cumulatively significant" effects, no one, not even Plaintiffs, maintain that the Cliff Project will result in the end of TNR efforts—let alone, eliminate all cats from the Park.  Lastly, the Cliff Project (intended to preserve

unimpaired the Park's resources) is changing little to nothing as it relates to the actual

Park—so the fourth and fifth circumstances ("significant impacts on…park" lands) does

not apply.

Plaintiffs' allegations are hardly sufficient to demonstrate that the record contains

"substantial evidence . . . that an extraordinary circumstance [may] apply" much less to meet

their burden to demonstrate that the existence of an extraordinary circumstance precluded the

application of the CE.  *See Safari Club Int'l*, 960 F. Supp. 2d at 81-82.

**C.      NPS was not required to "reassess" its 2018 CE.**

Plaintiffs' alternative argument, that the Park Service's reliance on the CE for the Cliff

Project was arbitrary and capricious because NPS did not "reassess" the exclusion in light of the

"passage of time," current litigation, and the 2023 Plan, is similarly unavailing.  Dkt. No. 58-1 at

44-51.

First, Plaintiffs incorrectly read the NEPA Handbook to argue that NPS was *required* to

"reassess" and "update[]" its CE.  *Id.* at 44-45.  As an initial matter, the NPS Handbook does not

create judicially enforceable duties.  *See* NEPA Handbook at 1.  Nevertheless, the NEPA

Handbook contains no such requirement that categorical exclusion determinations must be

assessed every five years.  Rather, the NEPA Handbook explains that "CEs used for *ongoing and

recurring actions should be* reviewed every five years."  NEPA Handbook § 3.6 at 41 (citation

modified).  "Ongoing" actions are, for example, activities related to park administration, such as

trail maintenance, which are of a routine nature.  *Id.*  The Cliff Project is not, under any

reasonable reading of the term nor review of the project plans, an "ongoing and recurring action"

for purposes of "routine" park administration.  Plaintiffs' attempt to label the Cliff Project as an

"ongoing" action because it was put into motion in 2018 and is now materializing, does not make

38

it an "ongoing action" for purposes of NEPA.  Even more, semantics aside, the NEPA

Handbook's suggestion for five-year review is specific to "programmatic" CEs, which provide

NEPA documentation for multiple instances of an ongoing or recurring activity, when the activity

impacts are predictable.  NEPA Handbook § 3.6 at 41.  The Cliff Project CE is not a

programmatic CE.

Relatedly, Plaintiffs argue that a memorandum to file should have been used to ensure

that the Cliff Project and its impacts are "still accurately described" because of the lapse in time

between the 2018 CE and construction implementation.  Dkt. No. 58-1 at 50 (citing NEPA

Handbook § 2.2 at 23).  Again, the provision upon which Plaintiffs rely is inapplicable to NPS'

use of a CE determination— § 2.2 of the NEPA Handbook provides that a memorandum to file

should be used when an EA and FONSI were previously prepared for a delayed project.  An EA

and FONSI were not prepared for the Cliff Project, and § 2.2 does not apply.  Nevertheless, the

record contains evidence that NPS reviewed its CE determination and affirmed that the Cliff

Project impacts were still accurately described.  For example, in February 2021, NPS prepared a

detailed schematic review report of the Cliff Project and therein verified that the information in

the 2018 CE, including the project description, was still accurate, and that the expected potential

impacts remained as described.  NPS_798.  The Park Service did not arbitrarily rely upon the

2018 CE in its decision to proceed with the Cliff Project.

Assuming that NPS was required to "reassess" its CE determination (it was not),

Plaintiffs argue that the Park Service's decision not to supplement its analysis reveals that "NPS

failed to meet its NEPA obligations."  Dkt. No. 58-1 at 46.  Plaintiffs incorrectly rely on *Mayo v.*

*Reynolds* ("*Mayo*"), 875 F.3d 11 (D.C. Cir. 2017) to argue that there are "two distinct

requirements" for "evaluating an agency's decision to not supplement a NEPA analysis."  Dkt.

39

No. 58-1 at 46.  But *Mayo*—a case addressing EISs and an agency's obligation to supplement— is inapposite.  First, the requirement to supplement an EIS per 40 C.F.R. § 1502.9 is no longer in effect, even for EISs.  *See Mayo*, 875 F.3d at 16.  Second, a CE is not an EIS—and Plaintiffs provide no support for their contention that the robust (and since repealed) requirements related to EISs apply to CEs.  Indeed, and as discussed, there are no continuing obligations on NPS to supplement CE determinations in 43 C.F.R. §§ 46.205-46.215.

Putting this aside, Plaintiffs, citing to *Mayo*, appear to argue that the Court should evaluate NPS' decision to rely on the CE by (1) considering whether NPS took a hard look at the environmental consequences, and then (2) whether any actual consequences of the implementing action were not adequately contemplated and analyzed by the earlier analysis.  Dkt. No. 58-1 at 46.  But the two-step test against which Plaintiffs wish to measure NPS' compliance with NEPA does not find support anywhere in the text of *Mayo* (nor any other case).  Instead, *Mayo* explains that for an EIS, an agency must "take a hard look at the environmental impacts of its proposed action[]. The statute does not, however, require the agency to take a *new* look every time it takes a step that implements a previously-studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis."  875 F.3d at 14-15 (citation modified).  As such, Plaintiffs' "two district requirements" find no basis in the cited case.  And even if *Mayo* could be reasonably read to set forth such a two-step test, as described, the "hard look" requirement is still a standard of review by which the *sufficiency of an agency's EIS* is evaluated. *See e.g.*, *Robertson*, 490 U.S. at 356 ("the twin functions of an EIS [are]—requiring agencies to take a 'hard look' at the consequences of the proposed action and providing important information to other groups and individuals.")  Again, a CE—not an EIS—is at issue.

In any case, more broadly, the "rule of reason" governs the Court's review of the agency's decision not to supplement a NEPA document. *Mayo*, 875 F.3d at 20. This standard "ensures that agencies determine whether and to what extent to prepare [NEPA documentation] based on the usefulness of any new potential information to the decisionmaking process." *Id.* Plaintiffs' scattershot of "new" or "changed" information—such as the adoption of the 2023 Plan (which was itself subject to robust NEPA—and which adopted a plan with the sole purpose of removing cats from the Park)—does not describe information that reasonably would mandate supplementation. Dkt. No. 58-1 at 47-49. Indeed, as discussed above, the "extraordinary circumstances" that Plaintiffs assert the Park Service needed to address in a supplemental evaluation are anything but.

The Park Service's reliance on the CE for the Cliff Project, and its determination therein that no extraordinary circumstances applied was reasonable, and not arbitrary and capricious.

## III.    The appropriate remedy is remand without vacatur.

Defendants are entitled to summary judgment on all Plaintiffs' claims. However, should the Court disagree and further, conclude that the Park Service made an error, remand without vacatur is the appropriate remedy, because any error would be curable on remand and the disruptive consequences of vacatur would be severe. *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036-37 (D.C. Cir. 2025) (quoting *Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)); *see also Checkosky v. SEC*, 23 F.3d 452, 466 (D.C. Cir. 1994) (listing 29 "D.C. Circuit cases remanding for inadequate explanation without vacating agency action").

As discussed above, Statement of Facts, Section C, *supra*, the Cliff Project is an expensive and imperative project needed to ensure the protection of fundamental aspects of the Park. Certainly, delays could cause additional costs and issues in implementing the Cliff Project.

41

*Id.* Moreover, the Cliff Project has commenced, and construction activities will have been ongoing for at least four months by the conclusion of briefing and while a decision on the merits is pending. As such, the consequences of vacating NPS' CE upon the completion of the Cliff Project, and upon the Park, will be dependent upon a variety of factors at that time, such as the current stage of construction, the NPS-Corps-and third-party contractor, and any related financial obligations, and safety considerations of sudden construction disruptions. For these reasons, should the Court find for Plaintiffs on the merits, Defendants would respectfully request the chance to submit supplemental briefs addressing the proper remedy, with updated declarations and information about the progression of the Cliff Project.

## **CONCLUSION**

For the reasons above, Plaintiffs' Motion for Summary Judgment should be denied, and Defendants' Cross Motion for Summary Judgment on all claims should be granted.

Respectfully submitted this 11th day of May 2026.

> ADAM R.F. GUSTAFSON
> Principal Deputy Assistant Attorney General
> Environment & Natural Resources Division
>
> */s/ Alexa V. Penalosa*
> ALEXA V. PENALOSA (AZ # 038005)
> Trial Attorney
> United States Department of Justice
> Environment & Natural Resources Division
> Natural Resources Section
> 150 M Street NE
> Washington, D.C. 20002
> Phone: (202) 294-3569
> Email: alexa.penalosa@usdoj.gov
>
> ROMNEY S. PHILPOTT (Colo. # 35112)
> Senior Attorney
> United States Department of Justice

Environment & Natural Resources Division
Natural Resources Section
999 18th Street, 6th Floor—Suite 600
Denver, CO 80305
Phone: (303) 844-1810
Email: romney.philpott@usdoj.gov

*Attorneys for Defendants*