**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALLEY CAT ALLIES INCORPORATED, and

SAVE-A-GATO, INC.

    Plaintiffs,

v.

UNITED STATES NATIONAL PARK           CASE NO.: 1:25-cv-04269-CKK
SERVICE, *et al.*,

    Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

PROCEDURAL UPDATE ...................................................................................................3

I.     The *ACA I* Court's May 20, 2026 Decision Regarding the 2023 Plan. ..............................3

ARGUMENT.........................................................................................................................4

I.     Plaintiffs Maintain Standing to Challenge the Paseo Closure. ...........................................4

     A.     Plaintiffs are being harmed on a daily basis by the Paseo Closure.........................4

     B.     The decision in *ACA I* does not change Plaintiffs' clear standing to bring this action. ....................................................................................................... 5

II.     NPS' Decision to Implement the Paseo Closure Violates the 2023 Plan. .........................6

     A.     The 2023 Plan is a management plan that binds NPS. ........................................ 7

     B.     The 2023 Plan creates binding requirements regarding NPS' future management of the community cats and the plan to end the existing TNR Program............................................................................................................. 12

     C.     The Paseo Closure was not a separate agency action from the Cliff Project....... 16

     D.     Plaintiffs clearly challenged Defendants' Paseo Closure – including that Paseo Closure violated 36 C.F.R. §§ 1.5 and 1.7.................................................. 18

III.     Defendants Violated NEPA in Failing to Supplement the 2018 CE Determination. ........20

     A.     Defendants were required to reassess the 2018 CE Determination. ..................... 20

     B.     Extraordinary circumstances existed in 2025 when Defendants moved forward with the Cliff Project. ............................................................................ 22

IV.     Vacatur is the Appropriate Remedy..................................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021)...................................................................................................25

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993)....................................................................................24

*\*Am. Wild Horse Campaign v. Bernhardt*,
  442 F.Supp.3d 127 (D.D.C. 2020)..................................................................................9

*Friends of Animals v. U.S. BLM*,
  548 F.Supp.3d 39 (D.D.C. 2021).................................................................................21

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
  284 F.Supp.2d 15 (D.D.C. 2003).................................................................................24

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).........................................................................................25

*\*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017).........................................................................20, 21, 22

*\*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
  No. CV 20-3706 (RC), 2024 WL 1344450 (D.D.C. Mar. 29, 2024), *appeal
  dismissed*, No. CV 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024)...............10, 11, 14

*\*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004).............................................................................................9, 11, 14

*\*Reed v. Salazar*,
  744 F.Supp.2d 98 (D.D.C. 2010).................................................................................22

*The Wilderness Soc. v. Norton*,
  434 F.3d 584 (D.C. Cir. 2006).....................................................................................14

*W. Org. of Res. Councils v. Zinke*,
  892 F.3d 1234 (D.C. Cir. 2018).............................................................................10, 11

*\*Walen v. United States*,
  246 F.Supp.3d 449 (D.D.C. 2017).........................................................................11, 12

*Wannall v. Honeywell, Inc.*,
  775 F.3d 425 (D.C. Cir. 2014).....................................................................................23

**Statutes**

5 U.S.C. § 706.............................................................................................................10, 11

54 U.S.C. § 100101............................................................................................................9

54 U.S.C. § 100501..........................................................................................................13

54 U.S.C. § 100502 ................................................................................................................13

**Other Authorities**

36 C.F.R. § 1.5 ................................................................................................3, 16, 17, 18, 19

36 C.F.R. § 1.7 ..............................................................................................................18, 19

Director's Order #2: Park Planning, Available at:
   https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last visited
   May 26, 2026) ................................................................................................7, 8, 9, 10

National Park Service NEPA Handbook (2015), Available at:
   https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.
   pdf (last visited May 26, 2026) ...............................................................20, 21, 23

NPS 2006 Management Policies, Available at:
   https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf (last
   visited May 26, 2026) ...............................................................................................17

Plaintiff Alley Cat Allies, Inc. ("ACA") and Plaintiff Save-A-Gato, Inc. ("SAG") submit this Reply in Support of Plaintiffs' Motion for Summary Judgment ("Motion") and Response to Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Cross Motion").

## INTRODUCTION

Recognizing the environmental significance of its decision to terminate the Trap-Neuter-Return ("TNR") Program on the Paseo del Morro ("Paseo") National Recreation Trail located just outside the San Juan National Historic Site (the "Park"), the United States National Park Service ("NPS") engaged in an Administrative Procedure Act ("APA") rulemaking to promulgate the 2023 Free-Ranging Cat Management Plan Environmental Assessment (NPS_953–1033, SAJU_302–82, "2023 EA")[1], accompanied by a Finding of No Significant Impact (NPS_1034–1070, SAJU_383–419, "2023 FONSI") issued under the National Environmental Policy Act ("NEPA") (collectively the "2023 Plan"). Further demonstrating the significance (and controversy) surrounding NPS' decision to cancel the TNR Program, thousands of concerned citizens commented in opposition to the 2023 Plan. Those comments highlighted the cultural importance and value of the community cats of the Paseo – and urged NPS (in addition to reconsidering its plan to end TNR), to modify its selected alternative to ensure that there was a sufficient time and resources to humanely capture and remove the community cats at the Paseo, mitigating expected adverse impacts on both the community cats and park resources.

Adapting in part those comments, NPS rejected the option of immediately terminating the TNR Program, and instead concluded that the TNR Program should be phased out over time

---

[1] NPS has lodged two administrative records in this action, the "Cliff Stabilization Project" (ECF No. 23-2, using NPS_ Bates labelling) and the "Partial Closure" of the Paseo (ECF No. 19-2, using SAJU_ Bates labelling). Plaintiffs cite to both records where applicable.

1

(approximately 6 – 12 months) in order to mitigate adverse environmental impacts both on the community cats that live on the Paseo, and to Park resources. Under the 2023 Plan, NPS bound itself to keeping, and maintaining, the feeding and veterinary care stations that are an integral and necessary element of the TNR Program on the Paseo until after the community cats in the vicinity of each feeding station were captured and removed from the Paseo.

NPS now claims that the 2023 Plan is not binding and that the TNR Program can be effectively immediately terminated by the Cliff Project, precisely the alternative expressly rejected by NPS when it promulgated the 2023 Plan. NPS' arguments belie the plain language of the 2023 Plan, which was duly promulgated under APA public comment procedures, and clearly mandated that the existing feeding stations remain in place at the Paseo until after the community cats that live in the vicinity of the feeding stations are captured and removed over a period of at least six to twelve months. The requirement that the feeding stations only be phased out over time was made deliberately by NPS, who concluded the premature and immediate removal of the feeding stations could cause negative impacts both on Park resources and the community cats themselves.

NPS' decision to ignore the 2023 Plan unravels its remaining arguments. NPS' claim that its Paseo Closure decision is legitimate because it is not constrained by the 2023 Plan is wrong. NPS' claim that its 2018 Categorical Exclusion Determination ("2018 CE Determination") for the Cliff Project and decision not to supplement the 2018 CE Determination were legitimate because the 2023 Plan was not binding or implicated by the Cliff Project is also wrong. That is because the 2023 Plan does place binding obligations on NPS' management of the Paseo – obligations NPS itself thought were necessary to protect Park resources – and those obligations have been disregarded and upended by the Cliff Project and the Paseo Closure.

2

The facts and common sense dictate rejecting Defendants' claim that the Paseo Closure is a completely distinct action from the Cliff Project and 2023 Plan, is not subject to the 2023 Plan, and instead sheltered under the Park superintendent's unfettered authority. Facts undercutting Defendants' claim the Paseo Closure is distinct include that (1) the undisputed sole purpose of the Paseo Closure is to effectuate the Cliff Project, and (2) it is undisputed that immediately shutting down the feeding/veterinary stations violates the 2023 Plan and is precisely the course of action rejected by NPS when it adopted the 2023 Plan. Further, the Park Superintendent's general authority to implement Park closures under 36 C.F.R. § 1.5 is still subject to other superseding binding obligations, including management plans adopted by NPS such as the 2023 Plan.

Having ignored and completely reversed the 2023 Plan, Defendants' actions in abruptly closing the Paseo and starting the Cliff Project were arbitrary and capricious, contrary to law, and in violation of the APA and NEPA.  Further, Defendants' actions modified and abrogated  the 2023 Plan without the public notice and comment required by the APA, and violated Defendants' obligations under NEPA to supplement the 2018 CE Determination for the Cliff Project. Defendants' actions in implementing the Paseo Closure are causing daily harm to Plaintiffs' organizational interests in promoting and maintaining the TNR program on the Paseo, and worse, are harming the community cats themselves, many of which are currently unaccounted for and their wellbeing in jeopardy.   This Court should vacate and enjoin Defendants' Paseo Closure as in violation of the 2023 Plan, and direct Defendants to revisit their 2018 CE Determination for the Cliff Project in light of the extraordinary circumstances implicated by the 2023 Plan.

## PROCEDURAL UPDATE

I.    **The *ACA I* Court's May 20, 2026 Decision Regarding the 2023 Plan.**

On May 20, 2026, the Court in *Alley Cat Allies, Inc. v. United States Natl Park Serv*., 1-24-cv-876 (Lead Case, Consolidated with *Save-a-Gato v. United States Natl Park Serv*., 25-cv-

3

1873 (D.D.C.) ("*ACA I*")) ruled on the parties' pending cross-motions for summary judgment, granting Defendants' motion for summary judgment and upholding the 2023 Plan. ECF No. 78. This means that the 2023 Plan remains the current operative plan binding NPS' current and future action impacting the community cats on the Paseo.[2]

## ARGUMENT

### I.      Plaintiffs Maintain Standing to Challenge the Paseo Closure.

Defendants do not dispute Plaintiffs' standing or their claimed harms in their Cross Motion. As set forth in their Motion and herein, Plaintiffs clearly have standing to bring and pursue this action – and they continue to be harmed daily by the Paseo Closure. Further, nothing in the recent decision in *ACA I* lessens Plaintiffs' standing or deprives this Court of jurisdiction because the 2023 Plan is effective, and Plaintiffs—at a minimum—still maintain an interest in NPS following the 2023 Plan at the Paseo.

### A.      Plaintiffs are being harmed on a daily basis by the Paseo Closure.

Despite not challenging Plaintiffs' standing, Defendants do attempt to downplay Plaintiffs' alleged harms by insinuating Plaintiffs have created issues by refusing to "relocate" the feeding stations when offered the chance. ECF No. 60-1 at 18.[3] This criticism ignores the established facts regarding the behavior of the community cats, as well as the well-documented harms that the Paseo Closure is imposing on Plaintiffs' organizational purposes to effectively administer the TNR Program, and the community cats themselves.

As Plaintiffs explained previously through extensive, and unrebutted, declarations from veterinarians, SAG volunteers, and experts in animal cruelty, cats are habit-forming animals who

---

[2] Plaintiffs disagree with the ruling in *ACA I* and are presently exploring all options to challenge that ruling including, but not limited to, an appeal.

[3] Citations to ECF documents herein refer to the court generated pagination at the top of the page.

are unlikely to move from one feeding station to another. *See, e.g.* ECF No. 8-13, Gonzalez Decl. (Doctorate and accomplished veterinarian with expertise in TNR programs stating that community cats are unlikely to move from feeding stations as they are habit-forming, will instead resort to increased scavenging, and that the plan to cut off the community cats' access to feeding stations would constitute animal cruelty); ECF No. 8-12, Perez Decl. (SAG's Paseo Manager with a degree in Veterinary Medicine stating that in the past community cats have not migrated when feeding stations were rendered inoperable, and that some community cats have physical ailments that prevent migration).

Tragically, Plaintiffs' unrebutted evidence has proven accurate. Plaintiffs have kept detailed logs since Defendants' Paseo Closure, which reveal that several cats have not been seen since the week of the Paseo Closure, and many other cats in need of medical services are located in the closed area and cannot be currently captured for purposes of administering care (that is how the TNR Program works). Perez Decl., ECF No. 58-2 at ¶¶ 26–28, 44. While Plaintiffs continue to attempt to coax as many community cats as possible to the open area of the Paseo, they simply cannot override the community cats' habit-forming nature and behavior. Plaintiffs are unable to enter the closed portion of the Paseo, and thus are unable to effectively administer the TNR Program at the Paseo while it remains closed. *Id.* at ¶¶ 30-44.

**B.    The decision in *ACA I* does not change Plaintiffs' clear standing to bring this action.**

As this Court previously recognized, Plaintiffs' "consistent investment in the Paseo's TNR program, consistent work to maintain and administer the Paseo's TNR program, and their alleged agreement with NPS to administer the Paseo's TNR program" demonstrates Plaintiffs' concrete interest in the TNR program supporting organizational standing. ECF No. 35 at 18. This Court also recognized that Plaintiffs have associational standing to represent their members' and

supporters' interests in "in viewing and enjoying cats on the Paseo living under humane conditions." *Id.* at 23.

Those interests continue until the day the TNR program is ended on the Paseo – up through and including the transition period in which NPS begins catching the community cats on the Paseo and removing them under the binding requirements of the 2023 Plan.[4]  The *ACA I* opinion has merely confirmed that the 2023 Plan continues to be the operative management plan governing NPS' actions that impact the community cats on the Paseo, and changes nothing about the Court's prior conclusions that Plaintiffs have standing.

Finally, Plaintiffs are evaluating all options for continuing their challenge to the 2023 Plan, including but not limited to, an appeal of the Court's decision.  To the extent, if any, that Plaintiffs' standing is based in their ongoing challenge to the 2023 Plan, that challenge has not concluded.

## II.    NPS' Decision to Implement the Paseo Closure Violates the 2023 Plan.

NPS' 2023 Plan is a binding management plan, adopted through NEPA and APA rulemaking procedures, that governs NPS' future actions at the San Juan National Historic Site and the Paseo that impact the community cats that reside there.  Material changes to the 2023 Plan, much less the complete evisceration of the Plan at issue here, must also follow APA rulemaking requirements.

Defendants spend much of their Cross Motion disputing that the 2023 Plan is a General Management Plan ("GMP"), or an addition to a GMP, such that the 2023 Plan can restrict the Superintendent's authority to issue the Paseo Closure.  ECF No. 60-1 at 25-30.  Defendants never explain what the 2023 Plan is purported to be if it is not a "Free-Ranging Cat *Management Plan*"

---

[4] Plaintiffs also do not accept Defendants' characterization that they complied with the request for letters of interest process under Alternative 3 and that they can move to Alternative 2 under the 2023 Plan.  *See* e.g. Palfrey Decl., ECF No. 15 at ¶ 8.

as NPS titled it when it was promulgated. Defendants simply state that the "2023 Plan cannot be construed as restricting the Park Service's ability to make management decisions that have nothing to do with the management of the free-ranging cat population." ECF No. 60-1 at 30. This statement is correct: if an NPS action has nothing to do with the community cats (i.e., does not impinge on the subject matter of the 2023 Plan), then the 2023 Plan should not restrict such decisions. However, that is precisely the point: it is undisputed that the Paseo Closure and Cliff Project do directly and adversely affect the management of the community cats. It defies the facts and common sense to conclude that the Paseo Closure and Cliff Project are "management decisions that have nothing to do with the management of the free-ranging cat population," when Defendants have expressly prohibited the feeding and care of the free-ranging cat population through the Paseo Closure. Since the Paseo Closure and Cliff Project expressly, admittedly, and adversely affect the management of the community cats, the 2023 Plan must be construed as restricting Defendants ability to implement the Paseo Closure and Cliff Project.

A.      The 2023 Plan is a management plan that binds NPS.

Defendants are incorrect to assert that Plaintiffs have claimed that the 2023 Plan is "a General Management Plan" or an "additional General Management Plan". ECF No. 60-1 at 25. Instead, Plaintiffs were clear in arguing that the 2023 Plan is a "management plan developed under the 1984 GMP" that "controls NPS' administration of the Park." Second Am. Compl., ECF No. 57 at ¶ 189; *see also* ECF No. 58-1 at 30 ("NPS' 2023 Plan is tiered under the 1984 GMP, is a final agency action with records of decision developed under the APA, and as such controls NPS' actions as to the management of the community cats on the Paseo.").

The distinction is relevant because in the modern era NPS' "park planning program has transitioned from preparing traditional stand-alone general management plans to a more responsive and flexible planning framework to meet park planning needs and fulfill legal and policy

7

requirements."  Director's Order #2: Park Planning, **Exhibit 1** at 1.[5]  As NPS Director Order #2

clarified, in the modern era "[c]entral to the planning framework is the park planning portfolio—

the assemblage of planning documents that guide park management and decision making and

satisfy law and policy. A park's planning portfolio, which extends from the foundation document

to site-specific resource and visitor use management plans, creates a logical, trackable guide for

future park management actions."  *Id.* at 2.  Thus, "the term 'general management plan' refers to

(1) a stand-alone GMP, or (2) the planning documents in a park's planning portfolio that

collectively meet the statutory requirements for a GMP."[6]

This is important because NPS no longer places all of its operative management plans in

the original GMPs, but instead adopts and tiers management plans in a portfolio of plans that,

collectively, bind and govern NPS' actions.  For example, NPS will adopt "implementation plans"

which "typically tier off comprehensive plans and focus on how to implement an activity or project

needed to achieve a long-term goal, address a management issue, or achieve a desired condition

or goal. Implementation plans may direct a specific project or an ongoing activity. These plans

usually require a level of detail and analysis that goes well beyond what is appropriate for a

comprehensive or strategic plan" such as the GMP.  *Id.* at 5.  Examples of these tiered

implementation plans include "resource-specific management plans."  *Id.* at 5-6.

In other words, under Director's Order #2, the 2023 Plan is a typical example of how NPS

creates new "tiered" and "resource-specific management plans" that govern NPS' future actions

---

[5]  Available at: https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last visited May 24, 2026).

[6] Notably, Director's Order #2 states that a GMP will be reviewed every 10-15 years to ensure that it is up to date with statutory requirements.  Exhibit 1 at 5.  NPS' 1984 GMP is 25 years past that standard update period, indicating that subsequent planning documents, such as the 2023 Plan, were intended to bring the 1984 GMP forward.

at a park.    Defendants' claim that the 2023 Plan is purely advisory and contains entirely unenforceable aspirations is incorrect. It is instead part of NPS' "portfolio" of plans that govern its conduct. This status is further demonstrated by the formal and resource-intensive APA and NEPA procedures Defendants' followed in developing and promulgating the 2023 Plan, something it would hardly have done for an informal and non-binding aspirational document. Defendants' litigation position also disrespects and makes a mockery of the public's extensive engagement in the development of the 2023 Plan. NPS invited public comment on the draft plan, the public responded with thousands of comments, NPS responded and made some (though insufficient) modifications to the plan, and then promulgated a final decision and FONSI under NEPA. Defendants are now essentially saying that this was all a charade because the 2023 Plan is meaningless and non-binding.

This Circuit's precedent holding that an agency must follow adopted management plans when they contain discrete and binding obligations applies to NPS' 2023 Plan.  Defendants attempt to distinguish *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ("*SUWA*") and *Am. Wild Horse Campaign v. Bernhardt*, 442 F.Supp.3d 127, 149 (D.D.C. 2020), but their claim that BLM resource management plans are not comparable to NPS management plans falls short.   Just like resource management plan, NPS land use plans are "designed to guide and *control* future management actions." *Am. Wild Horse Campaign*, 442 F.Supp.3d at 149.  For example, key to the Supreme Court's analysis in *SUWA* was that BLM had a statutory directive to manage the lands under its purview "in accordance with" land use plans.  542 U.S. at 69.  Here, NPS has similar statutory obligations that require that the Secretary "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units."  54 U.S.C. § 100101; *see also* Director's Order #2, Exhibit 1 at 2 (Noting that a

9

park's entire planning portfolio is used "to fulfill all relevant legal and policy requirements, including GMP statutory requirements.").

The 2023 Plan itself acknowledges that NPS' "discretion" to manage the Park is "limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise." FONSI, NPS_1069; SAJU 418. And as NPS recognized in the 2023 Plan, removing the feeding stations prior to first capturing and removing the community cats that relied upon the feeding stations would have adverse impacts on park resources, could contribute to the dispersion of an "invasive species"[7] in the Park, and would harm the community cats themselves. NPS_973–974; SAJU_322–23. Further, Defendants have consistently claimed in the 2023 Plan and in this litigation that their "existing authorities" *require* them to control (and eradicate) invasive species within Park boundaries (NPS_954; SAJU_303), yet now conflictingly claim that this is all just advisory and aspirational. Defendants' argument should be rejected because it is clear that NPS promulgated the 2023 Plan, under the formal requirements of the APA and NEPA, to control the community cats in order to protect other Park resources NPS is statutorily required to manage under the 1984 GMP.

Further, Defendants attempt to distinguish *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior* ("*NPCA*"), No CV 20-3706 (RC), 2024 WL 1344450 (D.D.C. March 29, 2024), *appeal dismissed*, No. 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024) and *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir. 2018) also falls short, since those opinions were addressing failure to act claims under 5 U.S.C. § 706(1). *NPCA* and *W. Org. of Res. Councils* both

---

[7] As noted in Plaintiffs' Motion, Plaintiffs dispute any characterization of the community cats as an invasive species.

relied on the Supreme Court's analysis in *SUWA* to determine what the standard was for bringing a failure to act claim under 5 U.S.C. § 706(1), without any analysis of a § 706(2) claim whatsoever. This is not a "failure to act" case. To the contrary, Plaintiffs are asking this Court to stop an action – the Paseo Closure.

The Supreme Court's decision in *SUWA* recognized that land use plans can bind agencies, including preventing agencies from "taking actions inconsistent with the provisions of a land use plan", and that "[u]nless and until the plan is amended, such actions can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)."  542 U.S. at 69.  What was up for consideration was whether the Court could "go further" and also allow a party to enforce a binding commitment under 5 U.S.C. § 706(1) to affirmatively force an agency to take an action, which the Supreme Court concluded in that instance was inappropriate "absent clear indication of binding commitment in the terms of the plan."  *Id.*  The *NPCA* and *W. Org. of Res. Councils* courts only applied the Supreme Court's reasoning to § 706(1) failure to act claims, further exploring the bounds of what type of commitments in land use plans were specific enough to allow a failure to act claim.  *See e.g. NPCA,* 2024 WL 1344450 at *18 ("*SUWA* does not preclude Section 706(1) claims."); *W. Org. of Res. Councils*, 892 F.3d at 1245 (analyzing agency statements in the ROD and finding they were not specific enough to create binding requirements permitting a § 706(1) failure to act claim). *SUWA* is thus clear that Plaintiffs can seek to enforce agency management plans when they contain discrete, binding provisions, whether under 706(1) or (2). Here, Plaintiffs seek to stop NPS' affirmative action, the Paseo Closure, that has reversed and undercut the 2023 Plan.

Defendants' attempts to distinguish *Walen v. United States* fall equally short.  246 F.Supp.3d 449 (D.D.C. 2017).  There, the court specifically found that discrete NPS "Tree Plans" could contain non-discretionary, mandatory duties in the context of bringing Federal Tort Claims

Act claims, further confirming that "tiered" management plans can contain binding, non-discretionary, and enforceable duties. *Id.* at 460.  Thus, the 2023 Plan contains discrete and binding obligations that are enforceable against NPS where NPS has taken affirmative actions that reverse and undercut those obligations.

**B.    The 2023 Plan creates binding requirements regarding NPS' future management of the community cats and the plan to end the existing TNR Program.**

Defendants ignore the plain language of the 2023 Plan in claiming that nothing in the 2023 Plan prohibits NPS from removing feeding stations prior to the capture and removal of the community cats in the vicinity of the feeding station.   Instead, the 2023 Plan has clear, discrete, binding obligations regarding the removal of the feeding stations, and when NPS finalized the 2023 Plan it explicitly rejected the alternative it now claims is permissible.

First, NPS' Purpose and Need Statement for the 2023 Plan indicated NPS thought the plan was necessary to bring NPS into compliance with its existing regulatory and statutory authorities:

> The purpose of and need for this plan is to address free-ranging cat populations within San Juan National Historic Site to improve the safety of its visitors and employees, protect park resources and reduce impacts to native wildlife species associated with free-ranging cats, alleviate nuisance issues, align the visitor experience with the purpose of the park, and bring the park into compliance with existing authorities for invasive species.

NPS_958; SAJU_307 (emphasis added).  NPS, in responding to (and rejecting) comments that asked NPS to recognize the cultural significance and importance of the community cats, and to allow those community cats to remain on the Paseo, continued to claim that it had no choice but to remove the community cats as it was required to bring the Park into compliance with existing authorities.  NPS_1056; SAJU_405 (NPS "acknowledges that the cats are held in sentimental regard for many residents and visitors; however, the National Park Service must bring the park into compliance with existing authorities on invasive species, abandonment, and feeding

wildlife."). NPS justified the 2023 Plan based on its interpretation of its binding existing authorities as necessary for the protection of Park resources under 54 U.S.C. §§ 100501 and 100502. Thus, according to NPS, it was legally obligated to create and implement the 2023 Plan that it now disavows has any binding effect in this litigation.

Second, NPS' description and selection of alternatives in the 2023 Plan clearly set out binding procedures that NPS committed to follow in removing the community cats from the Paseo. ECF No. 58-1 at 13-16. This included requiring NPS to (1) select an "animal welfare organization" (Alternative 3) or "animal removal agency" (Alternative 2) for conducting the removal of cats from the Paseo, including with a required solicitation process (NPS_971-72, 1036; SAJU_320-21, 385); (2) next ensure applicable permits were obtained (NPS_970, 1042; SAJU_319, 391); (3) allow trapping and removal to occur over a 6-month period (with the potential for a 6-month extension) including through "continued use of the existing feeding stations" (NPS_971-72, 1036; SAJU_320-21, 385); and (4) only after the corresponding removal of the community cat population dependent on a particular feeding station could those feeding stations then be removed (NPS_972; SAJU_321).

NPS specifically considered and rejected the action it is taking today: removing the feeding stations along the Paseo without first humanely removing the cats due to the negative impacts that would occur. ECF No. 58-1 at 15; NPS_973–74; SAJU_322–23 ("For these reasons, removing the feeding stations [prior to capture of the community cats] was dismissed from consideration."). Thus, NPS' assertion that "absolutely nothing in the 2023 Plan can reasonably be construed as . . . setting forth an obligation upon NPS to allow for the maintenance of feeding stations that are currently located at the Park to continue to support SAG's TNR efforts" is wholly divorced from the plain language of the 2023 Plan, and should be rejected outright. Further, NPS is misconstruing

13

the context: the issue isn't simply whether NPS has an obligation to allow for the maintenance of the feeding stations; rather, it is the legitimacy of NPS' decision to abruptly and affirmatively terminate the maintenance of those feeding stations without first humanely removing the cats, an action explicitly and deliberately considered and rejected in the 2023 Plan.

Even if this Court were to find that Defendants' "Free-Ranging Cat *Management Plan*" (NPS_ 953; SAJU_302 (emphasis added)) was not a "management plan" in the sense discussed in *SUWA* and *NPCA* (it is), this Circuit's jurisprudence distinguishing binding agency promulgations versus mere statements of policy also compels finding the 2023 Plan created binding obligations on NPS that NPS could not affirmatively reverse. For example, in *The Wilderness Soc. v. Norton*, the D.C. Circuit considered whether NPS' Management Policies were binding or mere guidance documents.  434 F.3d 584 (D.C. Cir. 2006).  In examining the Management Policies, the D.C. Circuit held that courts are guided by two lines of inquiry.  First, courts focus "on the effects of the agency action," asking whether the agency has (1) imposed any rights and obligations, or (2) genuinely leaves the agency and its decisionmakers free to exercise discretion. *Id*. at 595.  Second, courts look to the agency's intentions under three factors: (1) the agency's characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or the agency. *Id*.

Both steps of *The Wilderness Soc*. favor finding binding obligations in the 2023 Plan that NPS cannot depart from without changing the 2023 Plan.  Under the first line of inquiry, the 2023 Plan imposes rights and obligations both on private parties and NPS.  As established above (and in Plaintiffs' Motion for Summary Judgment), The 2023 Plan establishes a specific phased process for NPS to follow, including being required to publish a request for letters of interest from animal welfare organizations to perform the community cat removal established by the 2023 Plan;

14

alternatively being required to select an animal removal agency and direct them to remove the community cats under the timelines set forth in the 2023 Plan. NPS_972–74; SAJU_321–23. Similarly, the 2023 Plan imposed rights and obligations on interested parties such as SAG and ACA who were afforded rights under the 2023 Plan to apply for the ability to become the animal welfare agency in charge of the eventual capture and removal of the community cats. *Id.* In doing so, private parties were also required to obligate themselves to follow the requirements of the 2023 Plan, including not removing feeding stations until after the community cats in the vicinity of the feeding station have been captured and removed from the Paseo. NPS_972–74; SAJU_321–23. Other than choosing between animal welfare organizations or some other agency to effectuate the phased cat removal, the 2023 Plan does not allow for the exercise of agency discretion: the feeding/care stations can only be removed once the cats that are dependent on those stations are first humanely removed. The 2023 Plan expressly rejected the alternative of simply removing the cats first, and did not provide NPS the discretion to choose that option.

Under the second line of inquiry in *The Wilderness Soc.*, NPS clearly characterized the 2023 Plan as necessary to bring the Park into compliance with existing authorities. In other words, this was not a discretionary action, but one NPS held out to be mandated by its existing authorities. Further, NPS felt the action was sufficiently important to require a public notice and comment rulemaking process, generating thousands of public comments and resulting in a formal Environmental Assessment and decision document in the Finding of No Significant Impact that was signed by both Superintendent Palfrey and Regional Director Foust. NPS_1034; SAJU_383. Finally, as established above, the 2023 Plan has both binding effects on private parties and NPS – including the eventual termination of SAG's right to administer the TNR program on the Paseo; and the ability for interested parties such as ACA and SAG to apply to be the animal welfare

15

organization in charge of removing the community cats.

The 2023 Plan created binding obligations on NPS – which NPS itself held out as being required in order to bring NPS into compliance with its existing authorities and its statutory obligations to manage the Park to protect and preserve the Park's resources.  The 2023 Plan is thus enforceable against NPS to prevent it from taking actions that directly contradict the requirements of the 2023 Plan.

**C.    The Paseo Closure was not a separate agency action from the Cliff Project.**

Despite admitting that the Paseo Closure "arose from the Cliff Project", ECF No. 60-1 at 36, Defendants continue to illogically claim that the Paseo Closure (and Closure ROD) must be evaluated independently of both the Cliff Project and the 2023 Plan, and only as subject to NPS' unfettered and unchallengeable discretion to close park areas.  Defendants' argument should be rejected for several reasons.

First, it is clear that the Paseo Closure (and Closure ROD) are a part and parcel of the ongoing Cliff Project.  Without the Cliff Project, there would be no need for Defendants to institute the Paseo Closure.  Further, the 2023 Plan acknowledged that the upcoming Cliff Project would potentially require closing the Paseo for a short period of time. NPS_983, SAJU_332.  The Closure ROD references the Cliff Project and discusses the need for the Paseo Closure.  NPS_340; SAJU_467.  NPS also previously conceded that the Paseo Closure was necessary to effectuate the Cliff Project construction.  *See* ECF No. 14 at 26-41. Further, the facts and common sense lead to the obvious conclusion that the sole reason for the abrupt closure of the Paseo is the Cliff Project. Thus, the closure is part and parcel of the Cliff Project.

Second, Defendants' argument that the Paseo Closure should only be evaluated as a discrete agency action under NPS' authority to close parks, or portions of parks to protect public safety under 36 C.F.R. § 1.5(a) misses the mark.  Plaintiffs do not dispute that 36 C.F.R. § 1.5

16

provides general authority for the Superintendent to close a portion of a park. However, the Superintendent's general authority to make closure decisions cannot override other binding management obligations, especially those of the type promulgated under APA notice and comment rulemaking such as are contained in the 2023 Plan.

Defendants' argument that their general closure authority in 36 C.F.R. § 1.5 allows them to ignore other conflicting management obligations should be rejected. In fact, the NPS 2006 Management Policies, which NPS cites to as evidence for its broad "discretion" to implement closures, explicitly state that "discretionary management activities may be undertaken only to the extent that they will not impair park resources and values." 2006 Management Policies § 8.2.5.1 at 105.[8]

Here, Plaintiffs have provided ample evidence, supported by Defendants' own conclusions in the 2023 Plan, that premature elimination of the feeding stations without first capturing and removing the community cats that rely on those feeding stations could "increase the impacts on park resources" and is harming the community cats themselves. NPS_973–74; SAJU_322–23. These are exactly the types of impacts that NPS 2006 Management Policies state would forbid a closure decision, and at a minimum require more analysis.

Yet NPS continues to assert that "even if the 2023 Plan could be construed as limiting the Park Service's authority and discretion to implement safety-related closures . . . the closure did not conflict with the 2023 Plan" and that "NPS did not remove nor require the removal of feeding stations used by SAG for TNR efforts." ECF No. 60-1 at 31-32. As explained in Section II.A-B, *supra*, and in Plaintiffs' Motion, Defendants are simply wrong that the safety closure does not

---

[8] Available at: https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf (last visited May 26, 2026).

conflict with the 2023 Plan.  Closing a portion of the Paseo and prohibiting Plaintiffs access to the existing feeding stations was a de facto removal of those feeding stations, as they can no longer be maintained. This was further demonstrated by NPS' refusal to provide Plaintiffs any access at all to maintain the feeding stations and provide care to the community cats, even under supervision for specified time periods during which no construction work was being conducted.  Further, as patiently explained to NPS, and documented (and not disputed) in the two Declarations of Ms. Perez, the community cats are habit-forming creatures that did not fully move with the feeding stations being closed, with several community cats having not been seen since NPS initiated the Paseo Closure.  Perez Decl. ECF No. 8-12; Perez Decl., ECF No. 58-2 at ¶¶ 26–28, 44.   It is clear that the Paseo Closure resulted in the de facto removal of feeding stations without first humanely removing the cats that depended on those stations, in violation of the binding requirements of the 2023 Plan.

**D.     Plaintiffs clearly challenged Defendants' Paseo Closure – including that Paseo Closure violated 36 C.F.R. §§ 1.5 and 1.7.**

Defendants are incorrect to claim that Plaintiffs are asserting a "new claim" in their Motion for Summary Judgment to the extent they challenge the sufficiency of NPS' Closure ROD under 36 C.F.R. §§ 1.5 and 1.7.  ECF No. 60-1 at 30-32.

First, Plaintiffs' original complaint was filed before NPS ever produced the post-hoc Closure ROD to Plaintiffs (which wasn't even created until after Plaintiffs informed Defendants that Plaintiffs would challenge the closure).  *See* ECF No. 14-3 (the Closure ROD as attached to Defendants' response to Plaintiffs' motion for a preliminary injunction).  Plaintiffs could hardly have been expected to specifically name the Closure ROD, and the authorities NPS relied on in the Closure ROD, in their original complaint.

Second, and regardless, Plaintiffs' complaint clearly challenges Defendants' Paseo Closure

18

decision. *See* Complaint, ECF No. 1 at ¶ 215; Second Am. Compl., ECF No. 57, at ¶ 188 (both challenging Defendants' actions cutting off "Plaintiffs' access to the Paseo to administer the TNR Program."). Given that Plaintiffs clearly challenged the Paseo Closure decision, it is reasonable for Plaintiffs to also point out that the C.F.R. provisions relied upon by Defendants in the Closure ROD also required Defendants to make a *Federal Register* publication for the Paseo Closure because the Paseo Closure resulted in "a significant alteration in the public use pattern of the park area", would "adversely affect  the park's natural, aesthetic, scenic or cultural values," and was of a "highly controversial nature."   36 C.F.R. § 1.5(b).

As Defendants admit, the Paseo Closure will extend at least through December 15, 2026. Cubero del Toro Decl., ECF No. 17 at ¶ 10. An almost year-long closure, which is the lower limit of Defendants' estimate, is a significant alteration in the public use pattern of the Paseo. Further, as Defendants concluded in the 2023 Plan, prematurely removing feeding stations would "increase the impacts on park resources", thus triggering yet another factor requiring publication. NPS_973–74; SAJU_322–23. And, there can be no doubt that the closure decision was of a highly controversial nature given the litigation over the 2023 Plan.

Third, Plaintiffs challenge to the closure decision is that it violates the 2023 Plan and NPS' binding commitments for managing the community cats made in the 2023 Plan. That Plaintiffs have pointed out that NPS' decision also violates the *Federal Register* publication requirements of 36 C.F.R. § 1.5(b) simply goes back to Plaintiffs overarching challenge to the Paseo Closure decision. Yet because the Paseo Closure violates the plain requirements NPS promulgated in the 2023 Plan for maintaining the feeding stations, the Paseo Closure cannot stand regardless of whether it is in compliance with 36 C.F.R. §§ 1.5 and 1.7. Thus, Defendants' incorrect protestations that Plaintiffs have added an additional claim about the inadequate and post-hoc

19

Closure ROD in their motion for summary judgment are irrelevant.

**III.     Defendants Violated NEPA in Failing to Supplement the 2018 CE Determination.**

Refusing to acknowledge that the 2023 Plan created binding requirements to prevent adverse impacts on Park resources, NPS also argues that it did not ignore any extraordinary circumstances requiring environmental analysis in the 2018 CE Determination for the Cliff Project, either at the time it was published or when NPS finally decided to move forward with the Cliff Project over seven years later.   However, because the 2023 Plan did lay out binding requirements that NPS found were necessary to avoid impacts on Park resources, NPS at a minimum violated NEPA when it failed to reassess or update the 2018 CE Determination when it moved forward with the Cliff Project.[9]

**A.     Defendants were required to reassess the 2018 CE Determination.**

Defendants incorrectly assert that they were not under a duty to supplement the 2018 CE Determination, and that under "rule of reason" set out in *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017), NPS' "reliance on the [2018] CE [Determination] for the Cliff Project, and its determination therein that no extraordinary circumstances applied was reasonable, and not arbitrary and capricious."  ECF No. 60-1 at 48.

First, Defendants' attempt to distinguish the periodic NEPA review requirements of their own NEPA Handbook falls short.  The Handbook in multiple places directs NPS to reassess or reevaluate prior NEPA determinations, including when "implementation [of a project] was delayed because of unavailability of funds or other reasons" (NPS NEPA Handbook (2015), at Section

---

[9] Plaintiffs continue to assert their argument that Defendants ignored extraordinary circumstances when promulgating the 2018 CE Determination, but do not repeat it here.  *See* ECF No. 58-1 at 38-54.

2.2)[10] and for ongoing and reoccurring actions for which a CE has been prepared (*id.* at Section 3.6). Defendants attempt to distinguish these provisions by arguing that they are not applicable to the type of CE determination at issue here also miss the mark. For example, Defendants are incorrect that Section 2.2 only applies to situations where an EA or FONSI were created. Section 2.2 contains no such limitation and refers to "NEPA review" that was previously completed. Similarly, Section 3.6 of the NEPA Handbook does not define "ongoing" actions as solely actions involving "routine maintenance and repair of non-historic structures" as Defendants claim. ECF No. 60-1 at 45. Instead, "routine maintenance and repair of non-historic structures" are just *some examples* of projects of an ongoing or recurring nature. NPS NEPA Handbook (2015), at Section 3.6. Given that NPS admits it has engaged in multiple repairs of the fortification walls over the years, including as recently as the 1990s, it is reasonable to classify the current Cliff Project as an ongoing action. *See* NPS_321 (discussing 1990 repairs to the fortification walls).

Second, even though the above cited provisions from the NEPA Handbook are not binding, they inform this Court's "rule of reason" analysis under *Mayo*. Supplementing *any* NEPA document is evaluated through the rule of reason, which requires an agency to provide a contemporaneous and reasoned explanation for its decision regarding supplementation. *Friends of Animals v. U.S. BLM*, 548 F.Supp.3d 39, 61 (D.D.C. 2021) ("Courts must apply a 'rule of reason' when evaluating agency decisions not to supplement a NEPA document."). Given NPS' own guidance materials strongly indicating that a refreshed NEPA analysis is required, at a minimum, after a seven-year gap in a project, the "rule of reason" here dictates that NPS was required to at least consider reopening the 2018 CE Determination. NPS failed to do so here.

---

[10] Available at: https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.pdf (last visited May 26, 2026).

Defendants admit that they did not reassess or supplement the 2018 CE Determination when it initiated the Cliff Project seven years later. ECF No. 60-1 at 48. Failing to even consider updating a seven-year-old CE determination was not reasonable, and alone is enough for the Court to find that Defendants' decision to move forward with the Cliff Project was unlawful.

### B. Extraordinary circumstances existed in 2025 when Defendants moved forward with the Cliff Project.

Defendants admit that their 2018 CE Determination (and their decision not to reassess or supplement the 2018 CE Determination) is governed under an arbitrary and capricious standard. ECF No. 60-1 at 40. Defendants also agree that in this Circuit, "where there is substantial evidence in the record that an extraordinary circumstance might apply, an agency may act arbitrarily and capriciously by failing to explain its determination that a categorical exclusion is applicable." *Reed v. Salazar*, 744 F.Supp.2d 98, 116 (D.D.C. 2010); ECF No. 60-1 at 41-42. Finally, Defendants also admit that the "rule of reason" governs the Court's review of NPS' decision not to supplement the 2018 CE Determination. ECF No. 60-1 at 48 (citing *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017)).

There is no dispute that the administrative record in this challenge "contains MOUs between NPS and SAG, as well as the 2023 Plan decision documents." ECF No. 60-1 at 43. Thus, NPS' own conclusions in the 2023 Plan are dispositive as to whether extraordinary circumstances existed when NPS decided to move forward with the Cliff Project in 2025.

NPS itself admits that "Park Service guidance makes clear that an extraordinary circumstance might occur where a proposed project would contribute to the continued existence or spread of an invasive species known to occur in the area." ECF No. 60-1 at 37 (emphasis in original) (citing NPS_332).[11] As NPS explicitly stated in the 2023 Plan, prematurely removing

---

[11] Plaintiffs continue to dispute that the community cats are an invasive species at the Paseo.

the feeding stations prior to the removal of the community cats in the vicinity of those feeding stations "could cause the cats to disperse around the park or possibly other parts of Old San Juan", and could "increase the impacts on park resources" and wildlife. NPS_973, SAJU_322. Despite these admissions, Defendants claim that the extraordinary circumstance regarding the spread of invasive species is not implicated by NPS' actions implementing the Cliff Project and de facto removing feeding stations at the Park, incorrectly claiming that Plaintiffs have only asserted a "*detrimental impact* on an *invasive species*". ECF No. 60-1 at 44 (emphasis in original).

Defendants' argument both misconstrues Plaintiffs' arguments and NPS' own 2023 Plan. While Plaintiffs have *also* asserted that the removal of feeding stations is harmful to the community cats themselves, they have also pointed to Defendants' direct admissions in the 2023 Plan that the removal of the feeding stations could have unanticipated dispersal effects, and even cause additional free-ranging cats to enter the Paseo. *See* ECF No. 57 at ¶ 160 (describing the "Vacuum Effect" a scientific phenomenon whereby new cats move in to take advantage of the resources that sustained prior cats who were removed from a given area, and then reproduce back to capacity or even greater.). Defendants also asserted there would likely be impacts on park resources in the 2023 Plan if feeding stations were removed, including "increase[d] the impacts on park resources." NPS_973; SAJU_322.

Further, Defendants do not even address Plaintiffs' evidence that the Cliff Project implicated extraordinary circumstances involving (1) cultural resources and (2) a violation of a federal, state, local or tribal law or requirement imposed for the protection of the environment. ECF No. 58-1 at 48 (citing NPS_332; NPS NEPA Handbook (2015), at Section 3.5(b), (i)). *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (If a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the

23

unaddressed arguments as conceded (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries,* 284 F.Supp.2d 15, 25 (D.D.C. 2003)).

As such, the 2023 Plan, and related materials NPS considered in the development of the 2023 Plan, including numerous public comments, contained substantial evidence that extraordinary circumstances would be implicated by the Cliff Project, and NPS' actions were arbitrary and capricious in failing to reassess or supplement the 2018 CE Determination in 2025.

## IV.    Vacatur is the Appropriate Remedy.

Defendants' request for remand without vacatur should be rejected because "the seriousness of [NPS'] deficiencies" and "the disruptive consequences" of vacatur do not weigh in NPS' favor. *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (quoting *International Union UMW v. FMSHA*, 920 F.2d 960, 966–67 (D.C. Cir. 1990)).

As to the seriousness of NPS' deficiencies, NPS chose to directly violate the recently promulgated 2023 Plan, despite having seven years since its initial creation of the 2018 CE Determination in which to properly provide notice (and a plan) to allow Plaintiffs to continue to maintain the feeding stations at the Paseo.  Further, NPS ignored its own guidance policies and the rule of reason for updating environmental determinations, proceeding with the Cliff Project under the stale 2018 CE Determination.  NPS' deficiencies counsel in favor of vacatur.

As to any disruptive consequences, they are entirely of NPS' own making, and in any event could be quickly remedied even upon vacatur.  Defendants claim that the consequences of "vacatur" would be severe, citing to the fact that the Cliff Project (which was rushed forward with little notice to Plaintiffs, despite the seven-year hiatus) has been under construction for four months.  However, that construction has come at direct, ongoing harm to Plaintiffs and to the community cats of the Paseo.  Regardless, there is no interest in the perpetuation of unlawful

24

agency action, and if this Court finds that NPS' actions violate the 2023 Plan, or that Defendants' 2018 CE Determination is invalid, the correct way to proceed is to vacate NPS actions in violation of the 2023 Plan and the 2018 CE Determination. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (In the context of issuing a stay and weighing equities and public benefits, this Circuit has held that "[t]here is generally no public interest in the perpetuation of unlawful agency action."); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 594 U.S. 758, 766 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.").

Further, the "severe" effects that Defendants claim will occur in the event of vacatur are not, and were never, required outcomes. Defendants could have made plans to ensure compliance with the 2023 Plan prior to engaging in the Paseo Closure, and properly assessed extraordinary circumstances prior to moving forward with the Paseo Closure in 2025. Defendants' refusal to do so, however, is a problem of their own creation.

## CONCLUSION

For the reasons set forth herein, the Court should grant Plaintiffs' motion for summary judgment.

25

Respectfully submitted this 26th day of May 2026.

/s/ Paul M. Seby
Paul M. Seby (DC Bar No. CO000129)
Matthew K. Tieslau (DC Bar No. CO00130)
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500 telephone
(303) 572-6540 facsimile


*Attorneys for Plaintiffs Alley Cat Allies
Incorporated and Save-A-Gato, Inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May 2026, a true and correct copy of the foregoing document has been filed and served upon all counsel using the Court's E-filing system.


*s/ Paul M. Seby*
Paul M. Seby

27